UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------ x

**ESTATE OF EITAM HENKIN, ESTATE OF NAAMA HENKIN, I.Z.H.**, a minor, by his guardians ad litem YOAV ARMONI and DAVID JACKSON, **M.H.H.**, a minor, by his guardians ad litem YOAV ARMONI and DAVID JACKSON, **N.E.H.**, a minor, by his guardians ad litem YOAV ARMONI and DAVID JACKSON, and **N.Y.H.**, a minor, by his guardians ad litem YOAV ARMONI and DAVID JACKSON

Plaintiffs,

-v-

KUVEYT TÜRK KATILIM BANKASI A.Ş.,

Defendant.

------------------------------------------------------ x

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 19-cv-05394-BMC

**DEFENDANT KUVEYT TÜRK KATILIM BANKASI A.Ş.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12**

Oral Argument Requested

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

PARTIES .................................................................................................................. 2

    A.    Plaintiffs ..................................................................................................... 2

    B.    Kuveyt Türk ................................................................................................ 2

ALLEGATIONS ....................................................................................................... 3

STANDARDS OF REVIEW ..................................................................................... 5

ARGUMENT ............................................................................................................ 6

    I.     PLAINTIFFS DO NOT PLEAD FACTS SUFFICIENT TO STATE A
           CLAIM FOR AIDING AND ABETTING UNDER THE ATA .......................... 6

         A.    Plaintiffs Fail to Allege That Kuveyt Türk Was Generally Aware It
              Was Assuming a Role in Terrorist Activities ............................................ 7

         B.    Plaintiffs Fail to Allege That Kuveyt Türk Knowingly and
              Substantially Assisted the Attack on the Henkin Family ........................ 15

         C.    Plaintiffs Fail to Allege That Kuveyt Türk's Banking Services
              Directly Assisted the Persons Who Caused Plaintiffs' Injuries ............... 19

    II.    NON-U.S. PERSONS CANNOT BRING ATA CLAIMS FOR THEIR
           OWN INJURIES .......................................................................................... 23

    III. THIS COURT LACKS PERSONAL JURISDICTION ......................................... 26

         A.    Background .............................................................................................. 26

         B.    Argument ................................................................................................ 28

CONCLUSION ......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*,
821 F.3d 352 (2d Cir. 2016)................................................................................24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................5

*Biton v. Palestinian Interim Self-Government Authority*,
310 F. Supp. 2d 172 (D.D.C. 2004) ...................................................................26

*Brill v. Chevron Corp.*,
2018 WL 3861659 (N.D. Cal. Aug. 14, 2018) ...................................................15

*Chew v. Dietrich*,
143 F.3d 24 (2d Cir. 1998)..................................................................................29

*Copeland v. Twitter Inc.*,
352 F. Supp. 3d 965 (N.D. Cal. 2018) ................................................................19

*Crosby v. Twitter, Inc.*,
921 F.3d 617 (6th Cir. 2019) ..............................................................................20

*Daimler AG v. Bauman*,
571 U.S. 117 (2014).............................................................................................28

*Goldberg v. UBS AG*,
660 F. Supp. 2d 410 (E.D.N.Y. 2009) ..........................................................21, 22

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ...................................................................... passim

*Honickman v. BLOM Bank SAL*,
2020 WL 224552 (E.D.N.Y. Jan. 14, 2020) ......................................10, 11, 16, 17

*In re Terrorist Attacks on Sept. 11, 2001*,
295 F. Supp. 3d 416 (S.D.N.Y. 2018)...............................................................5, 6

*Kaplan v. Lebanese Canadian Bank SAL*,
405 F. Supp. 3d 525 (S.D.N.Y. 2019).......................................................10, 11, 12

*Kemper v. Deutsche Bank AG*,
911 F.3d 383 (7th Cir. 2018) ....................................................................15, 16, 19

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  673 F.3d 50 (2d Cir. 2012) ................................................................30

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013) ..............................................................29

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018) ........................................................ passim

*Miller v. Arab Bank, PLC*,
  372 F. Supp. 3d 33 (E.D.N.Y. 2019) ...............................16, 17, 19, 20

*National Council of Resistance of Iran v. Department of State*,
  373 F.3d 152 (D.C. Cir. 2004) ...........................................................21

*O'Sullivan v. Deutsche Bank AG*,
  2019 WL 1409446 (E.D.N.Y. Mar. 28, 2019) .....................................7

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
  609 F.3d 30 (2d Cir. 2010) .................................................................28

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013) ...................................................................5

*Shaffer v. Deutsche Bank AG*,
  2017 WL 8786497 (S.D. Ill. Dec. 7, 2017) ..................................19, 20

*Siegel v. HSBC Bank USA, N.A.*,
  2018 WL 3611967 (S.D.N.Y. July 27, 2018) ..................................... passim

*Strauss v. Crédit Lyonnais, S.A.*,
  2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ..................................21, 22

*Strauss v. Crédit Lyonnais S.A.*,
  379 F. Supp. 3d 148 (E.D.N.Y. 2019) .................................................7

*Taamneh v. Twitter, Inc.*,
  343 F. Supp. 3d 904 (N.D. Cal. 2018) .................................15, 16, 17

*Weiss v. Nat'l Westminster Bank PLC*,
  381 F. Supp. 3d 223 (E.D.N.Y. 2019) ............................................7, 14

*Weiss v. Nat'l Westminster Bank*,
  453 F. Supp. 2d 609 (E.D.N.Y. 2006) ...........................................25, 26

**STATUTES**

18 U.S.C. § 2331(3) ................................................................................................19

18 U.S.C. § 2333(a) ......................................................................................6, 24, 25

18 U.S.C. § 2333(d) ......................................................................................... passim

Antiterrorism Act of 1990, S. 2465, 101st Cong. § 2(a) (1990) ...................................24

Federal Courts Administration Act of 1992, Pub. L. No. 102 572, Title X,
    § 1003(a)(4), 106 Stat 4506, 4522 (1922).............................................................25

130 Stat. 852, 852 § 2(a)(5) (2016)..............................................................................6

**RULES**

Fed. R. Civ. Pro. 12..........................................................................................27, 28

Fed. R. Civ. Pro. 12(b)(2) ...........................................................................5, 27, 28

Fed. R. Civ. Pro. 12(b)(6) ................................................................................1, 5

Fed. R. Civ. Pro. 12(g) .......................................................................................27

Fed. R. Civ. Pro. 12(h) .......................................................................................27

**OTHER AUTHORITIES**

136 Cong. Rec. 26,716 (1990)................................................................................25

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
    (3d ed. Aug. 2019 update)..................................................................................27

Defendant Kuveyt Türk Katilim Bankasi A.Ş. ("Kuveyt Türk" or "Bank") respectfully submits this memorandum of law in support of its motion to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12.

## INTRODUCTION

The killing of Eitam and Naama Henkin in the West Bank was tragic and horrific. Kuveyt Türk condemns the attack and all similar acts of violence. Plaintiffs deserve justice. But seeking to hold Kuveyt Türk liable unfortunately misses that mark because Kuveyt Türk is not responsible for the Henkins' tragedy. Kuveyt Türk, based in Turkey, is a responsible member of the international banking system. The Bank provides financial services to more than 5.6 million customers across 430 branches throughout Turkey.

Plaintiffs do not allege primary liability against the Bank or claim that the Bank conspired with Hamas, which Plaintiffs assert is responsible for the attack. Instead, Plaintiffs allege that Kuveyt Türk aided and abetted the attack by providing ordinary financial services to three customers—two entities and one individual—alleged to have had ties to Hamas. None of those three customers ever has been sanctioned by the United States. Nor has the United States ever prohibited those three customers from lawfully making use of the U.S. banking system.

