UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **ESTATE OF EITAM HENKIN,** | : | |
| **ESTATE OF NAAMA HENKIN,** | : | No. 19-cv-05394-BMC |
| **I.Z.H.**, a minor, by his guardians ad litem | : | |
| YOAV ARMONI and DAVID JACKSON, | : | |
| **M.H.H.**, a minor, by his guardians ad litem | : | |
| YOAV ARMONI and DAVID JACKSON, | : | |
| **N.E.H.**, a minor, by his guardians ad litem | : | |
| YOAV ARMONI and DAVID JACKSON, and | : | |
| **N.Y.H.**, a minor, by his guardians ad litem | : | |
| YOAV ARMONI and DAVID JACKSON, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| -against- | : | |
| | : | |
| KUVEYT TÜRK KATILIM BANKASI A.Ş., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................1

STATEMENTS OF FACTS...............................................................................................4

    A.   HAMAS Is A Prominent Foreign Terror Organization
          That Relies On A Terror Financing Network, Including Various "Charities." ................. 4

    B.   HAMAS Terrorists Attacked The Henkins, Killing Eitam and Naama............................ 6

    C.   Kuveyt Türk Knowingly Provides Banking Services To
          HAMAS Institutions And Leaders........................................................................... 7

PLEADING STANDARDS.................................................................................................9

ARGUMENT..................................................................................................................10

I.    Plaintiffs Have Plausibly Alleged That Kuveyt Türk Is Liable Under the ATA,
      As Modified By JASTA, For Aiding-And-Abetting HAMAS. ...................................... 10

    A.   JASTA Provides The "Broadest Possible Basis" For Aiding-And-Abetting Liability..... 10

    B.   The Complaint Plausibly Alleges That Kuveyt Türk's Customers Are
          Alter-Egos Or Agents Of HAMAS, Which Committed The Attack. ............................. 13

        1.    HAMAS committed the Attack. .................................................................. 13

        2.    Kuveyt Türk's customers—IUG, IHH, and Yaghmour—
             are alter egos or agents of HAMAS. ......................................................... 13

        3.    Kuveyt Türk cannot escape liability by asserting that it did not aid and abet the
             specific terrorists who directly participated in the Attack........................................ 16

    C.   The Complaint Plausibly Alleges That Kuveyt Türk Was
          Generally Aware Of Its Role In HAMAS's Terrorist Activities. ................................. 17

        1.    The Complaint satisfies the governing Halberstam standard. ................................. 18

        2.    The Court should reject Kuveyt Türk's suggestion that Plaintiffs must allege that
             funds from Kuveyt Türk financed the Attack. .......................................................... 24

        3.    The Court should reject Kuveyt Türk's attempt
             to apply the incorrect *mens rea* standard.................................................................. 25

    D.   The Complaint Plausibly Alleges That Kuveyt Türk
          Provided Substantial Assistance To HAMAS. ....................................................... 27

II.   The ATA Provides Mrs. Henkin's Estate And Her Children's Guardians
      With Standing To Bring Their Own Solatium Claims. ............................................... 30

III. This Court Has Personal Jurisdiction Over Kuveyt Türk For Plaintiffs' Claim.......... 32

CONCLUSION ...............................................................................................................35

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                          **Page(s)**

*Ashcroft v. Iqbal*,
   556 U.S. 662, 678 (2009)................................................................................................9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................................9, 10

*Boim v. Holy Land Found. for Relief & Dev.*,
   549 F.3d 685 (7th Cir. 2008) ........................................................................... 28

*Chew v. Dietrich*,
   143 F.3d 24 (2d Cir. 1998) ............................................................................... 35

*Crosby v. Twitter, Inc.*,
   921 F.3d 617 (6th Cir. 2019) ........................................................................... 17

*DiStefano v. Carozzi North America, Inc.*,
   286 F.3d 81, 84 (2d Cir. 2001)......................................................................10

*Duncan v. Walker*,
   533 U.S. 167, 174 (2001)...............................................................................31

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*,
   304 F. Supp. 2d 232 (D.R.I. 2004) ..........................................................31, 32

*Gill v. Arab Bank, Pub. Ltd. Co.*,
   893 F. Supp. 2d 474 (E.D.N.Y. 2012) ............................................................24

*Gill v. Arab Bank, Pub. Ltd. Co.*,
   893 F. Supp. 2d 542 (E.D.N.Y. 2012) ............................................................13,

*Goldberg v. UBS AG*,
   660 F. Supp. 2d 410 (E.D.N.Y. 2009) .......................................................... 16, 24

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ..................................................................... *passim*

*Hayden v. Paterson*,
   594 F.3d 150 (2d Cir. 2010) ........................................................................... 10

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ........................................................................................... 22

*Honickman v. Blom Bank SAL*,
   No. 19-cv-00008(KAM)(SMG), 2020 WL 224552 (E.D.N.Y. Jan. 14, 2020) ............... 26, 27

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)........................................................................19

*Kaplan v. Lebanese Canadian Bank, SAL*,
  405 F. Supp. 3d 525 (S.D.N.Y. 2019) ................................................................. 26

*Knox v. Palestine Lib. Org.*,
  442 F. Supp. 2d 62 (S.D.N.Y. 2006) ................................................................... 32

*Knox v. Palestine Lib. Org.*,
  248 F.R.D. 420 (S.D.N.Y. 2008) ......................................................................... 31

*Lelchook v. Commerzbank AG*,
  No. 10 Civ. 5795 (AKH), 2011 WL 4087448 (S.D.N.Y. Aug. 1, 2011) ......................... 22, 32

*Lelchook v. Islamic Republic of Iran*,
  393 F. Supp. 3d 261 (E.D.N.Y. 2019) ............................................................. 19, 24

*Licci ex rel. Licci v. Lebanese Canadian Bank*,
  732 F.3d 161 (2d Cir. 2013) ....................................................... 3, 33, 34, 35

*Linde v. Arab Bank, PLC.*,
  97 F. Supp. 3d 287 (E.D.N.Y. 2015),
  *vacated on other grounds*, 882 F.3d 314 (2d Cir. 2018) ................................... 21, 24

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018) ............................................................. *passim*

*Linde v. Arab Bank,Pub. Ltd. Co.*,
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) .................................................................. 31

*Manos v. Green Bay*,
  372 F. Supp. 40 (E.D. Wis. 1974) ....................................................................... 32

*Miller v. Arab Bank, Pub. Ltd. Co.*,
  372 F. Supp. 3d 33 (E.D.N.Y. 2019) .................................................... *passim*

*O'Sullivan v. Deutsche Bank AG*,
  No. 17 CV 8709-LTS-GWG, 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ...................... 22

*Palin v. N.Y. Times Co.*,
  940 F.3d 804 (2d Cir. 2019) ................................................................................. 9

*Shaffer v. Deutsche Bank AG*,
  No. 16-CR-497-MJR-SCW, 2017 WL 8786497 (S.D. Ill. Dec. 7, 2017) ........................ 17

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019) ..................................................... 2, 23, 26, 30

*Siegel v. HSBC Bank USA, N.A.*,
  No. 17CV6593 (DLC), 2018 WL 3611967, (S.D.N.Y. July 27, 2018),
  *aff'd sub nom.*, *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019) .......17, 23

*Strauss v. Credit Lyonnais, S.A.,*
  No. CV-06-0702 (CPS), 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ............................ 15, 16

*Strauss v. Crédit Lyonnais, S.A.,*
  379 F. Supp. 3d 148 (E.D.N.Y. 2019) ................................................................................ 26

*Terrorist Attacks on September 11, 2001 v. Al Rajhi Bank*
  (*In re Terrorist Attacks on September 11, 2001*), 714 F.3d 118 (2d Cir. 2013) ................... 23

*TRW Inc. v. Andrews,*
  534 U.S. 19 (2001) .............................................................................................................. 31

*United States v. Falcone,*
  109 F.2d 579 (2d Cir. 1940) ............................................................................................... 26

*Weinstock v. Marzook,*
  No. 17-23202-Civ-Scola, 2019 WL 1470245 (S.D. Fla. Apr. 2, 2019) ................................ 32

*Weiss v. Nat'l Westminster Bank Pub. Ltd. Co.,*
  768 F.3d 202 (2d Cir. 2014) ............................................................................................... 26

*Weiss v. Nat'l Westminster Bank Pub. Ltd. Co.,*
  381 F. Supp. 3d 223 (E.D.N.Y. 2019) ................................................................................ 26

**State Cases**

*Al Rushaid v. Pictet & Cie,*
  28 N.Y.3d 316, 327, 68 N.E.3d 1, 10 (N.Y. 2016) ..............................................................33

**Federal Statutes**

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222,
  S. 2040, 114th Cong. (2016) ...........................................................................11, 12, 16, 18

1 U.S.C. § 1 ....................................................................................................... 12, 16, 17

18 U.S.C. § 2333(a) ............................................................................................. *passim*

18 U.S.C. § 2333(d) ...................................................................................................... 12

18 U.S.C. § 2333(d)(1) ...................................................................................... 16, 17, 21

18 U.S.C. § 2333(d)(2) ............................................................................... 13, 19, 20, 26

18 U.S.C. § 2339B ................................................................................................. 25, 26

18 U.S.C. § 2334(a) ......................................................................................................33

**State Statutes**

N.Y. C.P.L.R. § 302 ..................................................................................................... 33, 35

**Federal Rules**

Fed. R. Civ. P. 4 (k)(1)-(2)................................................................................................ 33

Fed. R. Civ. P. 12 ........................................................................................................... 33

**Other**

Antiterrorism Act of 1990, Hearing Before the Subcomm. on
Courts and Administrative Practice of the Comm. on the Judiciary
of the United States Senate, 101st Cong., 2d Sess. (July 25, 1990) ............................................31

S. Rep. 102-342 (1992)................................................................................................11

Statement of Senator Grassley, Oct. 1, 1990,
    136 Cong. Rec. S. 14279, (Amendment No. 2921) ...............................................11

**INTRODUCTION**

Plaintiffs are victims of a brutal terrorist attack committed by the Foreign Terrorist Organization HAMAS.[1] On October 1, 2015, U.S. National Eitam Henkin was driving his wife, Naama, and their four minor children in the West Bank when HAMAS terrorists ambushed them and fired repeatedly at their car. Both Eitam and Naama were shot dead—as their children watched in horror from the backseat of the car. Defendant Kuveyt Türk Katilim Bankasi ("Kuveyt Türk" or "Defendant") is a Turkish bank, partly owned by the Turkish Government, which provided significant financial services to a HAMAS alter ego and its agents. Plaintiffs' Complaint alleges that Defendant aided and abetted HAMAS by providing it with financial services in violation of 18 U.S.C. § 2333(d), which was added to the Anti-Terrorism Act ("ATA") in 2016 by the Justice Against Sponsors of Terrorism Act ("JASTA"). Defendant has moved to dismiss the Complaint asserting three bases for dismissal: (1) Plaintiffs' failure to state a claim for relief, (2) certain Plaintiffs' alleged lack of standing, and (3), to the extent the Court is willing to entertain the argument without jurisdictional discovery, for lack of personal jurisdiction.