To establish liability under the Anti-Terrorism Act ("ATA"), Plaintiffs must show, amongst other things, that the Bank was both generally aware that it was assuming a role in the perpetrators' violent acts and that the Bank's financial services knowingly and substantially assisted the attack. Plaintiffs allege neither. Plaintiffs' only allegation regarding Kuveyt Türk's general awareness is that two newspaper articles noted that one of the three bank customers (Islamic University of Gaza) had ties to Hamas. Complaint, ECF No. 1 ("Compl.") ¶¶ 181, 185. Such allegations are wholly insufficient to show that Kuveyt Türk was generally aware that it was

assuming a role in the perpetrators' violent acts.  Plaintiffs do not allege that Bank officials ever read those two articles, much less that the Bank developed a general awareness that it had assumed a role in perpetrating terrorism.

Plaintiffs also fail to plead that the Bank's financial services substantially assisted the attack.  Plaintiffs do not allege that any funds that passed through Kuveyt Türk were used to perpetrate the attack on the Henkins.  In fact, Plaintiffs do not even allege that the funds that passed through the Bank were even received by Hamas or were used to assist the attack in any way.

Finally, even if Plaintiffs had pled a legally sufficient ATA claim, only one of the five Plaintiffs can bring an ATA claim.  Under the ATA, only injuries to a U.S. national are compensable.  Neither Mrs. Henkin nor the four Henkin children are U.S. nationals, and thus those Plaintiffs (including Mrs. Henkin's estate) cannot recover for their own injuries.

## **PARTIES**

### A.  Plaintiffs

Plaintiffs are the Estates of Eitam and Naama Henkin, and the four minor children of Mr. and Mrs. Henkin, I.Z.H, M.H.H., N.E.H., and N.Y.H. (collectively, the "Henkin children"). Compl. ¶¶ 7-13.  Mr. and Mrs. Henkin were killed by armed gunmen allegedly affiliated with Hamas in an October 1, 2015 attack (the "Attack") while they were driving with the Henkin children in the West Bank.  *Id*. ¶¶ 20-30.  Mr. Henkin was allegedly a U.S. national.  *Id*. ¶ 7. Mrs. Henkin was not a U.S. national, and neither are any of the Henkin children.  *Id*. ¶¶ 8-13. Plaintiffs bring claims for their respective alleged injuries arising from the Attack.  *Id*. ¶¶ 7-13.

### B.  Kuveyt Türk

Kuveyt Türk is the eleventh largest bank in Turkey by asset size and has nearly 6,500 employees.  It is a prominent Turkish bank that provides retail and corporate banking services to

approximately 5.6 million customers across 430 branches and fifteen regional offices. Kuveyt Türk was founded in Turkey over thirty years ago and continues to operate primarily in Turkey. Its only alleged connection to the United States is via correspondent bank accounts[1] at U.S. financial institutions. Compl. ¶ 5. It has been awarded the Best Islamic Finance Institution Award by Global Finance and the Ethical Responsibility Award by the Turkish Ethical Values Center.

As Plaintiffs acknowledge, Kuveyt Türk observes "Know Your Customer" and sanctions compliance procedures, including filtering transactions through the U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC"), the Dow Jones watch lists, and the European Union lists of blacklisted persons and entities. *Id.* ¶¶ 17-18. In an effort to avoid doing any business with bad actors, Kuveyt Türk regularly screens its customers against these international watch lists. Plaintiffs do not allege that Kuveyt Türk has provided financial services to any individual or entity that is, or was, included on any of the above lists of sanctioned persons. *Id.* ¶¶ 173-195.

## ALLEGATIONS

Plaintiffs allege that the attack on the Henkin family was perpetrated by three gunmen who were Hamas operatives. Compl. ¶¶ 20-30. The Complaint does not assert that any of the gunmen were customers of Kuveyt Türk, or that they received any funds transferred through the Bank. *Id.* ¶¶ 6, 173-178, 189-195. Nor does the Complaint allege that Hamas was a Kuveyt Türk customer, or that Kuveyt Türk otherwise provided financial services to Hamas. *Id.* Instead, Plaintiffs allege that Kuveyt Türk provided financial services in Turkey to three customers allegedly affiliated with Hamas: two organizations—the Foundation for Human Rights and

---

[1] A correspondent account is an account established by a financial institution to receive deposits from, make payments on behalf of, or process other financial transactions for another financial institution.

Freedoms and Humanitarian Relief ("IHH") and the Islamic University of Gaza—and one individual—Jihad Yaghmour ("Yaghmour").  *Id.* ¶¶ 173-178, 189-195.

IHH appears to be a charitable organization that provides humanitarian relief across the globe.  According to the Complaint, Kuveyt Türk maintained several accounts, including a Eurodollar account, for IHH, which IHH used to transfer funds through correspondent bank accounts in the United States.  *Id.* ¶ 174.  Plaintiffs allege that IHH is a part of Hamas's fundraising network—in particular, a member of the "Union of Good," which is alleged to be the umbrella organization for Hamas's global fundraising activity.  *Id.* ¶¶ 111, 134, 141-142.  But Plaintiffs do not allege any facts indicating that Kuveyt Türk knew of any alleged ties between IHH and Hamas. *Cf. id.* ¶¶ 179-188.

The Islamic University of Gaza ("University" or "IUG") is an academic institution in the Gaza Strip that provides undergraduate and graduate degrees.  As alleged in the Complaint, Kuveyt Türk maintained at least one bank account and provided financial services to the University, including hundreds of thousands of Eurodollar transfers through an account at the Bank.  *Id.* ¶¶ 177-178.  Plaintiffs allege that the University has close ties to Hamas and serves as a principal source for Hamas recruitment.  *Id.* ¶¶ 153-172.  As with IHH, the Complaint alleges no facts that establish that Kuveyt Türk was aware of the alleged relationship between the University and Hamas.  Plaintiffs allege only that two stories in Turkish media outlets reported links between the University and Hamas.  *Id.* ¶¶ 181, 185.  However, Plaintiffs do not allege that anyone from Kuveyt Türk read or was otherwise aware of those two stories.  *Cf. id.*

Jihad Yaghmour is an individual living in Turkey.  *Id.* ¶¶ 125-126.  Kuveyt Türk allegedly provided financial services to, and maintained at least one bank account for, Yaghmour.  *Id.* ¶ 176.  Plaintiffs claim that Yaghmour is an active Hamas official who serves as Hamas's liaison with

Turkish authorities. *Id.* ¶¶ 125-126, 176. Plaintiffs, however, allege no facts indicating that Kuveyt Türk knew of the alleged connection between Yaghmour and Hamas. *Cf. id.* ¶¶ 179-188.

On the basis of these allegations, Plaintiffs assert that Kuveyt Türk "provided substantial assistance to HAMAS," "was generally aware of its role in supporting HAMAS's conduct and terrorist activities," and thereby "knowingly aided and abetted HAMAS within the meaning of 18 U.S.C. § 2333(d)." *Id.* ¶¶ 191-195. For the reasons set forth below, those conclusory assertions are not supported by the facts alleged.

## STANDARDS OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556).

The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "In addressing the sufficiency of a complaint, [the court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the court is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

To survive a motion to dismiss for lack of personal jurisdiction under Federal Rule 12(b)(2), "the plaintiff has the burden of making a prima facie showing that personal jurisdiction over the defendant exists." *In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 3d 416, 424 (S.D.N.Y. 2018), *rev'd on other grounds*, 779 F. App'x 66 (2d Cir. 2019). "[T]he court is neither

required to draw argumentative inferences in the plaintiff's favor, nor must it accept as true a legal

conclusion couched as a  factual allegation." *Id.* (internal quotation marks and citations omitted).