The Complaint plausibly states a claim for relief under the governing, congressionally mandated standard set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). As set forth in more detail below, *Halberstam* (and thus JASTA) requires that Plaintiffs establish three elements: (1) the party whom the defendant aids (here, HAMAS) must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam*, 705 F.2d at 487).

---

[1]     Capitalized terms not defined here are defined below.

1

Plaintiffs have plausibly alleged all three elements.  HAMAS committed the attack against the Henkins, and as the Complaint sets forth in great detail, HAMAS relies on donations to and from so-called charities and other ostensibly non-profit organizations to fund its violent terrorist operations. Defendant knowingly maintains accounts for, and provides financial services to, customers widely known to be a HAMAS alter ego (Islamic University of Gaza) and HAMAS agents (the "charity" IHH and the prominent HAMAS operative Jihad Yaghmour) and is generally aware of its role assisting HAMAS in funding its operations. This financial assistance includes at least hundreds of thousands of dollars of Eurodollar transfers at the direction of a known HAMAS operative, and constitutes knowing and substantial assistance.

Defendant's motion rests, in essence, on three erroneous legal assertions. *First*, Defendant repeatedly invokes the *facts* of *Linde* as the minimum for what Plaintiffs must *allege* in the Complaint, but *Linde* was assessing jury instructions after many years of discovery and after a full trial. *Linde* does not establish the minimum standard for what Plaintiffs must allege at this initial pleading stage. *Second*, Defendant relies heavily on language from *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019), but it ignores the obviously dissimilar factual allegations in that case. There, plaintiffs attempted to revive a set of allegations that the Second Circuit had already rejected; brought what amounted to a negligence claim (which is not cognizable under the ATA and JASTA); and failed to show that any of the defendant banks' financial services actually went to an FTO, as opposed to financial services provided to another bank with *links* to certain FTOs. The Complaint contains none of those defects. *Third*, Defendant attempts to impose artificial requirements that are not found in JASTA's text or Findings and Purpose. It criticizes the Complaint for not alleging that (1) funds from Kuveyt Türk can be traced to the individual terrorists who directly committed the attack, (2) Defendant's customers directly

2

participated in the attack, or (3) Defendant specifically intended the attack to occur. But Plaintiffs are not required to plead—or even to prove—any of these facts.

In addition, the Estate of Mrs. Henkin and her minor children have standing to bring their own solatium claims. The ATA provides a cause of action for a U.S. national or, if deceased, to "his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a). The ATA does not limit recovery to that injured party or, if the U.S. national is deceased, to the U.S. national's "estate." Consistent with the ATA's broad remedial purpose of protecting the rights of all interested parties, and especially family members, many courts have held that the statute contemplates claims by multiple plaintiffs stemming from the murder of one U.S. national. Moreover, the ATA does not limit the citizenship of the "survivors or heirs" who may bring claims, and at least two courts have awarded damages to non-U.S. survivors or heirs for their *own* solatium claims. Defendant does not cite any cases in its favor, and its statutory interpretation would result in both surplusage and, contrary to the ATA's purpose, the exclusion of family members who suffer harm, apart from their recovery as heirs of a deceased U.S. national's "estate."

Finally, Defendant moves to dismiss the Complaint for lack of personal jurisdiction—but does so in recognition of the Court's prior comments that Plaintiffs are likely entitled to jurisdictional discovery. Plaintiffs similarly respond, in brief, that Under *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013), Plaintiffs have pleaded a *prima facie* case of personal jurisdiction. Indeed, Defendant is attempting to create a "proximate cause" personal jurisdiction standard under New York's long-arm statute and the Constitution that is contrary to governing Second Circuit law.

**STATEMENT OF FACTS**

A.    **HAMAS Is A Prominent Foreign Terror Organization That Relies On A Terror Financing Network, Including Various "Charities."**

HAMAS is a radical Islamist terrorist organization operating in the Palestinian Territories, including the West Bank, formerly led by Ahmed Yassin (or "Sheikh Yassin").[2] Compl. ¶¶ 31, 33, 41, 47. Founded as an offshoot of the Egyptian radical group, the Muslim Brotherhood, HAMAS is responsible for committing hundreds of terror attacks against Israel, and murdering and wounding thousands of soldiers and civilians, including U.S. nationals. *Id.* ¶¶ 40. The United States designated HAMAS a Specially Designated Terrorist ("SDT") on January 24, 1995, an FTO on October 8, 1997, and a Specially Designated Global Terrorist ("SDGT") on October 31, 2001. *Id.* ¶¶ 74-77.

Since its inception in 1987, HAMAS has combined, with its terror attacks, the operation of a network of social and political institutions sometimes referred to as the "*da'wa*." Compl. ¶ 36. The *da'wa* is deeply integrated with HAMAS's terror apparatus—for example, all seven of HAMAS's founders were members of the *da'wa* apparatus. *Id.* ¶ 43. The *da'wa* consists of schools, mosques, hospitals, clinics, and other institutions that form the movement's political base in the West Bank and Gaza Strip. *Id.* ¶¶ 36, 44, 69, 71-72. Although some of these organizations have ostensibly charitable purposes, *id.* ¶ 72, they raise substantial funds for HAMAS's political and operational terrorist infrastructure and free up (fungible) money to plan and perpetrate suicide bombings and other terrorist attacks. *Id.* ¶¶ 45, 66-72. For example, HAMAS uses the *da'wa*'s educational institutions, including the Islamic University of Gaza ("IUG"), to recruit terrorists. *Id.* ¶¶ 46, 159. And HAMAS uses so-called charitable contributions to *da'wa* institutions to distribute

---

[2]    HAMAS is an acronym of the Arabic "*Harakat al-Muqawama al-Islamiya*"—Islamic Resistance Movement—but its name also means, in Arabic, enthusiasm, courage, and zeal for battle. Compl. ¶ 32 n.3.

payments to relatives of "martyrs." *Id.* ¶ 72.

HAMAS's use of its *da'wa* to fundraise became public knowledge, even outside the Palestinian Territories, as early as 1994. Compl. ¶ 66. That year, *The New York Times* reported that HAMAS had collected millions of dollars a year from "associations operating largely abroad but with ties to the international Muslim Brotherhood network" as well as "from Islamic and Arab communities in the United States" and Western Europe. *Id.* In 1996, *The New York Times* reported on the HAMAS *da'wa*'s intensified fundraising reaching an estimated $70 million per year. *Id.* ¶ 69. In 2001, the *Washington Post* reported that "Hamas's status has been underpinned by a network of medical clinics, schools and welfare institutions" and that HAMAS also "distributes $2 million to $3 million in monthly handouts to the relatives of … 'martyrs.'" *Id.* ¶ 72.

HAMAS fundraisers located abroad are key members of HAMAS's *da'wa*, closely tied to operatives of HAMAS's terror apparatus—referred to as the *Izz al-Din al-Qassam* Brigades ("Qassam Brigades")—in the Palestinian Territories, and to HAMAS political leaders in Turkey, Qatar, and elsewhere in the Middle East. Compl. ¶ 65. Several of these fundraisers have been designated SDGTs by the U.S. Government, which characterized them as "a web of charities raising funds on behalf of HAMAS and using humanitarians [sic] purposes as a cover for acts that support HAMAS. Funds are generated by, and flow through, these organizations on behalf of HAMAS," *Id.* ¶¶ 100-01, or entities otherwise identified as HAMAS fundraisers.

In 2000, HAMAS established the Union of Good, as the umbrella organization for HAMAS's global fundraising activity. Compl. ¶ 111. Multiple HAMAS leaders have served openly in the Union of Good's executive leadership. *Id.* ¶ 122. And the Union of Good's chairman has publicly proclaimed that "[t]he martyr operations is [sic] the greatest of all sorts of Jihad in the Cause of Allah," *id.* ¶ 112, and that suicide attacks are "evidence of God's justice," *id.* ¶ 115. In

2008, the U.S. Treasury Department designated the Union of Good as an SDGT. *Id.* ¶ 118. The Union of Good consists of more than 50 separate organizations; several of them were designated SDGTs by the U.S. Treasury Department years earlier. *Id.* ¶¶ 99-101, 112. The Foundation for Human Rights and Freedoms and Humanitarian Relief ("IHH") is an active participant and member of the Union of Good. *Id.* ¶ 113.