## ARGUMENT

### I.   PLAINTIFFS DO NOT PLEAD FACTS SUFFICIENT TO STATE A CLAIM FOR AIDING AND ABETTING UNDER THE ATA.

The federal Anti-Terrorism Act ("ATA") creates a cause of action for United States

nationals who are "injured in [their] person, property, or business by reason of an act of

international terrorism."  18 U.S.C. § 2333(a).  The Complaint asserts a single cause of action

against Kuveyt Türk for aiding-and-abetting liability under the ATA, as amended by the Justice

Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2).  Compl. ¶¶ 189-195.

Prior to the enactment of JASTA in 2016, there was no secondary liability under the ATA.

By its terms, JASTA extends ATA liability to "any person who aids and abets, by

knowingly providing substantial assistance [to], or who conspires with the person who

committed[,] such an act of international terrorism," where the person who committed the terrorist

act was a then-designated Foreign Terrorist Organization ("FTO").  18 U.S.C. § 2333(d)(2).

In assessing the sufficiency of aiding-and-abetting allegations under JASTA, Congress

directed that "[t]he decision of the United States Court of Appeals for the District of Columbia in

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), … provides the proper legal framework for

how [aiding-and-abetting] liability should function."  JASTA, § 2(a)(5), 130 Stat. 852, 852 (2016).

*See also Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018).  In *Halberstam*, the D.C.

Circuit held that aiding-and-abetting liability includes three elements: (1) "the defendant must be

generally aware of his role as part of an overall illegal or tortious activity at the time that he

provides the assistance"; (2) "the defendant must knowingly and substantially assist the principal

violation"; and (3) "the party whom the defendant aids must perform a wrongful act that causes an

injury."  705 F.2d at 477.  Plaintiffs fail to allege facts satisfying any of these elements of their

ATA secondary liability claim.

> **A.  Plaintiffs Fail to Allege That Kuveyt Türk Was Generally Aware It Was Assuming a Role in Terrorist Activities.**

Plaintiffs fail to allege that Kuveyt Türk had any knowledge that it played any role in

terrorist activities by allegedly providing banking services to the three customers at issue.

Aiding-and-abetting liability "requires the secondary actor to be aware that, by assisting

the principal [Hamas], it is itself assuming a role in terrorist activities."  *Linde v. Arab Bank, PLC*,

882 F.3d 314, 329 (2d Cir. 2018) (internal quotation marks and citation omitted).  Although "[s]uch

awareness may not require proof of … specific intent" or knowledge "of the specific attacks at

issue," it does require that "the bank was 'generally aware' that[, by providing financial services

to a client,] it was thereby playing a 'role' in [the] violent or life-endangering activities."  *Id.*

(citation omitted).

As a result, satisfying the "general-awareness" element under the ATA "requires more than

the provision of material support to a designated terrorist organization."  *Id.* at 329.  *See also*

*Strauss v. Crédit Lyonnais S.A.*, 379 F. Supp. 3d 148, 164 (E.D.N.Y. 2019) ("Evidence that

[d]efendant knowingly provided banking services to a terrorist organization, without more, is

insufficient to satisfy JASTA's scienter requirement."); *Weiss v. Nat'l Westminster Bank PLC*, 381

F. Supp. 3d 223, 239 (E.D.N.Y. 2019) ("Evidence that Defendant knowingly provided banking

services to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter

requirement."); *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *10 (E.D.N.Y. Mar. 28,

2019) ("Allegations regarding Iran's status as a state sponsor of terrorism, as well as allegations

regarding the purpose of U.S. sanctions are, on their own, insufficient to allege plausibly that

Defendants were 'generally aware' that they had taken a 'role' in the attacks that killed or injured Plaintiffs." (citation omitted)).

Here, the Complaint fails to allege any facts from which the Court can plausibly infer that Kuveyt Türk was "generally aware" that it was playing a "role" in any FTO's violent or life-endangering activities when it provided arm's-length, routine commercial banking services to its customers. Plaintiffs allege that Kuveyt Türk "knowingly maintained bank accounts for, and provided financial services to" IHH, Jihad Yaghmour, and the Islamic University of Gaza. Compl. ¶ 173.

But Plaintiffs fail to allege that Kuveyt Türk *knew* that these customers were connected to Hamas, much less Hamas alter egos or assisters of Hamas violence. With respect to IHH and the University, nothing on the face of those organizations put Kuveyt Türk on notice regarding their alleged connections to Hamas or terrorism generally. IHH appears to be a Turkish NGO that provides humanitarian relief in areas of war, earthquake, hunger, and conflicts. The University appears to be a Palestinian institution of higher education.

Plaintiffs limit their allegations regarding Kuveyt Türk's knowledge to just nine paragraphs. *Id.* ¶¶ 179-188. None of the allegations in the Complaint provide any factual allegations that the Bank knew that IHH or Yaghmour had any connection to Hamas.[2] And, regarding the Islamic University of Gaza, Plaintiffs' factual allegations to establish the Bank's awareness is limited to the notation that *six media reports* were published.

Three of those articles are plainly irrelevant to the Bank's awareness because *they say nothing* about any of the three Bank customers. Instead, those articles simply relate to Hamas

---

[2] Plaintiffs do allege that IHH was "an active participant and member of the Union of Good," "the preeminent Muslim Brotherhood fundraising mechanism in the world." Compl. ¶¶ 113, 116. But Plaintiffs do not explain how Kuveyt Türk had any knowledge about such an alleged connection.

generally.  First, Plaintiffs point to a July 23, 2010, article "in the on-line Turkish news site T24 [that] restated the long-documented origins of HAMAS, its founding and key institutions in the Gaza Strip."  *Id.* ¶ 182.  Second, Plaintiffs note that "Turkish media reported the 2014 conference in Turkey at which HAMAS's senior leader in Turkey, Saleh al-Arouri, publicly stated that HAMAS was responsible for the … kidnapping and murder of three Israeli teenagers in the summer of 2014."  *Id.* ¶ 183.  Finally, Plaintiffs cite a March 2, 2014, article in *Cumhuriyet*, "the oldest up-market Turkish daily newspaper … that discussed Arouri's alleged support from the Turkish government and his role in supporting terrorism against Israel."  *Id.* ¶ 184.  None of these three articles could have put the Bank on notice of the alleged connection between its customers and Hamas because they ***do not even mention*** any of the three customers.

The remaining three articles cited by Plaintiffs, published over a nine-year period, relate only to the Islamic University of Gaza, with two of those articles noting a link between the University and Hamas:

- A 2007 article in "the high circulation Turkish daily newspaper, *Hurriyet*," that "reported on a Fatah Force 17 raid on the IUG that allegedly uncovered a weapons cache."  *Id.* ¶ 180.

- A December 29, 2008, article published "in the on-line Turkish news site *Haberler*," that described "the Islamic University … as 'a cultural symbol of Hamas.'"  *Id.* ¶ 181.

- A September 2015 report in "the Turkish media" that indicated that "the U.S. Department of the Treasury had designated Abu Ubaydah Khayri Hafiz al-Agha (i.e., Al Agha Jr.), head of the IUG supervisory board, as a senior HAMAS fundraiser."  *Id.* ¶ 185.

Plaintiffs, however, do not allege that any Bank official read any of these articles.  The publication of those articles thus does not show that the Bank had any knowledge of the alleged ties between the three customers and Hamas.  As a result, Plaintiffs wholly fail to allege any facts

that Kuveyt Türk was generally aware that it was banking for someone with alleged connections to Hamas, much less that it was generally aware that it was playing a role in violent terrorism.