**B.      HAMAS Terrorists Attacked The Henkins, Killing Eitam And Naama.**

On the evening of October 1, 2015, in the West Bank, HAMAS brutally murdered Plaintiffs Eitam Henkin, a U.S. national, and his wife Naama Henkin, while their four children watched ("the Attack"). Compl. ¶¶ 20-30. Mr. Henkin was driving his wife and his four minor children, Plaintiffs I.Z.H., M.H.H., N.E.H. and N.Y.H., near Nablus when their car was overtaken by another vehicle containing three HAMAS terrorists: Karam Lutfi Fathi Razek ("Razek"), Ihya Muhammed Naif Abdallah Haj Hamed ("Ihya"), and Samir Kusa (known as "Abu Zuhair"). *Id.* ¶ 20. Ihya leaned out of his window and sprayed automatic gunfire at the Henkin family, bringing their vehicle to a halt. *Id.* ¶ 21. Razek and Ihya immediately exited their vehicle, while Abu Zuhair remained behind the wheel. Compl. ¶ 22. Razek approached the Henkins' car and opened the driver's side door. *Id.* Although he was wounded by the initial gunfire, Eitam bravely attempted to defend his family by struggling with Razek. *Id.* ¶ 23. Ihya approached the passenger side of the vehicle and opened it just as Razek and Eitam began to struggle over Razek's weapon. *Id.* ¶ 24. Ihya then fired at Eitam, killing him and wounding Razek, before shooting Naama at point-blank range and killing her. *Id.* ¶ 25. The four Henkin children, then ages nine, seven, four, and ten months witnessed their parents' murders from the back seat of the car. *Id.* ¶ 26.

Several days later, the Israeli Army apprehended the three HAMAS gunmen and other individuals who helped them plan and execute the Attack. Compl. ¶ 27. Razek and Ihya were each convicted and sentenced to two life sentences plus 30 years. *Id.* ¶ 28. HAMAS leaders and at least

one of its official websites praised the Attack. *Id.* ¶ 29. The terrorists also admitted that they were HAMAS operatives and that HAMAS had committed the Attack. *Id.* ¶ 30.

**C.    Kuveyt Türk Knowingly Provides Banking Services To HAMAS Institutions And Leaders.**

Kuveyt Türk is a bank with its place of incorporation and principal place of business in Turkey, Compl. ¶ 14, and Kuveyt Türk uses four correspondent banks located in New York to effectuate U.S. dollar-denominated transfers, *id.* ¶ 5. Turkey has long been a major political and financial supporter of HAMAS. *Id.* ¶ 123. For example, Turkish President Recep Tayyip Erdogan has publicly met with HAMAS's current leader, Ismail Haniyah, and former leader, Khalid Mishaal, *id.* ¶ 124, and several Turkish citizens have been apprehended in recent years by Israel, *id.* ¶ 312. In 2011, Turkey accepted 11 Palestinian prisoners freed as part of an exchange for kidnapped Israeli Soldier Gilad Shalit. *Id.* ¶ 125. Some of these prisoners, now based in Turkey, continue their work on behalf of HAMAS, including from an office in Istanbul, out of which Turkish authorities permit HAMAS's Qassam Brigades to operate. *Id.* ¶ 128. One of these 11 former prisoners, Saleh al-Arouri, is a senior HAMAS leader, and designated SDGT, who has authority over HAMAS Qassam Brigades personnel in the West Bank. *Id.* ¶ 131. For example, in 2014, he led an unsuccessful coup attempt against Palestinian Authority President Mahmoud Abbas (based in the West Bank) and also masterminded the June 2014 abduction and killing of three Israeli teenagers, including an American citizen. *Id.* ¶ 130-31.

During the relevant period (2012-2015), Kuveyt Türk maintained bank accounts for, and provided financial services to, a HAMAS institution, a major HAMAS-financing charity, and at least one significant HAMAS operative. *Id.* ¶ 173.

*IUG.* The IUG "has long been described as a 'Hamas stronghold,'" Compl. ¶¶ 71, 157, and a Turkish news organization has described IUG as a "cultural symbol of Hamas," *id.* ¶ 181. Indeed,

7

the FBI in 1993 recorded a HAMAS operative describing the IUG as "the principal organization known to be affiliated with us[, HAMAS]." *Id.* ¶ 153. The IUG was established in 1978 after the Egyptian government barred Gazan students from studying in Egypt because of the Palestine Liberation Organization's (PLO) criticism of Egypt's peace treaty with Israel. *Id.* ¶ 154. After a prolonged power struggle, Ahmed Yassin—HAMAS's founder, and a co-founder of IUG—was able to split the University into two entities: one which the PLO controlled, and the IUG, which Yassin controlled. *Id.* ¶¶ 34, 155. Since the 1990s, IUG has been identified with HAMAS and has served as a principal source of the Qassam Brigades' recruitment. *Id.* ¶ 156. For example, several of HAMAS's founders are closely identified with IUG, including Salah Shehadah (who later founded the Qassam Brigades) and HAMAS's current leader, Ismail Haniyah, who served as its dean. *Id.* ¶¶ 160, 164. In September 2015, right before the Attack, the United States designated the head of the IUG supervisory board, Abu Ubaydah Khayri Hafiz al-Agha, as an SDGT for his role as a senior HAMAS fundraiser. *Id.* ¶ 185. Finally, in the years immediately preceding the Attack, Kuveyt Türk maintained at least one bank account in the name of IUG and transferred at least hundreds of thousands of Eurodollars (*see id.* ¶ 174 n.12) through that account at the direction of a HAMAS representative, Jamal N. al-Khoudary, who serves on the Board of IUG. *Id.* ¶¶ 177-78.

*IHH*. IHH is a member of the Union of Good, through which it provides most of its financial support to HAMAS. Compl. ¶¶ 134-35. IHH's head, Bulent Yildrim, has repeatedly met with HAMAS officials. *Id.* ¶¶ 144, 148. During the relevant period, IHH maintained a branch in Gaza and funded projects at IUG. *Id.* ¶¶ 137, 140. In January 2008, an IHH delegation met with a senior HAMAS activist in the Gaza Strip and, at the meeting, described the aid it had given HAMAS in the Gaza Strip during the preceding year, further stating that IHH intended to double it. *Id.* ¶ 141. That same year, Israel banned IHH as part of a list of 36 Union of Good member

8

organizations and designated it an unlawful organization. *Id.* ¶¶ 142, 147. The next year, IHH sent a representative to open an IHH branch in the West Bank, where he operated through known HAMAS institutions in Hebron and Nablus (near where the Attack was perpetrated) and funneled thousands of U.S. dollars to them. *Id.* ¶ 145. In 2010, IHH, coordinating with HAMAS, led the so-called "flotilla" from Turkey to Gaza in an effort to break the Israeli government's blockade of the Gaza Strip (which was, by then, controlled by HAMAS). *Id.* ¶ 149-50. In 2012, the Israeli government declared IHH a Terrorist Organization. *Id.* ¶ 151. Kuveyt Türk maintained several accounts, including a Eurodollar account, for IHH that was used to transfer funds through correspondent bank accounts in the United States. *Id.* ¶ 174.

*Jihad Yaghmour*. Yaghmour was previously sentenced to 30 years in prison for his participation in the 1994 abduction and subsequent murder of an Israeli soldier. Compl. ¶ 126. He is one of the 11 prisoners, together with Saleh al-Arouri, whom Turkey agreed to accept after they were released as part of the Gilad Shalit exchange. *Id.* He is a senior HAMAS operative, operating in Turkey, and is HAMAS's liaison with Turkish authorities. *Id.* ¶ 176. During the relevant period, Kuveyt Türk maintained an account for, and provided financial services to, Yaghmour. *Id.*

## PLEADING STANDARDS

"In order to satisfy Federal Rule of Civil Procedure 8, a complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The "plausibility" standard is "not akin to a probability requirement." *Twombly*, 550 U.S. at 678. A well-pleaded complaint must merely include sufficient facts to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Finally, when considering

9

motions to dismiss, the Court must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

Regarding personal jurisdiction, Plaintiffs need only make a *prima facie* showing that personal jurisdiction exists. *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 42 (E.D.N.Y. 2019) (Cogan, J.). At this early stage of the proceedings, where Defendant has not submitted any evidence, the Court must rely on the pleadings themselves and must construe those pleadings in the light most favorable to Plaintiffs, resolving all doubts in their favor. *Id.* (quoting *DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)).

## ARGUMENT

### I. Plaintiffs Have Plausibly Alleged That Kuveyt Türk Is Liable Under the ATA, As Modified By JASTA, For Aiding-And-Abetting HAMAS.

Plaintiffs have plausibly alleged a violation of 18 U.S.C. § 2333(d) for aiding-and-abetting HAMAS, a Foreign Terrorist Organization, because Defendant (1) aided a party that committed a wrongful act, (2) was "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provide[d] substantial assistance," and (3) "knowingly and substantially assist[ed] the principal violation." *See Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 487).

### A. JASTA Provides The "Broadest Possible Basis" For Aiding-And-Abetting Liability.

The ATA created civil remedies for American victims of international terrorism and their families. Pub. L. 102–572, title X, § 1003(a)(4), Oct. 29, 1992, 106 Stat. 4522 (now codified at 18 U.S.C. § 2333). The ATA's legislative history underscores that, in addition to providing redress to individual plaintiffs, the ATA provides a critical tool to combat terrorist financing. For example, a Senate Report described how "[b]y its provisions for compensatory damages, treble damages, and the imposition of liability *at any point along the causal chain* of terrorism, it would *interrupt,*

*or at least imperil, the flow of money*." S. Rep. 102-342, at 22 (1992).[3] The ATA did so, not by establishing a rigid, statutory cause of action that requires the parsing of technical legal elements, but instead, applied ordinary tort principles, by leaving "the substance of … an action … not defined by the statute, because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts." *Id.* at 25.[4] The ATA, however, did not expressly provide for secondary liability.