Courts in this Circuit have repeatedly found allegations of the existence of news reports insufficient to meet the "general awareness" element for aiding and abetting. For example, in *Kaplan v. Lebanese Canadian Bank SAL*, the court dismissed the aiding-and-abetting claims against the Lebanese Canadian Bank ("LCB") under the "general awareness" element because, among other reasons, "Plaintiffs nowhere allege[d] … that [LCB] read or was aware of such sources." 405 F. Supp. 3d 525, 535 (S.D.N.Y. 2019). Similarly, in *Honickman v. BLOM Bank SAL*, the court found that plaintiffs did not plausibly allege that BLOM Bank was generally aware of any connection between its customers and Hamas despite plaintiffs' citation to press articles, government actions, and "public knowledge," because plaintiffs failed to plausibly allege "that BLOM or any of its employees actually knew or should have known of any of the cited sources, or that BLOM would otherwise have a reason to review or consider those sources in the course of its operations." 2020 WL 224552, at *8 (E.D.N.Y. Jan. 14, 2020). Plaintiffs' allegations here are directly analogous and are likewise insufficient to state a claim for aiding and abetting under the ATA.

By contrast, in *Linde v. Arab Bank*, the plaintiffs made a number of allegations regarding Arab Bank's knowledge of its connection to Hamas's violent activities. Among other allegations, the *Linde* plaintiffs alleged that "Arab Bank actively participates in a formalized process which requires the families of so-called martyrs to obtain an official certification of their deceased relative's status as a bona fide martyr, replete with an individualized identification number." First Am. Compl. ¶ 311, *Linde v. Arab Bank*, No. CV 04 2779, 2004 WL 3546133 (E.D.N.Y. July 2, 2004), ECF No. 4. Plaintiffs further alleged that Arab Bank "is provided relatively detailed lists

consisting of the names of the martyrs, personal information and details concerning the date and manner of death and other information provided to it by the Saudi Committee and representatives of the leading terrorist groups via their charitable front organizations." *Id.* ¶ 312.  Moreover, "Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS, finalizes the lists, maintains a database of persons eligible under this universal coverage plan, and opens a dollar account for each beneficiary." *Id.* ¶ 313.  Nothing in the Complaint against Kuveyt Türk indicates that the Bank was aware of any such, or indeed any, connection to Hamas, much less to violent terrorist activities.

Importantly, the Complaint contains no allegations that any of the three individuals that actually perpetrated the Attack[3] were customers of Kuveyt Türk or that Kuveyt Türk transferred any funds to them.  Nor does it assert that any of the three named Kuveyt Türk customers were designated as FTOs,[4] provided funds to the perpetrators of the Attack, or played any role in planning, facilitating, orchestrating, or committing the attack on the Henkins.  For that matter, the Complaint does not even allege that Hamas provided funds to the perpetrators of the Attack or played any role in planning, facilitating, orchestrating, or committing the Attack.

*Kaplan v. Lebanese Canadian Bank SAL* is instructive.  In *Kaplan*, plaintiffs alleged that LCB "intentionally and/or recklessly provided [to Hizbollah] extensive banking services" that "caused, enabled and facilitated" the rocket attacks that caused their injuries.  405 F. Supp. 3d at

---

[3] Plaintiffs allege that three assailants—Karam Lutfi Fathi Razek, Ihya Muhammed Naif Abdallah Haj Hamed, and Samir Kusa (known as "Abu Zuhair")—carried out the attack on the Henkin family.  *See* Compl. ¶ 20.

[4] Although Plaintiffs repeatedly allege that Israel has designated IHH an unlawful organization, *see* Compl. ¶¶ 134, 142, 147, 151, Plaintiffs do not allege that Kuveyt Türk was aware of that designation.  *See Honickman*, 2020 WL 224552, at *3 n.5 (disregarding plaintiffs' allegations that Israel designated an entity from whom the bank processed a transfer because plaintiffs did "not allege that BLOM maintain[ed] an office in … Israel or knew or would otherwise have any reason to know of these developments"); *see also id.* at *5 n.6 (same).

529.  To satisfy the general awareness element, the plaintiffs alleged that "[LCB] knew or should have known that providing such banking services would result in Plaintiffs' injuries. … Plaintiffs allege that [LCB] had such knowledge because Hizbollah's affiliation with Shahid, Bayt-al-Mal, and Yousser was 'notorious public knowledge,' as evidenced by various news articles, reports, and Hizbollah's own media sources."  *Id.*  The plaintiffs further alleged that in 2011, the U.S. Department of the Treasury designated LCB a primary money laundering concern, and the U.S. government alleged that LCB "was involved in a money laundering scheme with links to Hizbollah."  *Id.* at 536.

The *Kaplan* court held that these allegations were insufficient to state a claim for aiding and abetting under the ATA.  The court explained that plaintiffs failed to "offer any non-conclusory allegations that [LCB] was aware that, by providing financial services to the Five Customers, it was playing a role in" acts of international terrorism.  *Id.* at 535.  The court emphasized that "none of the Five Customers were designated by the United States—prior to the rocket attacks [at issue]—as having an affiliation with Hizbollah."  *Id.*  Moreover, despite allegations that the account holders were "openly, publicly and repeatedly acknowledged" as integral constituent parts of Hizbollah, "[p]laintiffs nowhere allege[d], however, that Defendant read or was aware of such sources."  *Id.*

*Kaplan* follows the Second Circuit's decision in *Siegel v. HSBC North America Holdings, Inc.*, which is equally illustrative here.  In *Siegel*, the Second Circuit affirmed dismissal of a case against HSBC brought by victims (or representatives of the victims) of suicide bombings committed by Al Qaeda in Iraq ("AQI") for aiding and abetting the attacks by providing banking services to Al Rajhi Bank ("ARB").  933 F.3d 217 (2d Cir. 2019).  The *Siegel* plaintiffs alleged that "*The Wall Street Journal* reported that the government of Saudi Arabia was monitoring ARB

accounts for links to terrorist organizations"; in 2003, the CIA "referred to ARB as a 'conduit for terrorist transactions'"; and a 2012 report issued by the U.S. Senate Permanent Subcommittee on Investigations—that *explicitly mentioned HSBC* and its business with ARB—stated that "[a]fter the 9/11 terrorist attack in 2001, evidence began to emerge that [ARB] and some of its owners had links to financing organizations associated with terrorism, including evidence that the bank's key founder was an early financial benefactor of al Qaeda." *Id.* at 220 (citations omitted). The plaintiffs further alleged that in 2002, "the [HSBC Bank USA, N.A. ("HBUS")] officer in charge of Commercial and Institutional Banking stated in an email to a colleague that … compliance officers within the company were concerned 'that [ARB]'s account may have been used by terrorists[.]'" *Id.* (citation omitted). Plaintiffs also alleged that HSBC "flout[ed] … U.S. sanctions laws and regulations" when it "provided [ARB] with a wide range of banking services." *Id.* at 221 (quotation marks and citations omitted) (alterations in original). These prohibited transactions "made it possible for [ARB] and other prohibited financial institutions to transfer … hundreds of millions of dollars in U.S. currency through the U.S. in a manner designed to … circumvent monitoring by U.S. regulators" and "provided [ARB] with the means … [to] transfer millions of U.S. dollars to" al-Qaeda in Iraq. *Id.* (citations omitted) (alterations in original).

Despite these allegations, the Second Circuit ruled that the plaintiffs failed to establish that HSBC "knowingly assumed a role in AQI's terrorist activities or substantially assisted AQI in those activities." *Id.* at 225-26. The court explained that "the plaintiffs … failed to allege that HSBC was aware that by providing banking services to ARB, it was supporting AQI, much less assuming a role in AQI's violent activities." *Id.* at 224. In so holding, the court highlighted allegations that "themselves suggest that in providing banking services to ARB, HSBC had little reason to suspect that it was assuming a role in AQI's terrorist activities," such as the fact that

ARB had "vast operations" and billions in assets, but observed that the plaintiffs did not allege that "most, or even many, of ARB's banking activities are linked to terrorists." *Id.* at 224-25.