In 2016, Congress enacted JASTA, which further expanded ATA liability by expressly creating substantive causes of action for aiding and abetting and conspiracy liability. Pub. L. 114-222, § 2(a)(4); *accord Linde*, 882 F.3d at 328 (describing JASTA as an "expansion" of the ATA). JASTA's Findings and Purpose stated that "[t]he purpose of this Act is to provide civil litigants with *the broadest possible basis*, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b).

JASTA added subsection (d) to the ATA, which now provides, in relevant part:

> (a) Any national of the United States injured in his person, property, or business by reason of an act of international terrorism, or his estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he sustains and the cost of the suit, including attorney's fees.
> \*\*\*
> (d) Liability.
>
> (1) Definition.-In this subsection, the term "person" has the meaning given the term in section 1 of title 1.

---

3       *Emphasis added throughout unless otherwise indicated*.

4       As an additional example, when reporting the ATA out of committee, Senator Grassley stated on the floor of the Senate that the ATA "*puts the terrorists on notice. To keep their hands off Americans and their eyes on their assets*." *See* Statement of Senator Grassley, Oct. 1, 1990, 136 Cong. Rec. S. 14279, 14284 (Amendment No. 2921).

> (2) Liability.-In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by ***an organization that had been designated as a foreign terrorist organization*** under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, ***liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance***, or who conspires with ***the person who committed such an act of international terrorism***.

18 U.S.C. § 2333(a), (d). In turn, "person" is broadly defined to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1.

In addition, Congress provided that common law tort principles, routinely applied by federal courts across the country, should *also* apply to suits by U.S. terror victims under JASTA. Congress specifically identified *Halberstam* as the proper framework for analyzing cases under the ATA (including JASTA) and noted that *Halberstam* "has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability." JASTA § 2(a)(5).

In *Halberstam*, the defendant, Linda Hamilton, was found civilly liable for aiding and abetting the murder of Michael Halberstam that, unbeknownst to her, was committed by her boyfriend, Bernard Welch, during a burglary. It was no defense that Hamilton did not know about the murder *or even that Welch committed burglaries*:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, ***it was enough that she knew he was involved in some type of personal property crime at night***—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises.

*Halberstam*, 705 F.2d at 488. It was sufficient that she was providing substantial assistance (by performing as a "banker, bookkeeper, recordkeeper and secretary") in support of her boyfriend's "personal property crimes at night" and that violence was a foreseeable consequence of those nocturnal property crimes. *Id*. at 487-88. Adopting *Halberstam*, the Second Circuit has held that

12

JASTA's aiding-and-abetting requires the three elements cited above. *See* p. 1, *supra*. *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 487). The Second Circuit has also adopted the six factors that *Halberstam* identified to assess knowing and substantial assistance, which are addressed at pp. 27-29, *infra*. *Linde*, 882 F.3d at 330 (citing *Halberstam*, 705 F.2d at 483-84).

**B.    The Complaint Plausibly Alleges That Kuveyt Türk's Customers Are Alter-Egos Or Agents Of HAMAS, Which Committed The Attack.**

Defendant argues that the Complaint does not properly state a claim under §2333(d)(2) because it fails to plausibly allege that (1) HAMAS committed the Attack, (2) Kuveyt Türk's three clients—IUG, IHH, and Yaghmour—are sufficiently linked to HAMAS, and (3) Kuveyt Türk aided and abetted the individual attackers. MTD 19-23. All three arguments are incorrect.

**1.    *HAMAS committed the Attack.***

Defendant argues that "Plaintiffs do not allege facts tending to show that Hamas played a role in the Attack." MTD 23. But all that Plaintiffs must allege at this initial pleading stage is that "the party whom the defendant aids must perform a wrongful act that causes an injury." *Linde* 882 F.3d at 329. The Complaint clearly alleges that HAMAS committed the Attack. Compl. ¶¶ 20-30. HAMAS claimed responsibility and the terrorists were convicted.  *Id.* ¶ 28-29.  Indeed, the terrorists themselves "admitted that they were HAMAS operatives and that HAMAS had committed the Attack." Compl. ¶ 30. These are clearly plausible allegations that HAMAS committed the Attack.  *See Gill v. Arab Bank, PLC,* 893 F.Supp.2d 542, 567 (E.D.N.Y 2012) (finding "admissible evidence adduced by plaintiff and the analyses by experts found admissible … [sufficient for] a reasonable jury [to] infer that the gunman who shot plaintiff was under Hamas control" even absent any criminal conviction of the gunman).

**2.    *Kuveyt Türk's customers—IUG, IHH, and Yaghmour—are alter egos or agents of HAMAS.***

Defendant incorrectly argues that the Complaint fails to plausibly allege that IUG was the

13

alter ego of HAMAS or that IHH and Yaghmour are HAMAS's agents. MTD 21-22. *First*, Defendant claims that IUG's status as an alter-ego of HAMAS was first raised at the Pre-Motion Conference.  MTD 20. It then attempts to minimize the IUG as a run-of-the-mill "degree-granting institution of higher education founded before Hamas existed." MTD 22.[5] But the Complaint itself contains a section under the heading "The Islamic University of Gaza ("IUG") Was A Core HAMAS Institution in Gaza." Moreover, the Complaint describes in detail how the IUG was co-founded by Ahmed Yassin—HAMAS's founder—who led a power struggle to ensure the IUG remained a Muslim Brotherhood organization and what HAMAS operatives described as a "principal organization known to be affiliated with us." Compl. ¶ 153-57.

Defendant also fails to mention the multiple allegations quoting media reports or FBI wiretaps that refer to the IUG as, among other things, a HAMAS "stronghold." *See, e.g.*, *id.* ¶¶ 71, 153-57. Indeed, Salah Shehadah (who later founded the Qassam Brigades) as well as the current head of HAMAS, Ismail Haniyah, served in leadership roles at IUG. In September 2015, right before the Attack, the United States designated *the head of the IUG supervisory board*, Abu Ubaydah Khayri Hafiz al-Agha, as an SDGT, for his role as a HAMAS fundraiser. *Id.* ¶ 185. Contrary to Defendant's understatement that IUG merely "has close ties" to HAMAS, *see* MTD 4, the Complaint has plausibly alleged that IUG is its alter ego. Its leadership, as the Complaint alleges, consists of HAMAS operatives and it functions as part of and at the behest of HAMAS.

*Second*, Defendant similarly attempts to downplay IHH as "a charitable organization that provides humanitarian relief across the globe." MTD 4. But IHH is not just any charity. It was established by the Muslim Brotherhood and is a member of the Union of Good—the

---

[5]    At the pre-motion conference, the Court expressed skepticism that Defendant can avoid liability for aiding and abetting IUG "just because they don't say Hamas on their door." Hr'g Tr. 19:19-25 (Dec. 18, 2019).

14

aforementioned HAMAS umbrella organization that was designated by the United States as an SDGT in 2008. Compl. at ¶¶ 111-22, 133-52. At that time of this designation, the U.S. Treasury Department stated:

> ***The Union of Good acts as a broker for HAMAS*** by facilitating financial transfers between a web of charitable organizations—including several organizations previously designated under E.O. 13224 for providing support to HAMAS—and HAMAS-controlled organizations in the West Bank and Gaza. ***The primary purpose of this activity is to strengthen HAMAS' political and military position in the West Bank and Gaza***, including by: (i) diverting charitable donations to support HAMAS members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of HAMAS.

*Id.* ¶ 118. IHH's head has also repeatedly met with HAMAS officials. *Id.* ¶¶ 144, 148. And IHH has touted its funding provided to HAMAS. *Id.* ¶ 141. In 2010, IHH led the "flotilla" to Gaza, which it coordinated with HAMAS. *Id.* ¶¶ 159-60. And in 2012, the Israeli government declared IHH a Terrorist Organization. *Id.* ¶ 151. Accordingly, the Complaint has plausibly alleged that IHH is a key fundraiser for HAMAS and serves as an agent of HAMAS.

*Third*, there is no question that Yaghmour is a HAMAS agent. He is a senior HAMAS operative who was sentenced to prison for the abduction and murder of an Israeli soldier; he operates in Turkey; and is HAMAS's liaison with Turkish authorities. *Id.* ¶¶ 126, 176.

Defendant relies on two cases in an effort to distinguish its conduct on behalf of IUG, IHH, and Yaghmour. *First*, it argues that the Complaint's allegations were more robust in *Strauss v. Crédit Lyonnais*, 2006 WL 2862704 at *10-11 (E.D.N.Y. Oct. 5, 2006), where the court found certain charities were agents of HAMAS. MTD 22. But *Strauss* involved a French "charity" that, like IHH, was allegedly a member of the Union of Good that raised funds for HAMAS and sent those funds to "charity" committees in the Palestinian Territories that were controlled by HAMAS. *Id.* at *6. Defendant also cites *Goldberg v. UBS AG*, 660 F. Supp. 2d 410 (E.D.N.Y. 2009). But *Goldberg* involved a Swiss "charity" that like IHH was allegedly a member of the Union of Good,

15

like IHH raised funds for HAMAS, and sent those funds to "charity" committees in the Palestinian Territories. *Id.* at 415-17. Defendant can cite no meaningful distinction between IUG or IHH and any of the so-called "charities" in *Strauss* and *Goldberg*. In fact, the banks in *Strauss* and *Goldberg* held accounts for the European fundraising organization that collected and transferred donations to HAMAS-controlled entities in the Palestinian Territories.  *See Strauss*, 2006 WL 2862704, at *5-6; *Goldberg*, 660 F. Supp. 2d at 415-16.  Neither of those defendants itself held an account in the name of one of those HAMAS-controlled entities in the Palestinian Territories or in the name of a notorious HAMAS operative in their country. Kuveyt Türk did.