Like *Siegel* and *Kaplan*, Plaintiffs' Complaint is devoid of any factual allegations from which this Court can properly infer that Kuveyt Türk was "generally aware" that it was "assuming a 'role' in terrorist activities" generally or, more specifically, the Attack that injured Plaintiffs when it provided arm's-length financial services to the three customers at issue. *Linde*, 882 F.3d at 329. If anything, the allegations here are less egregious than the allegations found insufficient in *Siegel* and *Kaplan*—*i.e.*, there are no allegations that Kuveyt Türk violated any sanctions aimed at stemming support for terrorism and there are no allegations that any of the Bank's customers were or have ever been designated by the United States.

Finally, even if the Complaint plausibly alleged that Kuveyt Türk knowingly provided banking services to Hamas or its affiliates (which it does not), such allegations would still be insufficient. As the Second Circuit held in *Linde*, "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist organization." 882 F.3d at 329. Indeed, it requires that the defendant be "generally aware" that it was "playing a role" in the attack that injured Plaintiffs. Where the defendant is a bank, the plaintiff must allege "that 'the bank was generally aware that[, by providing financial services to a client,] it was thereby playing a 'role' in [the] violent or life-endangering activities.'" *Siegel*, 933 F.3d at 224 (quoting *Linde*, 882 F.3d at 329) (alterations in original). The Complaint makes no such plausible allegations here. *See, e.g.*, *Weiss*, 381 F. Supp. 3d at 239 ("Plaintiffs present no evidence that creates a jury question as to whether Defendant generally was aware that it played a role in any of Hamas's or even Interpal's or the Union of Good's violent or life-endangering activities. Evidence that Defendant knowingly provided banking services to a terrorist

organization, without more, is insufficient to satisfy JASTA's scienter requirement."); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018) (affirming dismissal of ATA conspiracy claim against bank defendant that violated U.S. sanctions for failing plausibly to allege that the bank "'reach[ed] an agreement with the *specific intent* that' the conspiratorial goal be completed" (citation omitted) (emphasis in original)); *Brill v. Chevron Corp.*, 2018 WL 3861659, at *3 (N.D. Cal. Aug. 14, 2018) ("At most, the amended complaint alleges that Chevron should have known that it was contributing to terrorism and chose to ignore the possible consequences.  That is in effect an allegation of recklessness, but [Section 2333(d)] requires more." (internal citations omitted)).

### B.   Plaintiffs Fail to Allege That Kuveyt Türk Knowingly and Substantially Assisted the Attack on the Henkin Family.

The Complaint also fails to allege sufficient facts that Kuveyt Türk provided "knowing and substantial assistance" to the "person[s] who committed" the Attack.  With respect to the "substantial assistance" element, courts consider six factors: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance."  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam v. Welch*, 705 F.2d 472, 483-84 (D.C. Cir. 1983)).  For assistance to be considered "substantial" it must have played a "major part in prompting the tort" or been "integral" to the tort. *Halberstam*, 705 F.2d at 483-85.  *Accord Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 918 (N.D. Cal. 2018) (finding dispositive absence of allegations that defendants' services "played a major or integral part in ISIS's terrorist attacks").  This element "focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct."  *Linde*, 882 F.3d at 331.  Plaintiffs have not satisfied this standard.

First, "plaintiffs … have not plausibly alleged that [Kuveyt Türk] encouraged" the Attack, or, for that matter, any terrorist activity to which Plaintiffs might seek to tie to Hamas. *Siegel*, 933 F.3d at 225. *See also Honickman*, 2020 WL 224552, at *11 ("Plaintiffs' harm arises from violent acts conducted by Hamas, but Plaintiffs have not plausibly alleged that BLOM encouraged the attacks which injured Plaintiffs or knowingly provided any funds to Hamas for its violent activities."). Indeed, "[r]ather than providing targeted financial support," Kuveyt Türk is alleged to have "provided routine services generally available to members of the public." *Taamneh*, 343 F. Supp. 3d at 918. *Cf. Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 47-48 (E.D.N.Y. 2019) (Cogan, J.) (denying motion to dismiss where defendant provided banking services "in an unusual way under unusual circumstances" (quoting *Halberstam*, 705 F.2d at 487)). Accordingly, there are no facts that support a reasonable inference that Kuveyt Türk was "one in spirit" with the terrorists responsible for the Attack or Hamas when it provided financial services. *Halberstam*, 705 F.2d at 484. *See also Kemper*, 911 F.3d at 395 (dismissing the ATA claims and finding that "[n]one of the allegations suggest[ed] that [the defendant bank] cared how its … customers obtained or spent the funds that it processed").

Second, with respect to amount of assistance, Plaintiffs have not plausibly alleged that Kuveyt Türk provided any assistance that helped anyone carry out the Attack or that played any meaningful role in the Attack. Indeed, Plaintiffs do not even allege that Hamas received any of the funds that allegedly passed through accounts at the Bank. *Honickman*, 2020 WL 224552, at *11. And Plaintiffs do not allege that Hamas used *any* funds (received from the three Kuveyt Türk customers or otherwise) in support of the Attack.

Third, regarding presence at the time of the tort, Plaintiffs have not alleged that Kuveyt Türk (headquartered in Turkey with no presence or operations in Israel or the Palestinian

territories) was present at the Attack. *Id.* (rejecting the premise that the provision of banking services during the relevant period is sufficient for a defendant bank to be considered "present" during the attacks).

Fourth, with respect to relationship to the principal, Plaintiffs do not allege that Kuveyt Türk had any relationship with Hamas itself or the individual terrorists Plaintiffs claim were responsible for the Attack. Rather, the Complaint alleges that Kuveyt Türk provided banking services to individuals and entities alleged to have some connection to Hamas. In other words, there is no "real dispute that the relationship between [Kuveyt Türk] and [the alleged Hamas-affiliated entities and individual] is an arms'-length one—a market relationship at best." *Taamneh*, 343 F. Supp. 3d at 918. *Cf. Miller*, 372 F. Supp. 3d at 47 (Cogan, J.) ("For years, Arab Bank provided banking services—including, but not limited to, administering the Insurance Scheme—that assisted their terrorist campaign under circumstances indicating that Arab Bank had a culpable state of mind …. Arab Bank also maintained accounts for Hamas, its affiliates, and other terrorist organizations, which … further demonstrates its close relationship with the perpetrators."). Moreover, there are no allegations that any of the three customers, much less Kuveyt Türk, held a position of authority over the individuals who perpetrated the Attack or were part of a concerted activity to assist them. *See Halberstam*, 705 F.2d at 484.

Fifth, as to state of mind, Plaintiffs have not plausibly alleged that Kuveyt Türk knowingly assumed a role in Hamas's terrorist activities. As explained in detail above, Plaintiffs cite a smattering of articles, two of which suggest that one customer may have had a relationship with Hamas. But "Plaintiffs' citation to allegedly public knowledge, without any plausible allegations tying the cited public knowledge to [Kuveyt Türk], is not sufficient to show that [Kuveyt Türk] had a culpable state of mind." *Honickman*, 2020 WL 224552, at *12.

Finally, regarding duration of assistance, although Plaintiffs allege that the duration of Kuveyt Türk's banking services to its customers spanned "years," Compl. ¶ 178, so too did HSBC's relationship in *Siegel*.  Yet the Second Circuit still concluded in that case that HSBC did not provide substantial assistance.  *See Siegel*, 933 F.3d at 225-26.  In any event, the banking services allegedly provided to the three Kuveyt Türk customers here are far less extensive than the services alleged to have been provided in *Siegel*.  *Compare* Compl. ¶ 178 (alleging Kuveyt Türk transferred at least hundreds of thousands of dollars), *with Siegel*, 933 F.3d at 221 (alleging that HSBC provided ARB with the means to transfer millions of dollars to AQI).