### 3.    *Kuveyt Türk cannot escape liability by asserting that it did not aid and abet the specific terrorists who directly participated in the Attack.*

Defendant argues that it cannot be held liable for aiding and abetting under JASTA because "nothing in the Complaint can be construed as showing that the Bank aided and abetted—or even knew of—any one of the actual perpetrators." MTD 19-20. This argument badly misstates JASTA's broad scope. JASTA does not require Defendant to have had a relationship with the individual terrorists who committed the Attack—only that Defendant aided and abetted the "person who committed [the Attack]"—here, HAMAS. *See* 18 U.S.C. § 2333(d)(1),(2). JASTA incorporates the extremely broad definition of "person" from 1 U.S.C. § 1, which "include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." *See* 18 U.S.C. § 2333(d)(1). And Congress expressly stated that JASTA provides Plaintiffs with a claim against any defendant, "who provided material support or resources, directly *or indirectly*, to the persons or *organizations responsible for their injuries*." JASTA § 2(a)(7). Contrary to Defendant's assertions, JASTA provides for liability even where, as here, it aided and abetted HAMAS—but not the individual terrorists who committed the Attack.

The cases Defendant cites are consistent with this straightforward statutory interpretation.

16

MTD 19-20. In fact, *Miller* specifically *rejected* Defendant's argument, holding "a defendant may be liable under the ATA ***for aiding the organization behind the attacks*** [there, HAMAS], ***not only*** the individual 'triggerman' or suicide bomber. That is precisely why Congress broadly defined 'person' under that ATA to include entities as well as individuals." *Miller*, 372 F. Supp. 3d at 48. Furthermore, *Shaffer v. Deutsche Bank AG*, 2017 WL 8786497, at *1 n.1 (S.D. Ill. Dec. 7, 2017), *aff'd sub nom. Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018), is inapposite because it is a conspiracy case involving primary liability claims, not a JASTA case. Both *Crosby v. Twitter, Inc.*, 921 F.3d 617, 626 (6th Cir. 2019), and *Siegel v. HSBC Bank USA, N.A.*, 2018 WL 3611967, at *4 (S.D.N.Y. July 27, 2018), *aff'd sub nom.*, *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019), dismissed JASTA claims that failed to link the defendants to the organization responsible for a given attack, in one case an attenuated connection through a social media user and in the other, a correspondent banking client that had reputedly transferred funds to an FTO (where there were no allegations the client did so through the defendant bank.).  Here, as explained above, the Complaint plausibly alleges that IUG is an alter-ego of HAMAS, Yaghmour is a HAMAS operative working on the FTO's behalf, and IHH is a primary fundraiser for HAMAS. Finally, Defendant asserts (correctly) that "*Halberstam* requires that 'the party whom the defendant aids must perform a wrongful act that causes an injury.'" MTD 19 (quoting 705 F.2d at 477). But Defendant overlooks that the "party whom the defendant aids," in this JASTA context, is "the person who committed such an act of international terrorism"—here, HAMAS. *See* 18 U.S.C. § 2333(d)(1), (2); 1 U.S.C. § 1; *Miller*, 372 F. Supp. 3d at 48.

**C.      The Complaint Plausibly Alleges That Kuveyt Türk Was Generally Aware Of Its Role In HAMAS's Terrorist Activities.**

The Complaint plausibly alleges that Defendant was "generally aware of [its] role in a continuing criminal enterprise" from which terrorist attacks were "a natural and foreseeable

17

consequence." *See Halberstam*, 705 F.2d at 486. Defendant argues that the Complaint should be dismissed because it fails to allege: (1) that Defendant knew its customers were connected to HAMAS, (2) that funds used to finance the Attack are traceable to Defendant, and (3) that Defendant provided *more* than material support to HAMAS (or specifically intended the Attack). All three arguments fail.

### 1.    *The Complaint satisfies the governing* **Halberstam** *standard.*

As described above, *Halberstam* provides the relevant standard for general awareness. JASTA § 2(a)(5). There, Hamilton acted as her boyfriend's "banker, bookkeeper, recordkeeper, and secretary," and denied knowledge of the criminal nature of his "evening forays." 705 F.2d at 486, 488. Notwithstanding that her actions were "neutral standing alone," the court found that "it defies credulity that Hamilton did not know that something illegal was afoot." *Id.* at 486. The court thus concluded that, because she "knew about and acted to support Welch's illicit enterprise," she "had a general awareness of her role in a continuing criminal enterprise." *Id.* at 488. Because the killing was "a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake," and because her services substantially assisted the burglary resulting in murder, she was liable as an aider and abettor of the murder. *Id.*

The Second Circuit in *Linde*, following *Halberstam*, held that in the terrorism context a bank can be found liable for aiding and abetting a terrorist organization if it was generally aware of "a 'role' in terrorist activities" performed by that organization. 882 F.3d at 329.[6] *Linde* further held that Plaintiffs need not show "specific intent"—"intent to participate in a criminal scheme as

---

[6]    The term "terrorist activities" in *Linde* does not refer to an attack, but to the "overall illegal or tortious activity," *see Halberstam*, 705 F.2d at 488. In *Halberstam*, that "overall illegal or tortious activity" was "personal property crimes at night"—not murder. Indeed, in *Halberstam*, the defendant did not intend, or even know about, the implicated murder—or even the burglaries.

'something that he wishes to bring about and seek by his action to make it succeed,'" or that the bank "knew of the specific attacks at issue when it provided financial services for Hamas." *Id.*

At least three courts have, applying *Linde*, determined that § 2333(d)(2) requires a plaintiff merely to plausibly allege that the defendant knew it assisted a terrorist enterprise from which violence was a foreseeable consequence, i.e. Hamas's violent or life-endangering activities. *See Miller*, 372 F. Supp. 3d at 47 (denying motion to dismiss claims that Arab Bank aided and abetted HAMAS terror attacks); *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 267-68 (E.D.N.Y. 2019) (finding Iranian Bank Saderat liable for aiding and abetting Iranian terror attacks); Order, *Estate of Hirshfeld v. Bank of China, Ltd.*, No. 18-cv-1982 (KPF) (S.D.N.Y. Aug. 9, 2019), [Dkt. No. 61] (denying a motion for judgment on the pleadings regarding claims that Bank of China aided and abetted HAMAS terror attack), annexed hereto as <u>Exhibit A</u>.

The Complaint satisfies this standard. Although courts are expected to be "lenient in allowing scienter issues …. [t]o survive motions to dismiss," *In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 693 (2d Cir. 2009), the Complaint sets forth many specific allegations providing a strong inference of Defendants's awareness of its role in HAMAS's illegal fundraising activities (from which violence was a foreseeable consequence), including the central fact that it held accounts for a well-known HAMAS leader (Yaghmour) and well-known HAMAS-controlled institutions (IUG and IHH). *See* pp. 4-9, *supra*.

Defendant offers a number of misplaced arguments that these allegations are insufficient. *First*, Defendant argues that the Complaint fails to plausibly allege general awareness because the allegations here fall short of the facts in *Linde* showing that Arab Bank was actively participating in HAMAS's terror activities. MTD 10. But *Linde* did not hold that the use or knowledge of "martyr lists" is a *necessary pre-condition* for finding general awareness under § 2333(d)(2); it

19

merely cited Arab Bank's possession of such lists as an example of one way that a defendant *may* be shown to be generally aware of its role in a criminal enterprise whose foreseeable consequences include terrorism. 882 F.3d at 330. Moreover, *Linde* was decided in a much different posture. The facts of *Linde* (and *Miller*, which relied on *Linde*) were obtained during a decade-long discovery process and proven at trial. The overwhelming *evidence* in that case is thus an inappropriate contrast to what Plaintiffs must allege in a § 2333(d)(2) complaint.

*Second*, Defendant argues, in essence, that the Complaint fails to allege that it actually knew of IUG's, IHH's, and Yaghmour's connections to HAMAS. MTD 4, 8-9. Defendant attempts to downplay IUG's and IHH's links to HAMAS by asserting that the organizations "appear[] to be" a "Palestinian institution of higher education" and a "Turkish NGO," respectively. MTD 4, 8. Defendant similarly portrays Yaghmour as merely "an individual living in Turkey." MTD 4. As discussed above, each of the three are publicly known to be much more than that.

- IUG was co-founded by HAMAS's widely known founder (Sheikh Yassin), and has (and has had) senior HAMAS leaders in its own leadership (including SDGTs). Compl. ¶¶ 153-57, 168-72. Moreover, IUG has been reported to be a "Hamas stronghold," and its strong links to HAMAS were reported in Turkey. *Id.* ¶¶ 71, 153-57, 168-72, 180-81, 185.

- IHH (founded by the Muslim Brotherhood) is a member of the Union of Good (an SDGT) and is known to be HAMAS's most important fundraiser in Turkey. *Id.* ¶¶ 111-22, 133-35. IHH infamously organized the 2010 "flotilla" with HAMAS, and in 2012 Israel designated IHH as a terrorist organization. *Id.* ¶¶ 149-51.

- Yaghmour was one of 11 released prisoners that Turkey very publicly agreed to accept from Israel. *Id.* ¶ 125-26. His status as a HAMAS operative and his participation in an infamous kidnapping and murder of an Israeli solider are open and notorious. He is an active member of HAMAS living in Istanbul and is HAMAS's liaison to the Turkish Government. *Id.* ¶ 127-32.