Indeed, the facts of *Siegel* are instructive.  As discussed above, the *Siegel* plaintiffs alleged that HSBC violated U.S. sanctions by facilitating transactions with ARB, which was widely reported to be involved in financing terrorist activity, and that HSBC knew of those terrorist links. The plaintiffs further alleged that HSBC transferred hundreds of millions in U.S. currency to ARB, which enabled ARB to transfer millions of dollars to AQI.  Applying *Halberstam*, the Second Circuit found the allegations insufficient to plead the "substantial assistance" element because plaintiffs failed to "advance any non-conclusory allegation[s]" that "HSBC encouraged the [attack at issue] or provided any funds to AQI."  *Siegel*, 933 F.3d at 225.  The court explained (1) the allegations that HSBC "provided hundreds of millions of dollars to ARB" were insufficient without allegations "that AQI received any of those funds or that HSBC knew or intended that AQI would receive the funds"; (2) HSBC was not "present" at the time of the attack; (3) the plaintiffs did not plead any non-conclusory allegations that HSBC had a relationship with AQI, knowingly assumed a role in AQI's terrorist activities, or otherwise knowingly or intentionally supported AQI; and (4) although HSBC provided banking services to ARB for twenty-five years, the complaint did not suggest assistance to terrorism for that period of time.  *Id.*  The court held

that, at most, these allegations established that "HSBC helped ARB violate banking regulations despite knowing that ARB supported terrorist organizations," which is insufficient to state a claim under the ATA. *Id. See also Copeland v. Twitter Inc.*, 352 F. Supp. 3d 965, 976 (N.D. Cal. 2018) ("There are numerous failures to allege facts sufficient to support an allegation of substantial assistance: there is no evidence that defendants encouraged terrorist attacks, had advance knowledge of any attacks (much less that they were present), intended ISIS to carry out the attacks, or otherwise manifested a culpable state of mind."). For these same reasons, the allegations here are inadequate.

### C. Plaintiffs Fail to Allege That Kuveyt Türk's Banking Services Directly Assisted the Persons Who Caused Plaintiffs' Injuries.

Under the ATA, a defendant is liable for aiding and abetting only if it aided and abetted the individual or entity who committed the relevant act of international terrorism. 18 U.S.C. §§ 2331(3) (defining person), 2333(d)(2) (limiting liability to cases where a plaintiff's injury arises from an act of international terrorism that is "committed, planned, or authorized" by an entity designated as an FTO as of the date of the attack). *See also Miller*, 372 F. Supp. 3d at 48 (Cogan, J.) ("a defendant may be liable under the ATA for aiding the organization behind the attacks [or] the individual 'triggerman' or suicide bomber"); *Shaffer v. Deutsche Bank AG*, 2017 WL 8786497, at *1 n.1 (S.D. Ill. Dec. 7, 2017) ("JASTA added conspiracy liability for parties who conspire with a Foreign Terrorist Organization (FTO). … If Congress intended to include similar liability for conspiracy with [a State Sponsor of Terrorism], it would have included a provision in the amendment doing so."), *aff'd sub nom. Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018). Indeed, *Halberstam* requires that "the party whom the defendant aids must perform a wrongful act that causes an injury," 705 F.2d at 477, because aiding-and-abetting liability is concerned with the relationship between the alleged aider and abettor and the principal violator,

not the alleged aider and abettor and other alleged aiders and abettors.[5] *Siegel v. HSBC Bank USA, N.A.*, 2018 WL 3611967, at *4 (S.D.N.Y. July 27, 2018) (dismissing the aiding-and-abetting claims because plaintiffs "d[id] not allege any direct relationship with the terrorist organizations that were responsible for the … [a]ttack," among other reasons), *aff'd on other grounds*, 933 F.3d 217 (2d Cir. 2019); *Crosby v. Twitter, Inc.*, 921 F.3d 617, 626-27 (6th Cir. 2019) (rejecting aiding-and-abetting liability because plaintiffs did "not allege that Defendants directly helped [the shooter]"); *Shaffer*, 2017 WL 8786497, at *1 n.1 (holding that conspiracy claims failed under JASTA because plaintiffs "allege a conspiracy with Iran, a State Sponsor of Terrorism (SST), not with an FTO"). This requirement makes good sense—requiring that the assistance be provided to an FTO ensures that an innocent actor is not held secondarily liable for the acts of an unknown terrorist.

Plaintiffs' allegations fail to establish a relationship between the Bank and the persons who caused Plaintiffs' injuries. Indeed, Plaintiffs do not allege that Kuveyt Türk's three customers were responsible for the Attack. As such, nothing in the Complaint can be construed as showing that the Bank aided and abetted—or even knew of—any one of the actual perpetrators. *Cf. Miller*, 372 F. Supp. 3d at 48 (Cogan, J.) (finding the complaint adequately alleged that Arab Bank assisted the actors who caused plaintiff's injuries by alleging "that Arab Bank provided financial services to four individuals who directly participated in the attacks").

In an attempt to remedy this deficiency, at the Pre-Motion Conference, Plaintiffs argued that the Complaint alleges that the University "is not a fundraiser for Hamas but it's an alter ego."

---

[5] The Second Circuit did not decide this issue in *Siegel*. 933 F.3d at 223 (discussing the parties' disagreement regarding the scope of JASTA liability and stating, "[w]e need not here decide whether JASTA's reach is as limited as HSBC suggests").

Hr'g Tr. 19:16-18 (Dec. 18, 2019).  But the Complaint does not allege that the University, IHH, or Yaghmour were alter egos of Hamas.

To determine whether an entity is an alter ego of an FTO or under an FTO's control, courts in this district have adopted the holding in *National Council of Resistance of Iran v. Department of State*, 373 F.3d 152 (D.C. Cir. 2004).[6]  In that case, the D.C. Circuit addressed the question of when an entity is considered an "alias" of a FTO for purposes of the statute granting the Secretary of State power to designate FTOs.  That court held that:

> [O]rdinary principles of agency law are fairly encompassed by the alias concept ….  When one entity so dominates and controls another that they must be considered principal and agent, it is appropriate … to look past their separate juridical identities and to treat them as aliases.

*Id.* at 157-58.  Accordingly, "[f]actors to be considered include whether the organizations share leadership, whether they commingle finances, publications, offices, etc., and whether one operates as a division of the other."  *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 433 (E.D.N.Y. 2009) (citations omitted).

With respect to IHH, Plaintiffs allege that IHH "was an active participant and member of the Union of Good," Compl. ¶ 113, which is "the umbrella organization for Hamas's global fundraising activity" and a designated SDGT.  *Id.* ¶¶ 111, 118.  With respect to Yaghmour, Plaintiffs allege that he was one of 11 Palestinian prisoners freed as part of an exchange for Israeli Soldier Giliad Shalit, having been imprisoned for participating in the 1994 abduction and subsequent murder of an Israeli soldier.  *Id.* ¶¶ 125-126.  Plaintiffs further assert that Yaghmour "is HAMAS's liaison with Turkish authorities."  *Id.* ¶ 126.  But Plaintiffs' allegations do not provide any facts from which this Court could conclude that Hamas has an agent-principal

---

[6] *See Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 432 (E.D.N.Y. 2009); *Strauss v. Crédit Lyonnais, S.A.*, 2006 WL 2862704, at *10 (E.D.N.Y. Oct. 5, 2006).

relationship with either IHH or Yaghmour.  Plaintiffs do not allege that either IHH or Yaghmour are controlled by Hamas or have as their purpose the support of Hamas.  Plaintiffs' belated alter ego assertion therefore has no merit.