Defendant also notes that IUG, IHH, and Yaghmour were not designated by the United States as FTOs, implying that, as a result, the Complaint fails to plausibly allege general awareness. MTD 11, 14. As an initial matter, Defendant does not cite any case holding that, unless the

customer is an FTO, a defendant lacks general awareness under JASTA. Nor could this ever logically be the standard as *individual* terrorists are not designated FTOs, and quite obviously, JASTA applies to aiding and abetting individuals. *See* 18 U.S.C. § 2333(d)(1). In any event, assuming Defendant intended to refer to SDGTs (and not FTOs), this Court found in *Linde*—after a trial—that a defendant could have actual knowledge of a terrorist entity's identity and illicit activity, even if the entity were *not* designated an SDGT.  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 314 (E.D.N.Y. 2015) (Cogan, J.), *vacated on other grounds*, 882 F.3d 314 (2d Cir. 2018). Because this standard of proof is sufficient at trial, the Complaint does not need to plead a higher standard—*i.e.*, that IUG, IHH, or Yaghmour were SDGTs.

Defendant also attempts to characterize the news reports pleaded in the Complaint as insufficient to plausibly allege that Defendant was generally aware of HAMAS's connection to IUG, IHH, and Yaghmour. MTD 9. As the Complaint notes, Defendant's conduct took place at a time when the entire Gaza Strip was controlled by HAMAS and was subject to an Israeli blockade. Compl. ¶¶ 149-50. It is, therefore, more than plausible on its face that accounts held for a Gaza institution and large funds transfers directed toward institutions in the Gaza Strip were, in fact, connected to HAMAS. Even absent Know Your Customer due diligence, any financial institution would have understood that transactions routed to the Gaza Strip presented the highest possible risk for terror financing since the entire area was controlled by an FTO.

Moreover, Kuveyt Türk advances a nearly impossible standard: unless Plaintiffs can somehow plead that the management or compliance staff actually read the news reports, Plaintiffs can *never* plausibly allege general awareness. MTD 9. Again, Defendant argues that the evidence amassed in *Linde*—after years of discovery (and a trial)—is the standard for what Plaintiffs must *plead* in its Complaint. MTD 10-11. Neither law nor logic supports this argument.

21

*Third*, Defendant suggests that an FTO's utilization of a charitable "front," like IUG or IHH, can negate general awareness. There may be cases where a charity's external appearance conceals its nefarious conduct from the public, but this is not such a case. IUG was (and is) a flagship HAMAS institution located in the Gaza Strip—which has been controlled by HAMAS for more than a decade. IHH is also not some obscure charity in Turkey. It was at the center of an international incident due to its efforts to circumvent an Israeli naval blockade of the Gaza Strip. Compl. ¶¶ 149-50. That incident resulted in Israeli commandos being attacked with knives, axes, chains, and clubs by IHH supporters, and three wounded Israeli commandos were dragged below deck and beaten before the Israelis responded with lethal force. *Id.* It also ruptured Turkish-Israeli relations and was one of the reasons Israel designated IHH a terrorist organization in 2012. *Id.* ¶ 151. Moreover, IHH has also long been a member of the Union of Good which—since its 2008 SDGT designation—places its constituent organizations like IHH in a select group of charities that most blatantly pose a threat of terror financing.

As the Supreme Court held in *Holder*, "[m]uddying the waters between its political activism, good works, and terrorist attacks, Hamas is able to use its overtly political and charitable organizations as a financial and logistical support network for its terrorist operations." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010). Because "money is fungible" and FTOs "do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations… funds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives." *Id.* at 31.[7]

---

[7]    *See also O'Sullivan v. Deutsche Bank AG*, No. 17 CV 8709-LTS-GWG, 2019 WL 1409446, at *1 (S.D.N.Y. Mar. 28, 2019) ("Congress found, in enacting other provisions of the ATA, that a total prohibition on financial support to terrorist organizations was justified because

*Finally*, Defendant's heavy reliance on *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019), is misplaced. MTD 12-13. The allegations in *Siegel* were fundamentally weaker than, and inapposite to, the ones in this case. In *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 124-25 (2d Cir. 2013), the Second Circuit affirmed the dismissal of ATA claims against the Saudi Al Rajhi Bank ("ARB"), among others, for allegedly providing material support to *al Qaeda* because the plaintiffs had failed to adequately plead that ARB's accounts or donations were used to provide funds to *al Qaeda* and thereby proximately cause the September 11, 2001 attacks. Nonetheless, the *Siegel* plaintiffs not only sued ARB for the same alleged conduct (albeit for a different *al Qaeda* attack), but also added four HSBC defendants whom they alleged provided support *to ARB*. *Siegel v. HSBC Bank USA, N.A.*, No. 17CV6593 (DLC), 2018 WL 3611967, at *2-4 (S.D.N.Y. July 27, 2018). After the court dismissed ARB and two of the four HSBC defendants on personal jurisdiction grounds, the plaintiffs filed a third amended complaint against the remaining HSBC defendants—who were even further removed from ARB's alleged conduct already found insufficient in *In re Terrorist Attacks*—which was also dismissed. *Id.*

The *Siegel* claims were effectively premised on the banks' failure to take reasonable steps to ensure its correspondent banking customers did not have links to terrorists—a negligence claim that is insufficient under the ATA or JASTA. Unlike here, the *Siegel* plaintiffs did not connect the HSBC defendants to ARB's alleged illicit conduct, let alone HSBC to *al Qaeda* in Iraq ("AQI"). *See* 933 F.3d at 224-26. Therefore, the Court of Appeals correctly held that the *Siegel* third amended complaint did not sufficiently plead defendants' general awareness of their role in AQI's

---

'money earmarked for peaceful activities donated directly to a terrorist organization nevertheless furthers the organization's violent ends.'"); *Lelchook v. Commerzbank AG*, No. 10-cv-5795, 2011 WL 4087448, at *1 (S.D.N.Y. Aug. 2, 2011) ("[A] terrorist front organization has no legitimate function that the United States recognizes.").

terrorist activities. *Id.* at 224-25. Here, however, Plaintiffs have plausibly alleged that Defendant was generally aware of its role in HAMAS's criminal enterprise to raise funds for terrorism, from which terrorist attacks were a natural and foreseeable consequence.

### 2. The Court should reject Kuveyt Türk's suggestion that Plaintiffs must allege that funds from Kuveyt Türk financed the Attack.

Defendant criticizes Plaintiffs for failing to allege that "any of the three individuals that actually perpetrated the Attack were customers of Kuveyt Türk or that Kuveyt Türk transferred any funds to them." MTD 11. Lower courts have repeatedly rejected a requirement that plaintiffs trace specific transactions to specific attacks. For example, in *Linde*, the Court adopted Judge Gershon's prior holding that "rejected defendant's argument that plaintiffs were required to trace specific dollars to specific terrorist attacks". *Linde*, 97 F. Supp. 3d at 323. This makes perfect sense. "Such a burden would render the statute powerless to stop the flow of money to international terrorists, and would be incompatible with the legislative history of the ATA." *Goldberg*, 660 F. Supp. 2d at 429. And because money is fungible, *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012), held that "[a] contribution, if not used directly, arguably would be used indirectly by substituting it for money in Hamas' treasury; money transferred by Hamas' political wing in place of the donation could be used to buy bullets." Indeed, in *Halberstam*, Hamilton's contributions cannot be meaningfully traced to the shooting or the gun.

*Linde*, *Goldberg,* and *Gill* were all ATA cases. Because JASTA's express purpose was to *expand* ATA liability even further, it would make no sense to impose a traceability restriction. Indeed, the three recent JASTA decisions denying motions to dismiss, and cited above, did not require a complaint to trace specific funds from the defendant financial institution to the individuals who participated directly in the relevant attack. *See Lelchook*, 393 F. Supp. at 267, *Miller*, 372 F. Supp. 3d at 33; *cf. Hirshfeld*, Exhibit A, at 14 (denying motion as to ATA claim).

24

### 3. *The Court should reject Kuveyt Türk's attempt to apply the incorrect* **mens rea** *standard.*

Defendant mistakenly relies on language from several cases to assert that Plaintiffs must allege (and eventually prove) a higher *mens rea* than for a primary liability claim—or that Plaintiffs must allege that Defendant specifically intended the Attack. MTD 14-15. Defendant bases its argument on this language: "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist organization." *Linde*, 882 F.3d at 329 (emphasis in original). Read in isolation, this brief quotation is misleading.

As an initial matter, Defendant's interpretation of *Linde* cannot logically be correct. "Material support" is the standard for *primary* liability under the ATA (including criminal liability). *See* 18 U.S.C.§ 2339B. Secondary liability under § 2333(d) does not require a defendant to have an even *greater* level of intent than the criminal provision of 18 U.S.C. §2339B.

Moreover, the sentences immediately following Defendant's quotation clarify that the Second Circuit did *not* hold that JASTA aiding-and-abetting liability requires specific intent:

> Aiding and abetting requires the secondary actor to be "aware" that, by assisting the principal, it is itself assuming a "role" in terrorist activities. Such awareness *may not require proof of the specific intent demanded for criminal aiding and abetting culpability*, *i.e.*, defendant's intent to participate in a criminal scheme as 'something that he wishes to bring about and seek by his action to make it succeed. *Nor does awareness require proof that that [defendant] knew of the specific attacks at issue when it provided financial services to Hamas*.

*Linde*, 882 F.3d at 329. This is due to the fact that, in contrast to their criminal counterparts, civil conspiracy and aiding and abetting premise liability on the foreseeability of a wrong, not the intent to cause it. As Judge Learned Hand observed in *United States v. Falcone*, whereas a criminal aider and abettor or conspirator "must in some sense promote [the unlawful] venture himself, make it his own, have a stake in its outcome," a defendant's civil liability "extends to any injuries which he should have apprehended to be likely to follow from his acts." 109 F.2d 579, 581 (2d Cir. 1940).