Plaintiffs also fail to allege facts showing that the Islamic University of Gaza was an alter ego of Hamas.  Plaintiffs have alleged some overlap between Hamas officials and the University's leadership at some point in time, *id.* ¶¶ 160-164, 168-172, and that the Qassam Brigade has used the University's facilities for meetings and to store weapons, *id.* ¶ 159.  These allegations, however, do not demonstrate the requisite control, and pale in comparison to the allegations that courts have found sufficient.  For example, in *Strauss v. Crédit Lyonnais*, the court found the entities to which Crédit Lyonnais was alleged to provide financial services to be alter egos of Hamas where the plaintiffs alleged that the entities were "*controlled by HAMAS* agents and collect and distribute their funds *on behalf* of HAMAS by paying expenses for and assisting with the provision of housing subsid[i]es to the families of suicide bombers recruited by HAMAS." *Strauss*, 2006 WL 2862704, at \*3, \*10-11 (emphasis added).  By contrast, here there are no allegations that the University is controlled by Hamas or acts solely to further the goals of Hamas— nor would such an allegation appear to be plausible given that the University is a degree-granting institute of higher education that was founded before Hamas existed.  *Cf. Goldberg*, 660 F. Supp. 2d at 433 (finding that plaintiffs plausibly alleged that the bank's customer was an alter ego of Hamas where the complaint alleged that the customer was "the primary fundraiser for Hamas in Switzerland"; the customer "collect[ed] large amounts of money … and transfer[red] that money to sub-organizations of Hamas"; the customer "provide[d] financial support for Hamas"; "OFAC issued a 'Blocking Notice' freezing all of [the customer's] funds, accounts, and real property because of its association with Hamas"; the customer "transferred funds to organizations belonging

to Hamas's financial infrastructure"; "the Board of Directors of [the customer's] umbrella organization … include[d] three senior Hamas figures"; and "the Chairman of [the customer] made wire transfers to a well-known Hamas front").

Finally, the Complaint does not include any non-conclusory allegations tending to show that Hamas committed, planned, or authorized the Attack. Plaintiffs allege that three supposed "Hamas operatives" perpetrated the Attack and "admitted … that Hamas had committed the Attack." Compl. ¶¶ 20, 30. They further allege that "Hamas leaders and at least one of its official websites *praised* the attack." *Id.* ¶ 29 (emphasis added). But Plaintiffs do not allege facts tending to show that Hamas played a role in the Attack, let alone that Hamas committed, planned, or authorized the Attack. For example, there is no allegation that Hamas endorsed or approved of the Attack before it occurred, assisted with the logistics, purchased the weapons used in the Attack (or even contributed any funds), or claimed responsibility for the Attack. Without more then, the associational link and praise is not sufficient to support the inference that Hamas "committed, planned, or authorized" the Attack. Accordingly, even if the three Kuveyt Türk customers are the alter egos of Hamas (which they are not), Plaintiffs have still not alleged that Kuveyt Türk aided and abetted the individuals that committed the wrongful act that caused their injuries.

## II.   NON-U.S. PERSONS CANNOT BRING ATA CLAIMS FOR THEIR OWN INJURIES.

Even if the Complaint did not fail to state a claim under the ATA for the reasons above, the claims of Ms. Henkin and the Henkin children must nevertheless be dismissed because the ATA does not provide a cause of action for non-U.S. nationals to recover for their own injuries.[7]

---

[7] At the hearing on December 18, 2019, this Court raised the issue of dismissal of the claims brought by Plaintiffs the Estate of Mrs. Henkin and the Henkin children. Counsel for the Parties met and conferred on this issue. Plaintiffs stated that they have decided not to dismiss the claims of the Estate of Mrs. Henkin and the Henkin children.

The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor." 18 U.S.C. 2333(a). As the text makes plain, recovery under the ATA is limited to injuries to a national of the United States.

Mrs. Henkin was not a national of United States. Compl. ¶ 8. As a result, her estate cannot recover for her injuries. Likewise, the four Henkin children are not U.S. nationals. *Id.* ¶ 9. Thus, they also cannot recover for their own injuries.[8]

The Complaint, however, does allege that Mr. Henkin is a "national of the United States injured in his ... person, property, or business." *Id.* ¶ 7. As a result, Mr. Henkin or his "estate, survivors, or heirs, may sue therefore." That is, under current case law, the Estate of Eitam Henkin—which is a plaintiff and presumably the person now possessing the lawful right to pursue the claims of Mr. Henkin—may sue for the injuries to Mr. Henkin.

This interpretation is consistent with the legislative history of the ATA. As initially proposed, the ATA created a cause of action for only a "national of the United States injured in his person, property, or business." *See* Antiterrorism Act of 1990, S. 2465, 101st Cong. § 2(a) (1990). The problem thus arose: if the U.S. national dies, who could sue in his or her stead? During committee consideration of the draft legislation, the Department of Justice suggested revising the language to add reference to U.S. nationals' estates, survivors, or heirs, and the

---

[8] Failures to fall within the classes of plaintiffs permitted to recover under statutes has resulted in dismissals—sometimes for lack of standing and other times for failure to state a claim. "The Supreme Court has recently clarified ... that what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.'" *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)). Regardless of whether the ATA issue here is characterized as one of standing or one of failure to state a claim, the result should be the same: the claims brought by the Estate of Mrs. Henkin and the children must be dismissed.

discussion surrounding that proposal made clear that the intention was to clarify those parties'

rights to bring suit on behalf of deceased U.S. nationals:

> Senator THURMOND.  Mr. Valentine, you suggest expanding the definition of "U.S. national" to include the estate of the decedents, survivors, and heirs.  It is my understanding that implicit within the right to sue contained in Senate bill 2465 was the ability of family members to bring a lawsuit on behalf of a slain or injured relative.  Do we need to expand the definition in order to make certain the ability of family members to file a lawsuit on behalf of a slain or injured relative?
> …
> Mr. GREEN [Department of Justice].  We believe it would be beneficial.  It would make clear that which is already implied in the bill.  It would remove any doubt that anyone would have as to whether or not they could bring the litigation.
>
> Senator THURMOND.  Are you going to suggest such an amendment and get it to the committee?
>
> Mr. GREEN.  We have discussed this with the committee beforehand and we would be glad to provide language.

Antiterrorism Act of 1990, Hearing Before the Subcomm. on Courts and Administrative Practice

of the Comm. on the Judiciary of the United States Senate, 101st Cong. 46 (July 25, 1990)

(statement of Sen. Strom Thurmond).  The draft ATA language was then amended to add the

phrase "or his or her estate, survivors, or heirs."  Federal Courts Administration Act of 1992, Pub.

L. No. 102 572, Title X, § 1003(a)(4), 106 Stat 4506, 4522 (1922); 136 Cong. Rec. 26,716 (1990)

(Amendment No. 2921).  That purpose is further reinforced by the ATA's use of the disjunctive

"or" when providing that suits may be brought by a U.S. national's "estate, survivors, or heirs."

18 U.S.C. 2333(a).  That language indicates that only one of those classes—the estate, the

survivors, or heirs—may bring suit on a deceased U.S. national's behalf.  That is reasonable: only

one representative of a deceased U.S. national is necessary to bring suit on behalf of that decedent;

suits by multiple representatives would be superfluous.[9]

---

[9] Counsel for Kuveyt Türk is aware of no authority within the Second Circuit analyzing this issue.  In *Weiss v. National Westminster Bank*, 453 F. Supp. 2d 609, 620 (E.D.N.Y. 2006), the court permitted the claims of non-U.S. national heirs and survivors to proceed but without

- 25 -

During the December 18, 2019, Initial Status Conference, Plaintiffs' counsel asserted that the U.S. District Court for the District of Columbia's opinion in *Biton v. Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172 (D.D.C. 2004), held that non-U.S. national heirs or survivors could bring solatium claims on their own behalf. Hr'g Tr. 15:19-16:2 (Dec. 18, 2019). That is incorrect. The facts in *Biton* were precisely the opposite of here: the deceased victim of terrorism was not a U.S. national, but his surviving wife was. *Biton*, 310 F. Supp. 2d at 175, 181. *Biton* held only that the surviving wife—as a U.S. national—could sue for her own injuries (not for those of the non-U.S. national husband). The court held that Ms. Biton's claims for "emotional distress, a loss of consortium, and a loss of solatium constitute injuries in Ms. Biton's 'person, property, or business'" caused by the relevant act of international terrorism. *Id*. at 181-82 (quoting 18 U.S.C. 2333(a)). Nothing in *Biton*, however, suggests that non-U.S. nationals could recover under the ATA for their own injuries.