25

Accordingly, the modest point that the Second Circuit made in *Linde* is that the *mens rea* requirement in § 2333(d)(2) "is ***different*** from the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B"—not that the standard is *higher*, more stringent, or requires the defendant to have specifically intended the attack at issue. *See id.* at 329-30. As a result, Plaintiffs respectfully submit that *Miller*, *Lelchook*, and *Hirshfeld*—discussed above—correctly state and apply the Congressionally mandated *Halberstam* framework.[8]

Plaintiffs also respectfully submit that the Court should not rely on certain district court cases cited by Defendant to the extent they require a JASTA aiding-and-abetting defendant to specifically intend the attack—or otherwise hold that the *mens rea* standard is *higher* for JASTA claims than for ATA primary liability claims. Two decisions from this Court, both on appeal, interpret *Linde* to hold that a JASTA aiding-and-abetting defendant must either know its support is specifically assisting violent acts or the specific terrorist acts at issue. *See, e.g.*, *Strauss v. Crédit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 157-58, 164 (E.D.N.Y. 2019) ("None of the transfers processed by defendant were marked as being for a specific violent or terroristic purpose."); *Weiss v. Nat'l Westminster Bank Plc*, 381 F. Supp. 3d 223, 232-33, 238-39 (E.D.N.Y. 2019) (similar).

In *Kaplan*, the court dismissed a complaint because the plaintiffs failed to allege that "[d]efendant knowingly ***and*** intentionally supported Hizbollah ***in perpetrating the rocket attacks***." *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 536 (S.D.N.Y. 2019) (on appeal). *Honickman*, relying heavily on *Kaplan*, held that the *mens rea* required for aiding and

---

[8]      *See also Siegel*, 933 F.3d at 224 (quoting *Linde* that although "[s]uch awareness does not require proof of ... specific intent" or knowledge "of the specific attacks at issue," it does require that "the bank was generally aware that[, by providing financial services to a client,] it was thereby playing a 'role' in [the] violent or life-endangering activities," 882 F.3d at 329); *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208-09 (2d Cir. 2014) (holding that, under § 2339B of the ATA, which requires a higher scienter standard, "engaging in terrorist activities" includes merely "solicit[ing] funds for Hamas").

26

abetting "is a higher *mens rea* than that sufficient to establish material support in violation of the ATA." *Honickman for Estate of Goldstein v. BLOM Bank SAL*, No. 19-cv-8-KAM-SMG, 2020 WL 224552, *7 (E.D.N.Y. Jan. 14, 2020). These district court cases, therefore, misapply the governing *Halberstam* standard by requiring a JASTA defendant to specifically intend the result of their substantial assistance or at least know that its conduct is directly facilitating violence rather than knowing that violence is a reasonably foreseeable result of its conduct.

In sum, Plaintiffs are not required to allege and prove a *mens rea* standard greater than for primary liability under the ATA—or to allege Defendant specifically intended the Attack. Plaintiffs need only allege, as they have, that Defendant was generally aware of its role in a continuing enterprise from which terrorist attacks were a natural and foreseeable consequence.

**D.      The Complaint Plausibly Alleges That Kuveyt Türk Provided Substantial Assistance To HAMAS.**

Finally, Defendant asserts that Plaintiffs have not alleged the third element under § 2333(d), knowing and substantial assistance. MTD 15-19. As noted above at p. 13, *Halberstam* identified six factors to assess substantial assistance.[9] *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 483-84). The Second Circuit explained that, on the fully developed trial record there, "[d]isputed facts pertinent to these factors and the weight to assign such factors" were factual issues for the trier of fact and not matters that can be determined as a matter of law. *Linde*, 882 F.3d at 330. That is doubly true when assessing pleadings. Should the Court nonetheless attempt to weigh and assess the allegations related to these factors, the Complaint plausibly alleges substantial and knowing assistance.

---

[9]      These are:  (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. *Halberstam*, 705 F.2d at 483-84.

***Nature of the act encouraged***. Defendant asserts that Plaintiffs have not alleged that it encouraged the Attack. MTD 16. This argument overlooks that, under *Halberstam*, the nature of the act "dictates what aid might matter, *i.e.*, be substantial." 705 F.2d at 484. As explained above, financial services to HAMAS "mattered" to its financing of terrorism and the *da'wa* system that supports its terror infrastructure. *See* pp. 4-6, *supra*. It is enough that the injuries are caused by acts pursuant to or in furtherance of the enterprise, that the defendant "helped to create a danger; it was immaterial that the effect of [its] help could not be determined—that [its] acts could not be found to be either a necessary or a sufficient condition of the injury." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 697 (7th Cir. 2008). *Halberstam* also noted that "the blameworthiness of the tortious act or the seriousness of the foreseeable consequences" could be considered in the "nature of the act" and "state of mind" factors. 705 F.2d at 484 n.13. Here, Defendant assisted HAMAS, an FTO that kills and maims civilians, including U.S. nationals.

***Amount of assistance***. The Complaint alleges that Kuveyt Türk maintains an account for HAMAS alter ego IUG and has transferred *at least* hundreds of thousands of dollars at the direction of a HAMAS representative. Compl. ¶ 178. Kuveyt Türk also maintains multiple accounts for IHH, including a Eurodollar account, and provides banking services to Yaghmour. *Id.* ¶ 176. Considering Defendant's role as a bank, this assistance is substantial. Defendant does not engage with these facts and instead retreads its incorrect arguments that the Complaint does not allege Defendant participated in the actual Attack, or that the Complaint traces funds from the bank to the individuals who participated directly in the Attack. MTD 16. As discussed above, actual participation, specific intent, and traceability are not required allegations under JASTA.

***Presence at the time of the tort***. Although Defendant was not present at the scene of the Attack, neither was the defendant in *Halberstam* present at the scene of Halberstam's murder.

28

Indeed, a financial institution like Kuveyt Türk would likely never be "present" at an attack, and yet *Halberstam* does not immunize banks from liability. *See Halberstam*, 705 F.2d at 488.

***Relation to the tortious actor***. Defendant argues, in essence, that it only had an arms-length relationship with IUG, IHH, and Yaghmour—in contrast to the relatively close relationship Arab Bank had with HAMAS. MTD 17 (quoting *Miller*, 372 F. Supp. 3d at 47). But this factor is not about closeness. No bank is in a *personal* relationship with a terrorist group—as is clear from the example in *Halberstam* of a security guard and a motorist. *Halberstam*, 705 F.2d at 481-82. This factor instead asks whether the relationship "lent greater force" to the assistance, *id.* at 484— obviously, Kuveyt Türk's years-long role as banker to IUG, IHH, and Yaghmour lends the greatest possible force to the financial services it performed for HAMAS.

***State of mind***. Here, Defendant merely reasserts that Plaintiffs fail to adequately allege general awareness. MTD 17. For the reasons explained above, the Complaint does plausibly allege general awareness. Furthermore, Defendant's years long assistance to IUG and IHH "was no passing fancy or impetuous act." *Halberstam*, 705 F.2d at 488.

***Duration of assistance***. As Defendant acknowledges, the Complaint alleges that Kuveyt Türk provided years of assistance to, at least, IUG. MTD 18. Defendant attempts to deflect this allegation by contrasting it with the unsuccessful allegations in *Siegel* of a much longer duration of more substantial assistance. *Id.* But the allegations in *Siegel* did not fail to state a claim because the duration or degree of assistance alleged was insufficient, standing alone. As explained at length above, the Second Circuit dismissed the claims ultimately because the *Siegel* plaintiffs (1) were essentially bringing a negligence claim and (2) did not connect the HSBC defendants to ARB's alleged illicit conduct, let alone HSBC to AQI (the FTO). *Siegel*, 933 F.3d at 224-26. Here, by contrast, Plaintiffs have plausibly alleged Defendant's general awareness and its direct connection

29

to and relationship with IUG, IHH, and Yaghmour.

## II.    The ATA Provides Mrs. Henkin's Estate And Her Children's Guardians With Standing To Bring Their Own Solatium Claims.

Defendant argues that only the estate of Eitam Henkin has standing to bring a cause of action under the ATA. MTD 23-26. This is incorrect. Mrs. Henkin's estate and the Henkin children have standing to bring claims under the ATA (and JASTA) for their own solatium injuries resulting from the murder of Mr. Henkin, a U.S. national.

The ATA provides a civil remedy to "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, *or* his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a). Although the statute requires an injury to a U.S. national, it does not limit recovery to that injured party or, if the U.S. national is deceased, to the U.S. national's "estate." The statute includes claims for survivors or heirs (or both), inclusively and irrespective of citizenship. Indeed, Congress provided for multiple survivors (not just one) or multiple heirs (not just one) to bring claims. As a result, the ATA's plain text provides that there may be multiple plaintiffs stemming from the murder of one U.S. national.

Defendant argues, however, that the "or" in "estate, survivors, *or* heirs" is disjunctive such that only "only one of those classes—the estate, the survivors, or heirs" may bring a claim. MTD 25. This interpretation violates the "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Defendant's interpretation also undercuts the ATA's broad remedial purpose.  The ATA's "congressional purpose was to grant a remedy to U.S. nationals ***and their families*** who suffered from ***injury to an individual or property*** as a result of international terrorism." *Linde v. Arab Bank,*

30

*PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005); *see also Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 263 (D.R.I. 2004) ("Congress did not intend that the class of persons able to bring actions pursuant to § 2333(a) should be interpreted narrowly.").[10] A decedent's claims belong to the decedent's estate—for instance, a non-heir survivor has no presumptive right to the economic damages suffered by the decedent. Permitting a survivor who does not represent the estate to sue for the decedent's own injuries would compete with the estate's own claims, or the claims of *other* survivors and heirs. "Survivors or heirs" therefore may be among the people under state law that can represent an estate, but they cannot take the estate's claims for themselves. *See Knox v. Palestine Lib. Org.*, 248 F.R.D. 420, 423 (S.D.N.Y. 2008) (granting *separate* relief for "Plaintiffs, [who are] the representative *and* heirs *and* survivors of the Estate of Aharon Ellis"). Nor could the phrase "estate, survivors, or heirs" mean those permitted to represent the estate, as this would override state probate law and create the absurdity that an "estate" could represent an estate.