Because Naama Henkin was not a U.S. national and none of the Henkin children are U.S. nationals, their claims must be dismissed. *Id*.

## III. THIS COURT LACKS PERSONAL JURISDICTION.

### A. Background

As noted at the Pre-Motion Conference, Plaintiffs also fail to allege facts indicating that this Court has personal jurisdiction over Kuveyt Türk. We have carefully considered the Court's expression that the issue of personal jurisdiction may be best resolved after discovery. Hr'g Tr. 11:9-12:13, 18:18-22 (Dec. 18, 2019). The Court further suggested that Kuveyt Türk may wish to

---

analyzing this issue. All that was at issue in that context was whether those plaintiffs' claims must be dismissed because the complaint failed to specifically allege that they were "heirs" or "survivors." *Id*.

postpone presenting its arguments on the jurisdictional issue until after discovery has taken place and focus its brief on its other arguments in favor of dismissal. *Id*. 18:20-19:10.

After considering the Court's suggestions carefully, Kuveyt Türk is concerned that if it failed to raise personal jurisdiction in this Rule 12 motion, a court (on appeal or otherwise) could find that the Bank waived its personal jurisdiction defense. This concern arises out of the language of Federal Rule of Civil Procedure 12. Rule 12(b)(2) permits a party to seek dismissal of a complaint at the outset of litigation for lack of personal jurisdiction. Rule 12(g)(2) then requires that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Rule 12(h) then provides that "[a] party waives [any] defense listed in Rule 12(b)(2)-(5) by: (A) omitting it from a motion in the circumstances described in Rule 12(g)(2)." *See also* Fed. R. Civ. P. 12(g) advisory committee's note to 1966 amendment.

Taken together, these provisions could be read to find a waiver of the personal jurisdiction defense if not raised in a Rule 12 motion when such a motion is made. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1391 (3d ed. Aug. 2019 update) ("[i]f one or more of these [Rule 12] defenses are omitted from the initial motion but were 'then available' to the movant, they are permanently lost"). Thus, to ensure that it does not waive its personal jurisdiction defense, Kuveyt Türk briefly sets forth below its argument in support of its personal jurisdiction defense—with the hope that the Court will understand the need to do so to avoid any potential argument about waiver in the future.

Although Kuveyt Türk believes this case should be dismissed prior to any discovery for the reasons set forth throughout this brief, Kuveyt Türk does not believe that it makes sense to have personal jurisdictional discovery separate from and in advance of merits discovery if the

Court is unwilling to dismiss this case prior to discovery.  If the Court holds that dismissal is unwarranted after considering the allegations in the Complaint, Kuveyt Türk suggests that its personal jurisdiction defense should be reconsidered by the Court with all other applicable arguments at the time a summary judgment motion is filed.[10]

### B.  Argument

Plaintiffs do not appear to contend that this Court has general personal jurisdiction over Kuveyt Türk.  Nor could it, as the United States is not Kuveyt Türk's "place of incorporation [or] principal place of business," nor are its "affiliations with the [United States] … so 'continuous and systematic' as to render [it] essentially at home" in the United States.  *Daimler AG v. Bauman*, 571 U.S. 117, 137-39 (2014) (citation omitted).  Instead, Plaintiffs assert that this Court has specific personal jurisdiction over Kuveyt Türk "because it has transacted business and committed tortious acts within the United States (and New York) by transferring funds through the United States (and New York) for the benefit of the FTO HAMAS."  Compl. ¶ 4.  *See also id.* ¶¶ 6, 174-178.

Such allegations are insufficient to establish specific jurisdiction.[11]  Plaintiffs do not allege that any funds transferred through those correspondent accounts were actually received by Hamas,

---

[10] Counsel for the Parties met and conferred regarding the handling of Kuveyt Türk's personal jurisdiction defense.  Plaintiffs stated that they were willing to stipulate that the Bank's personal jurisdiction defense would not be waived if the Bank decided not to raise the issue in its Rule 12 motion, as suggested by the Court at the pre-motion conference; the Bank explained in turn that it believed that it needed to raise the issue preliminarily in its Rule 12 motion to avoid the possibility of a subsequent court finding a waiver of the defense.  The Parties agreed and respectfully submit that this Court should first consider the Bank's arguments regarding failure to state a claim, and agreed that any discovery on personal jurisdiction should proceed simultaneously with any discovery on the merits in the event that this Court holds both that the case should not be dismissed for failure to state a claim and that it cannot rule on Defendant's Rule 12(b)(2) motion until discovery on that issue has taken place.

[11] Plaintiffs have the burden to allege facts sufficient to establish personal jurisdiction over the Bank, or their Complaint is subject to dismissal.  *See, e.g.*, *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists …. Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." (internal quotation marks and citations omitted)).

much less by the individuals that perpetrated the Attack.  *Id.* ¶¶ 173-178.  Moreover, Plaintiffs have not alleged that any of the funds likely transferred through United States were connected to the Attack in any way.  Plaintiffs have thus failed to allege any causal relationship between the alleged dollar transfers and the acts giving rise to their claims.

That failure is fatal to Plaintiffs' claims.  To establish personal jurisdiction over Kuveyt Türk, Plaintiffs "must show that [their] claim arises out of or relates to [the Bank's] contacts with [the United States]."  *Chew v. Dietrich*, 143 F.3d 24, 28 (2d Cir. 1998) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).  Under established Second Circuit law, whether a claim arises out of or relates to a defendant's contacts with the forum depends upon the extent of the causal link between the alleged contacts and the plaintiff's injuries.  *Id*. at 29.  Courts must evaluate that link along a continuum, such that "[w]here the defendant has had only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts."  *Id*.

Here, Plaintiffs have failed to establish ***any*** link between their injuries and the Bank's alleged contacts with the forum.  Plaintiffs allege that the Court has jurisdiction over the Bank based on some unspecified number of Eurodollar transfers processed by the Bank on behalf of the three customers that may have passed through correspondent accounts in the United States.  Compl. ¶¶ 4, 6, 174-178.  But Plaintiffs have failed to allege that Defendant itself directed any such transfers through the United States.  Plaintiffs also fail to allege a volume of transfers sufficient to give rise to personal jurisdiction in the United States.  *Id.* ¶¶ 174-178.  *Cf. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) ("[T]he plaintiffs allege wire transfers through [defendant] that numbered in the dozens and totaled several million dollars[.]").  Critically, Plaintiffs have not alleged any facts that show that their injuries have any

causal link with the alleged transfers processed through U.S. correspondent accounts.  Compl. ¶¶ 20-30, 173-195.  *Cf. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 55 (2d Cir. 2012) ("According to the plaintiffs, in carrying out these transactions, LCB acted with the knowledge that they were for the purpose of facilitating Hizballah's ability to carry out acts of terrorism, such as the rocket attacks at issue here.").  The Court therefore lacks specific personal jurisdiction over the Bank with respect to Plaintiffs' claims.

## CONCLUSION

For the reasons set forth above, Defendant respectfully requests that this Court dismiss the Plaintiffs' claims.

Dated:          February 13, 2020                    Respectfully submitted,

**JONES DAY**

By: /S/ Steven T. Cottreau

Steven T. Cottreau (NY Bar 475857)
51 Louisiana Avenue, N.W.
Washington, D.C.  20001.2113

Fahad A. Habib (*pro hac vice*)
Paul Hines (*pro hac vice*)
Emily F. Knox (*pro hac vice*)
555 California Street, Suite 2600
San Francisco, CA 94104.1500

*Attorneys for Defendant*
*KUVEYT TÜRK KATILIM BANKASI A.Ş.*