The ATA therefore permits different types of claims when a U.S. national dies as a result of a terrorist attack: claims of the estate, which includes the decedent's pain and suffering before death and his or her economic losses, *Knox v. Palestine Lib. Org.*, 442 F. Supp. 2d 62, 78-79 (S.D.N.Y. 2006), and claims of survivors and heirs, which together cover a decedent's family members under various definitions, for their own injuries. *See Miller*, 372 F. Supp. at 41 ("Spouses

---

[10]    Kuveyt Türk quotes a colloquy between witness Steven Valentine of the Department of Justice and Senator Thurmond at a 1990 Senate hearing. MTD 25. That witness's prepared statement, also included in the record, states: "We suggest that this provision be amended to include, in addition to the individual directly affected, such additional parties as the estate of the decedent, survivors, and heirs. ***This will ensure that the bill is fully protective of the interests of all relevant parties to the civil suit***." *See* Antiterrorism Act of 1990, Hearing Before the Subcomm. on Courts and Administrative Practice of the Comm. on the Judiciary of the United States Senate, 101st Cong. 38 (July 25, 1990). Obviously, Mrs. Henkin and her children are "relevant parties" in this context.

and relative[s] in direct lineal relationships are presumed to suffer damages for mental anguish.")) (quoting *Knox*, 442 F. Supp. 2d at 78); *Ungar*, 304 F. Supp. 2d at 263 ("[t]he parents or siblings of a U.S. national killed by terrorists are undeniably 'victims of international terrorism' in the sense that they suffer the loss of a close family member.").

Defendant's contrary interpretation is allegedly based on "current case law." MTD 24. But Defendant does not cite a single case for its position. Indeed, courts have rejected the argument that the phrase "estate, survivors, or heirs" in the ATA refers to the "capacity of a representative" to sue for a decedent's claim, rather than to bring a separate claim. *Lelchook*, 2011 WL 4087448, at *3 ("The fair meaning is that any national, or that national's estate, heirs or survivors may sue. This fair interpretation implements the congressional intent to interpret the statute broadly" and thus "each individual Plaintiff in this case may bring claims"); *see also Ungar*, 304 F. Supp. 2d at 263 (discussing the ATA's legislative history).

Courts have also found that the U.S. national's "estate, survivors, or heirs" need not be U.S. nationals themselves in order to recover on their own solatium claims. In *Ungar*, the court awarded damages to non-U.S.-citizen children for their own solatium claims stemming from their father's murder. *Ungar*, 304 F. Supp. 2d at 270-72 ("18 U.S.C. § 2333(a) contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States, and this court will not read such a requirement into the statute."). Another court similarly awarded solatium damages to a non-U.S. father as a "survivor" of a U.S. terror victim. *Weinstock v. Abu Marzook*, No. 17-cv-23202-RS, 2019 WL 1470245, at *4, *6 (S.D. Fla. Apr. 3, 2019). Again, Defendant cites no case to the contrary.

III.    **This Court Has Personal Jurisdiction Over Kuveyt Türk For Plaintiffs' Claim.**

Plaintiffs have pleaded a *prima facie* case that Kuveyt Türk is subject to specific personal jurisdiction in the State of New York pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and/or

32

Federal Rule of Civil Procedure 4(k)(1)-(2).[11] Compl. ¶¶ 4-5, 174, 177-78. The Court has personal jurisdiction where, as here, personal jurisdiction exists under both the laws of New York and under the due process protections of the U.S. Constitution. *See Miller*, 372 F. Supp. 3d at 42 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) ("*Licci III*")). New York's long-arm statute provides jurisdiction if Defendant "in person or through an agent … transact[ed] … business within the state." *See Id.* (quoting N.Y. C.P.L.R. 302(a)(1)). Indeed, a single transaction in New York, if related to Plaintiffs' claims, is sufficient to create personal jurisdiction under the state's long arm statute. *Id.* (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999)). The Constitution then permits the Court to exercise jurisdiction over Kuveyt Türk if any suit-related transactions create a "substantial connection" with New York. *Id.* (quoting *Licci III*, 732 F.3d at 168).

In *Licci III*, the Second Circuit held that a foreign bank's use of a correspondent account in New York to process transactions is sufficient to establish specific personal jurisdiction in an ATA case. 732 F.3d at 168. There, funds were transferred through a Lebanese bank's New York correspondent accounts for the benefit of a "charity" that served as a fundraiser for Hezbollah. *Id.* at 168-69. The allegations in *Licci III* were not that the Lebanese bank *itself* initiated the funds transfers through New York to its Hezbollah-related accounts, as Defendant contends. *See id.* at 165-66; *see also Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 327, 68 N.E.3d 1, 10 (N.Y. 2016)) ("Our cases do not require that the foreign bank itself direct the deposits, only that the bank affirmatively act on them," rather than "ignore or reject the funds"). However, like Kuveyt Türk,

---

[11]    As Defendant describes at page 28, note 10, of its brief, Plaintiffs similarly understood the Court's comments as a suggestion that it might postpone any ruling on Defendant's Rule 12(b)(2) motion, until after sufficient jurisdictional discovery is completed. Because Defendant has raised its argument against personal jurisdiction, Plaintiffs similarly raise (and preserve) their arguments in favor of personal jurisdiction and jurisdictional discovery.

the Lebanese bank in *Licci III* chose to offer its customers accounts denominated in U.S. dollars (Eurodollars) and chose to maintain correspondent accounts in the United States to clear and settle its U.S. dollar-denominated transactions. *See id.* The court found that the allegations also met the constitutional standard of minimum contacts and reasonableness, noting that it expected cases that fulfilled § 302 but not due process to be "rare." *Id.* at 170-74.

The Complaint satisfies the governing *Licci III* standard. Plaintiffs allege that Defendant made Eurodollar transfers through its correspondent accounts in New York for the benefit of HAMAS, and in so doing, has transacted business and committed tortious acts within the United States (and New York)—purposefully availing itself of United States jurisdiction. Compl. ¶¶ 4-5, 174, 177-78.

Defendant makes three arguments against personal jurisdiction. *First*, it asserts that Plaintiffs must allege that the specific funds transferred through its correspondent accounts were used to finance the Attack. *See* MTD 29. This is incorrect. Under *Licci III*, Plaintiffs need only plead sufficient facts to connect those funds transfers to a single element of their claim. *See Licci III*, 732 F.3d at 168-69; *see also Miller*, 372 F. Supp. 3d at 42 ("ATA claims do not necessarily have to correspond one-to-one with particular transfers."). As in *Licci III*, Plaintiffs allege transfers through New York correspondent accounts for the benefit of HAMAS. Compl. ¶¶ 5, 174, 177-78.

*Second*, it asserts that Plaintiffs have not pleaded "a volume of transfers sufficient to give rise to personal jurisdiction in the United States," citing *Licci III*. MTD 29. Although *Licci III* held that the transfer of several million dollars through New York was sufficient to establish jurisdiction, there is no "sufficient volume" threshold for personal jurisdiction. Indeed, "[a] single transaction is sufficient to satisfy this requirement, provided the relevant claims arise from that transaction." *See Miller*, 372 F. Supp. 3d at 42. In any event, Plaintiffs have alleged that at least

34

hundreds of thousands of Eurodollars were transferred through New York accounts. Compl. ¶ 178.

*Third*, Defendant asserts that, because of its allegedly limited New York contacts, Plaintiffs injuries must be *proximately caused* by Kuveyt Türk's contacts with New York, citing *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998). MTD at 29. *Chew* held that there *was* specific personal jurisdiction over the defendant German yacht-owner for the death of a crewmember in international waters, where defendant's agent hired the crew (including decedent) in Rhode Island, and the yacht-owner "intended to return to Rhode Island with many of the same crew members" (although not necessarily the decedent). *Chew*, 143 F.3d at 30. *Chew*, merely held that, in cases where forum contacts are limited, those contacts may need to be the proximate cause of injury. *Id.* at 30. *Licci III*—which assessed transfers through a correspondent bank in New York on behalf of an FTO's charity front—held that C.P.L.R. § 302(a)(1) does "not require a causal link between the defendant's New York business activity and a plaintiff's injury," only that the "claim arises out of, or relates to, the defendant's contacts with the forum." *Licci III*, 732 F.3d at 168-69. *Licci III* further held that "[s]o long as this in-forum activity sufficiently reflects the defendant's purposeful availment of the privilege of carrying on its activities here, minimum contacts are established, ***even if the effects of the defendant's entire course of conduct are felt elsewhere***." 732 F.3d at 173. Accordingly, Defendant is incorrect that "established Second Circuit [personal jurisdiction] law," MTD 29, requires Kuveyt Türk's New York conduct to be the proximate cause of Plaintiffs' harm, and as discussed above, personal jurisdiction exists under *Licci III*.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss.

Dated:   March 27, 2020

Respectfully Submitted,

/s/ Michael A. Petrino
Jonathan E. Missner (*pro hac vice*)
Michael A. Petrino (*pro hac vice*)
STEIN MITCHELL BEATO & MISSNER LLP
901 Fifteenth St., NW, Suite 700
Washington, D.C. 20005
Telephone: (202) 737-7777
Facsimile:  (202) 296-8312
mpetrino@steinmitchell.com

Gary M. Osen
Aaron Schlanger
OSEN LLC
2 University Plaza
Suite 402
Hackensack, NJ 07601
Tel: (201) 265-6400
Fax: (201) 265-0303

Gavriel Mairone
Adora Sauer (*pro hac vice*)
MM~LAW LLC
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
Tel: (312) 253-7444
Fax: (312) 275-8590

*Counsel for Plaintiffs*

36