UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

ESTATE OF EITAM HENKIN, et al.,                 :
                                                 :
                          Plaintiffs,            :
                                                 :        **MEMORANDUM**
               -against-                         :        **DECISION AND ORDER**
                                                 :
KUVEYT TURK KATILIM BANKASI,                     :        19-cv-5394 (BMC)
A.S.,                                            :
                                                 :
                          Defendant.             :
                                                 :
---------------------------------------------------------- X

**COGAN**, District Judge.

      This action arises after a husband and wife were killed during a terrorist attack in the

West Bank in 2015.  Their respective estates and surviving children bring a claim under the civil

liability provision of the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333(a), as amended by

the Justice Against State Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat.

852, against a Turkish bank, Kuveyt Turk Katilimi Bankasi, A.S. ("Kuveyt Turk"), for allegedly

aiding and abetting the terrorist organization responsible for the killings.

      The bank has moved to dismiss the complaint on three grounds: (1) that the Henkin

children and Mrs. Henkin may not seek redress under the ATA due to their nationality; (2) that

the complaint fails to state an aiding and abetting claim; and (3) that the Court lacks personal

jurisdiction over it.  For the reasons stated below, the motion to dismiss is denied as to the first

two grounds and deferred as to the personal jurisdiction issue pending discovery.[1]

---

[1] The parties have conferred and requested that the Court first consider defendant's motion to dismiss for failure to
state a claim.  They have agreed that, should the Court deny the motion, any discovery on personal jurisdiction
should proceed simultaneously with any discovery on the merits.  I will therefore reserve decision on this issue and
permit discovery since plaintiff may be able to establish jurisdiction when given an opportunity to develop a full
factual record.  See Leon v. Shmukler, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014) (citing In re Magnetic Audiotape
Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003)).

## SUMMARY OF COMPLAINT

According to the complaint, which is assumed to be true for purposes of defendant's Rule 12(b)(6) motion, Kuveyt Turk provided financial support to Hamas, a radical terrorist organization operating in the West Bank and Gaza Strip.[2]  The bank is accused of knowingly maintaining several bank accounts for a Hamas operative, the terrorist organization's primary Turkish fundraising entity, and a Hamas-controlled institution in Gaza, fully understanding the customers' roles in supporting Hamas' illicit and violent activities.  Hamas was founded in 1987 as an outgrowth of the Palestinian branch of the Muslim Brotherhood, an international Islamic organization committed to the globalization of Islam through social engineering and the elimination of the State of Israel through a violent *jihad* (holy war).

On the evening of October 1, 2015, Mr. Eitam Henkin, a U.S. national, and his wife, Mrs. Naama Henkin, a foreign national, were in the family van driving in the West Bank.  Traveling with them were their four young children.[3]  Another vehicle, carrying three Hamas gunmen, was secretly following them.  Once it got close to the family's van, a gunman leaned out of the car and sprayed automatic gunfire from his rifle at the van, quickly bringing both vehicles to a stop.

Two of the gunmen then stepped out of the car and quickly proceeded towards the immobilized van.  The first gunman approached and opened the driver's side door of the family's vehicle, encountering the wounded father.  Despite his injuries, Mr. Henkin struggled with his attacker and tried to grab the assailant's firearm.  At the same time, a second gunman opened the van's passenger's side door, saw the struggle between the two, and shot and killed Mr. Henkin.

---

[2] Hamas is an acronym for the Islamic Resistance Movement in Arabic, Harakat al-Muqawama al-Islamiya.  In October 8, 1997, the U.S. Government designated Hamas as a Foreign Terrorist Organization pursuant to 8 U.S.C. § 1189.  The designation has been renewed every two years.

[3] The children are also foreign nationals.

He then turned his weapon towards Mrs. Henkin and shot her at point blank range, killing her as well.  The four children, who remained in the vehicle during this entire ordeal, witnessed their parents' deaths, but were otherwise spared by the gunmen.  Several days later, the Israeli military captured the gunmen and others who helped plan and execute the attack on the family.  Those arrested admitted to authorities that they were Hamas operatives and that Hamas had committed the terrorist act.  Hamas leaders and one of its official websites also specifically praised the killings.

Plaintiffs allege that defendant aided and abetted the murders by providing banking services to three customers: (1) a known Hamas operative, Jihad Yaghmour; (2) a Hamas fundraiser designated by the Israeli government as a terrorist organization called the Foundation for Human Rights and Freedoms and Humanitarian Relief; and (3) a Hamas-controlled institution called the Islamic University of Gaza.  To understand how these three were connected with Hamas, a discussion on how Hamas raises and distributes funds would be beneficial.

The Union of Good was originally established in October 2000 to serve as Hamas' global fundraising network.  Comprised of more than 50 separate Islamic organizations, several of which have been designated as Specially Designated Global Terrorists ("SDGT") by the U.S. Treasury Department, it began as a fundraising drive for emergency aid at the outset of the Second Intifada, a terrorist campaign from 2000-2004 against the State of Israel.  The fundraising effort was so "successful," that the Union of Good was converted into a permanent institution.

Its nefarious efforts quickly attracted the attention of anti-terrorism authorities in both Israel and the United States.  In February 2002, Israel's Minister of Defense designated the Union of Good as "part of the Hamas organization or supporting it and strengthening its

infrastructure."  A few years later, in November 2008, the U.S. Treasury Department designated

the Union of Good as an SDGT, describing how the organization

> acts as a broker for Hamas by facilitating financial transfers between a web of
> charitable organizations – including several organizations previously designated
> under E.O. 13224 for providing support for Hamas – and Hamas-controlled
> organizations in the West Bank and Gaza.  The primary purpose of this activity is
> to strengthen Hamas' political and military position in the West Bank and Gaza
> including by: (i) diverting charitable donations to support Hamas members and
> the families of terrorist operatives; and (ii) dispensing social welfare and other
> charitable services on behalf of Hamas.

Notably, the Treasury Department identified that "[f]unds raised by the Union of Good affiliates

have been transferred to Hamas-managed organizations in the West Bank and Gaza" and also

diverted to "compensate[] Hamas terrorists by providing payments to the families of suicide

bombers."

The complaint alleges that Turkey has been a major political and financial supporter for

Hamas.  The Turkish President, for example, has publicly and frequently met with senior Hamas

leaders.  Turkey also accepted 11 Palestinian prisoners freed as part of a prisoner exchange

between Israel and Hamas in 2011.  A number of these individuals were Hamas operatives who

remained active with the terrorist organization upon their release from prison, including Jihad

Yaghmour.  An Israeli military court had sentenced Yaghmour to 30 years in prison for his

participation in the high-profile 1994 kidnapping and killing of an Israeli soldier.  Once released,

Yaghmour remained in Turkey and served as Hamas' liaison with Turkish authorities.

The Union of Good's most prominent and notorious fundraiser for Hamas in Turkey is

the Foundation for Human Rights and Freedoms and Humanitarian Relief ("IHH").  In July

2008, the Israeli Defense Minister signed a public order declaring IHH, along with 35 other

Islamic organizations, as banned entities in Israel since they were all members of the Union of

Good and "part of Hamas' fundraising network and both support[ed] and assist[ed] it" by

directly financing the activities of Hamas' military wing.  The order, publicly available on the official website of Israel's Ministry of Foreign Affairs, stated it was "the broadest and most comprehensive ever issued in Israel[.]"[4]  Out of the 36 listed members, IHH was the only Turkish organization identified.  By December 2012, the Israeli government had designated IHH as a Terrorist Organization.

For several years before the attack on the Henkin family, IHH was recognized in Turkey as an organization that provided financial support to Hamas.  In 2009, IHH sent a Turkish representative named Ezat Shahin to open an IHH branch office in Gaza, where Shanin operated through known Hamas institutions to funnel thousands of U.S. dollars to the terrorist organization.  Within a year, he was arrested by the Israel Security Agency and charged with funding terrorism and working with Hamas.  The same year, IHH and other Turkish associations organized a public demonstration in Turkey's capital, Ankara, in support of Hamas.  In 2010, IHH also purchased three ships, including a passenger ship called the Mavi Marmara, to participate in the so-called Gaza Freedom Flotilla and attempt to break Israel's naval blockade of Gaza.  While attempting to circumvent the blockade, the Mavi Marmara was boarded by Israeli commandos, who were quickly attacked by IHH supporters armed with knives, axes, chains, and clubs.  The Israeli boarding party responded with lethal force and several IHH supporters aboard the ship were killed.  This deadly incident was widely covered by the international media.

IHH also provided funding to a Hamas-controlled institution in Gaza, the Islamic University of Gaza ("IUG").  The complaint alleges that, since the 1990s, IUG has been identified exclusively with Hamas and has served as a principal source for recruitment into the

---

[4] See https://www.mfa.gov.il/mfa/pressroom/2008/pages/defense%20minister%20signs%20order%20banning%20hamas-affiliated%20charitable%20organizations%207-jul-2008.aspx.

5

terrorist organization's ranks in Gaza, including the al-Qassam Brigades – Hamas' terrorist apparatus.  Specifically, in 1993, an FBI wiretap recorded a Hamas affiliate describing IUG as "the principal organization known to be affiliated with [Hamas]."  On May 29, 2007, the U.S. Department of Justice publicly identified IUG as part of Hamas' social infrastructure by listing it as an unindicted co-conspirator in a federal criminal prosecution against a separate charity and its officers for allegedly providing millions of dollars to Hamas.[5]  And also that year, an Arabic newspaper, *al-Mustaqbal*, described the university as "the main stronghold of Hamas in Gaza."

Numerous Hamas leaders also had close ties to IUG, further suggesting that the university was an alter ego of Hamas.  Hamas' external (and supreme) leader, Ismail Haniyah, once served as the dean of the university, gave a public address at IUG in January 2010, and was the university's commencement speaker in June 2013.  Further, IUG's supervisory board was headed by Khayri Hafiz Al-Agha, a wealthy senior Muslim Brotherhood leader.  After his death, Al-Agha's son, Abu-Ubayadah Khayri Hafiz Al-Agha (Al-Agha Jr.), assumed this influential position.  The son was later designated an SDGT by the U.S. Treasury Department for being "a senior Hamas financial officer involved in the investment, funding and money transfers for Hamas in Saudi Arabia."  Another senior Hamas leader who served as the Minister for Telecommunications for the Hamas-run government in Gaza, Jamal N. al-Khoudary, also served as the Chairman of the Board of Trustees of IUG from 1993 until 2014.

Even before the attack on the Henkin family, the Turkish media had reported on IUG's ties to Hamas.  In 2007, a major Turkish newspaper reported that a weapons cache was uncovered on IUG's campus.  The al-Qassam Brigades had long used IUG's facilities for terrorist activities and training, such as storing weapons on its campus, using its laboratories to

---

[5] See United States v. Holy Land Foundation, No. 04-cr-240, Dkt. No. 656 (N.D. Tex. May 29, 2007).

develop and manufacture weapons, and using its rooms to hold meetings for Hamas leadership and operatives.  In 2008, a Turkish news website described the university as "a cultural symbol of Hamas," and, in 2010, another news website chronicled the origins of Hamas, its founding, and key institutions in Gaza.  In 2014, the Turkish media widely reported that Hamas leaders publicly acknowledged that Hamas was responsible for the kidnapping and murder of three Israeli teenagers.  Lastly, in September 2015, the country's media reported how Al-Agha Jr., the head of IUG's supervisory board, had been designated as a senior Hamas fundraiser by the U.S. Treasury Department.

Kuveyt Bank employs several mechanisms to ostensibly avoid doing business with terrorist organizations.  Its Risk, Control and Compliance Department claims it engages in (a) suspicious activity reporting, (b) transaction monitoring, (c) adverse information screening, and (d) sanctions compliance.  The bank further claims that its Anti-Money Laundering and Combating Finance of Terrorism Policy prohibits it from maintaining a business relationship with "[t]hose who are in the lists of supporters of money laundering and/or financing terrorism prepared by local regulators or international bodies and institutions" and that it monitors "the client and his/her activities while the client-relationship continues."

Despite these prophylactic measures, from 2012-2015, Kuveyt Bank maintained several bank accounts for Yaghmour, IHH, and IUG.  Some of these accounts were Eurodollar accounts, which were used to transfer substantial funds through correspondent bank accounts in the United States.[6]  In the years immediately preceding the act of terrorism at issue here, Kuveyt Bank transferred at least hundreds of thousands of Eurodollars in the name of IUG, at the direction of

---

[6] Eurodollars are U.S. dollars that have been deposited with a banking institution located outside the United States.  Citibank, N.A. v. Wells Fargo Asian Ltd., 495 U.S. 660, 662-63 (1990).  The vast majority of Eurodollar transfers between banks are cleared and settled in New York.

two individuals mentioned above: Jamal N. al-Khoudary, the high-ranking Hamas official who served as the Chairman of IUG's Board of Trustees; and Al-Agha Jr., the U.S. designated SDGT identified as a Hamas fundraiser, who served as the head of IUG's supervisory board.

Plaintiffs claim that Kuveyt Bank, by maintaining multiple bank accounts for a notorious Hamas operative, Hamas' most prominent fundraiser in Turkey, and a key Hamas institution in Gaza, understood that it was providing vital financial services to the terrorist organization responsible for the deaths of Mr. and Mrs. Henkin.  Plaintiffs thus bring a sole cause of action under JASTA against the bank for allegedly aiding and abetting Hamas by knowingly providing substantial assistance to Hamas while the bank was generally aware of its role in a continuing criminal enterprise from which terrorist and violent activities were a natural and foreseeable consequence.

## DISCUSSION

### I.     Foreign Survivors and Heirs under the ATA

The ATA provides a cause of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs … ."  18 U.S.C. § 2333.  The ATA thus "excludes foreign nationals (with the possible exception of foreign survivors or heirs)" from its provision providing a cause of action.  Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 1404 (2018).  Further, under the ATA, someone who "survived the attack … has no 'survivors' or 'heirs' that can recover for his injuries on his behalf."  Morris v. Khadr, 415 F. Supp. 2d 1323, 1337 (D. Utah 2006).

Courts permit "[p]laintiffs to pursue claims for solatium [emotional] damages" under the ATA.  Lelchook v. Commerzbank AG, No. 10-cv-5795, 2011 WL 4087448, at *2 (S.D.N.Y. Aug. 2, 2011).  To this end, "[s]pouses and relative[s] in direct lineal relationships are presumed

8

to suffer damages for mental anguish." Knox v. Palestine Liberation Org., 442 F. Supp. 2d 62,

78 (S.D.N.Y. 2006) (quoting Smith ex rel. Smith v. Islamic Emirate of Afghanistan, 262 F. Supp.

2d 217, 234 (S.D.N.Y. 2003)).

Here, Mr. Henkin, a U.S. national, perished during the attack, and thus defendant

concedes his estate may bring a claim on his behalf.  Defendant, however, advances three

arguments challenging whether the remaining plaintiffs have a cause of action under the ATA.[7]

First, it contends that the statute's use of the disjunctive article "or" in the text means that only

the injured U.S national or – if he is deceased – his estate, or his heirs, or his survivors may sue

on the victim's behalf – but not more than one of these categories of persons.  Second, it

contends that the Henkin children may not seek redress under the ATA because they are not U.S.

nationals.  And, third, it contends that Mrs. Henkin's estate may not sue because she too was a

foreign national upon her death.  All of these arguments fail.

To support its first argument, defendant points out that "only one representative of a

deceased U.S. national is necessary to bring a suit on behalf of that decedent" and thus contends

that only Mr. Henkin's estate may maintain a cause of action under the ATA.  In Lelchook, the

court rejected this argument as one "based on a strained interpretation" of the statute.  See 2011

WL 4087448, at *3.  I agree.  Defendant's assertion that multiple representatives would be

"superfluous" is inconsistent with the statue's plain meaning that permits multiple "survivors" or

"heirs" to bring a cause of action.  Thus, a better reading is that any "[U.S.] national, or that

national's estate, heirs, or survivors may sue" – which furthers "congressional intent to interpret

---

[7] The Supreme Court has clarified that "what has been called 'statutory standing' in fact is not a standing
issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.'"  Am.
Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d 352, 359 (2d Cir. 2016) (quoting Lexmark Int'l, Inc. v.
Static Control Components, Inc., 572 U.S. 118, 128 (2014)).

the statute broadly." Id.  For this reason, courts routinely permit the deceased individual's estate, survivors, and heirs to bring separate claims under the ATA.  See, e.g., Knox v. The Palestine Liberation Org., 248 F.R.D. 420, 423 (S.D.N.Y. 2008); Weiss v. Nat'l Westminster Bank PLC, 453 F. Supp. 2d 609, 620 (E.D.N.Y. 2006); Estates of Ungar ex rel. Strachman v. Palestinian Auth., 304 F. Supp. 2d 232, 263 (D.R.I. 2004).

The Henkin children's nationality makes no difference.  "18 U.S.C. § 2333(a) contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States."  Ungar, 304 F. Supp. 2d at 271. Defendant's narrow interpretation would undermine the ATA's broad remedial purpose "to grant a remedy to U.S. nationals and their families who suffered from injury to an individual or property as a result of international terrorism."  Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005), vacated on other grounds, 882 F.3d 314 (2d Cir. 2018).  Accordingly, this Court "will not read such a requirement into the statute."  Ungar, 304 F. Supp. 2d at 271.  See also Weinstock v. Abu Marzook, No. 17-cv-23202, 2019 WL 1470245, at *4 (S.D. Fla. Apr. 3, 2019) (stating that the deceased's father, who was not a U.S. citizen, was included among those permitted to bring a claim under § 2333); Weiss, 453 F. Supp. 2d at 620 ("it is sufficient for plaintiffs to allege a familial relationship, such as that of a child, parent, spouse, or sibling of a U.S. national.").

For the same reason, Mrs. Henkin, and by extension, her estate, may seek solatium damages arising from her husband's death.  According to the complaint, the Hamas gunmen first killed Mr. Henkin before shooting his wife and killing her.  In other words, even though it may have been a mere split seconds, Mrs. Henkin nonetheless outlived her husband and witnessed his death, causing her severe pain and suffering.  Congress meant to incorporate the full range of

traditional tort principles in the ATA, see Lelchook, 2011 WL 4087448, at *2, and it is blackletter law that a tort victim can collect for compensable terror, even if the duration is extremely limited.  See, e.g., Skubikowski v. Morena, 190 F.R.D. 305, 306-07 (N.D.N.Y. 2000); Lang v. Bouju, 245 A.D.2d 1000, 667 N.Y.S.2d 440 (3rd Dep't 1997).  Mrs. Henkin's estate may therefore maintain a cause of action under the ATA.

A contrary conclusion would make little sense.  Upon a U.S. national's death, the statute grants his "survivors" and "heirs" a cause of action.  The fact that Mrs. Henkin's life was cut short by her husband's assailants only a few seconds later should not divest her estate from bringing a claim for emotional damages from witnessing her husband's death.  See Ungar, 304 F. Supp. 2d at 267 (stating the deterrent effect of the legislation would be maximized if it was interpreted to subject terrorists to the broadest possible range of damages, including both pecuniary and non-economic damages).  Holding otherwise would be tantamount to reviving the discarded common law prohibition against recovery for wrongful death, a doctrine that has long been superseded by statute or case law in virtually every common law jurisdiction.  See generally Phoenix Indem. Co. v. Staten Island Rapid Transit Ry. Co., 251 N.Y. 127, 136, 167 N.E. 194, 197 (1929), aff'd, 281 U.S. 98 (1930).

## II.    Aiding and Abetting Claim

To survive a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citation omitted).

Congress enacted JASTA, amending Section 2333 of the ATA, "to provide civil litigants with the *broadest possible basis* to seek relief against those who have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States." <u>Siegel v. HSBC N. Am. Holdings, Inc.</u>, 933 F.3d 217, 233 n.5 (2d Cir. 2019) (quoting 18 U.S.C. § 2333 Statutory Notes) (internal quotation marks omitted). To that end, JASTA expressly authorized civil claims based on theories of "secondary" liability – for conspiring to violate the ATA and for aiding and abetting violations of the ATA. <u>See</u> 18 U.S.C. § 2333(d)(2).

The Act further states that <u>Halberstam v. Welch</u>, 705 F.2d 472 (D.C. Cir. 1983), provides "the proper legal framework" for "[f]ederal civil aiding and abetting and conspiracy liability." JASTA, § 2(a)(5). In <u>Halberstam</u>, the Court set forth the three elements of a civil aiding and abetting claim: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477. In the instant case, the first element warrants little discussion. Plaintiffs have adequately pled that Hamas committed the wrongful terrorist killings: the gunmen confessed they were Hamas agents and Hamas leaders and its official website praised the attack.

As to the second element, to plead adequately the "general-awareness" element, a plaintiff must plausibly allege that the defendant was "aware that, by assisting the principal, it is itself assuming a role in terrorist activities." <u>See Linde v. Arab Bank, PLC</u>, 882 F.3d 314, 329

(2d Cir. 2018) (internal quotation marks omitted).  In <u>Linde</u>, the Circuit explained that, although "[s]uch awareness does not require proof of … specific intent" or knowledge "of the specific attacks at issue," it does require that "the bank was generally aware that [, by providing financial services to a client,] it was thereby playing a 'role' in [the] violent or life-endangering activities." <u>Id.</u>

I concur with plaintiffs' contention that an application of <u>Halberstam</u> to this case compels me to deny defendant's motion to dismiss.  In <u>Halberstam</u>, the D.C. Circuit held that Linda Hamilton was civilly liable under an aiding and abetting theory after her boyfriend, Bernard Welch, a serial burglar, murdered Dr. Halberstam during the commission of a burglary. Hamilton was neither accused of planning nor knowing about the murder.  Rather, the extent of Hamilton's involvement in Welch's illicit activities was "neutral standing alone," <u>Halberstam</u>, 705 F.2d at 488.  Specifically, she typed letters for the sale of goods, kept inventories of antiques sold, and in general did secretarial work for Welch.  As to her state of mind, Hamilton testified that she had no idea that her boyfriend's business of selling antiques, jewelry, silverware, and other various household goods was related to any criminal activities.

The district court, however, rejected Hamilton's pleas of ignorance and entered a verdict against her, and the D.C. Circuit affirmed on appeal.  The Court reasoned that it "defies credulity that Hamilton did not know that something illegal was afoot," <u>id.</u> at 486, due to the following red flags: Welch's pattern of unaccompanied evening jaunts over five years; his boxes of booty; the smelting of gold and silver; the sudden influx of great wealth; the filtering of all transactions through Hamilton except payouts for goods; and Hamilton's collusive and unsubstantiated treatment of income and deductions on her tax forms.  The Court held that liability for aiding and

abetting murder followed even though Hamilton did not intend to facilitate violence or even

know that Welch was committing burglaries:

> It was not necessary that Hamilton knew specifically that Welch was committing
> burglaries. Rather, when she assisted him, it was enough that she knew he was
> involved in some type of personal property crime at night – whether as a fence,
> burglar, or armed robbery made no difference – because violence and killing is a
> foreseeable risk in any of these enterprises.

Id. at 488. Because Hamilton "knew about and acted to support Welch's illicit enterprise," this

demonstrated that she "had a general awareness of her role in a continuing criminal enterprise."

Id. She was therefore found liable for the "reasonably foreseeable acts done in connection with"

Welch's tortious activity, including Halberstam's murder. Id. at 484.

Analogizing our case to Halberstam and drawing all reasonable inferences in plaintiffs'

favor, I find that they have adequately nudged their claim of secondary liability under the ATA

"across the line from conceivable to plausible." Twombly, 550 U.S. at 570. It is plausible that

Kuveyt Turk, similar to Hamilton, was aware of the various warning signs and red flags about its

customers from which they could infer that the funds from these accounts would make their way

to Hamas, a designated foreign terrorist organization responsible for the attack on the Henkin

family.

The complaint alleges that it was generally known that IHH was the most prominent

fundraiser in Turkey for Hamas. In July 2008 – well before the October 2015 attack – in its

"broadest and most comprehensive order ever issued," Israel designated IHH as part of Hamas'

fundraising apparatus and as an active member of the Union of Good. Only a few months later,

in November 2008, the U.S. Treasury Department designated the Union of Good as an SDGT,

identifying that its primary purpose was to strengthen and support Hamas, funnel funds to the

terrorist organization, and that "[f]unds raised by the Union of Good affiliates have been

transferred to Hamas-managed organizations in the West Bank and Gaza." It is therefore plausible that, once the United States recognized the Union of Good and its numerous "affiliates" as Hamas fundraisers, Kuveyt Bank's robust Anti-Terrorism and compliance department, having conducted due diligence of its clients from 2012-2015, knew that IHH was a conduit for Hamas.

This conclusion is bolstered by the two international incidents that arose even before the October 2015 terrorist attack, further cementing IHH's ties to Hamas: the arrest of an IHH representative by Israel authorities in the West Bank for funding terrorism and working with Hamas; and the flotilla incident in which several armed IHH supporters, aboard an IHH-purchased ship, violently attacked Israel commandos and were subsequently killed in an attempt to break Israel's naval blockade of Hamas-controlled Gaza. Since all of this information was publicly available, once I draw all reasonable inferences in plaintiffs' favor, it is plausible that Kuveyt Bank knew the funds it transferred at IHH's request to Hamas-affiliated entities in the West Bank and Gaza would make its way to Hamas to support its violent activities.

As to IUG and Yaghmour, it is plausible that the bank was also aware of the litany of warning signs from which they would infer that illicit activity was afoot and that terrorist activities and violence were reasonably foreseeable. Before the October 2015 attack, the university was well-known as a pipeline into Hamas' terrorist wing and utilized by Hamas to store caches of weapons; had been identified by the U.S. Department of Justice as an unindicted co-conspirator and part of Hamas' social infrastructure in a federal criminal case against Hamas fundraisers; labeled by an Arabic newspaper as a "stronghold of Hamas in Gaza" and as "a cultural symbol of Hamas" by a Turkish online news site; and several Hamas leaders held prominent positions at the university. For example, IUG's supervisory board was headed by an individual designated by the Treasury Department as an SDGT intimately involved in the

funding of Hamas, and the dean was a high-ranking Hamas Minister.  The bank processed several high-value transactions to the Hamas-controlled institution at the request of these same individuals.  Yaghmour was a notorious Hamas affiliate convicted of kidnapping and murdering an Israeli soldier.  He was freed during a prisoner exchange with Israel and also served as Hamas' liaison with Turkish authorities.

Defendant contends that plaintiffs are required to plead with specificity that the bank read or was actually aware of information connecting its customers to Hamas to survive a motion to dismiss.  It relies on several district court cases for this proposition, many of which are pending appeal before the Second Circuit or which heavily relied upon one of these cases.[8]  Despite this supposed "trend," there is no such pleading requirement under JASTA or Halberstam.  Nor is this interpretation consistent with the statute's broad remedial purpose and findings.

As a practical matter – absent discovery – terrorist victims and their families understandably do not have conclusive evidence that bank officials or compliance staff had actual knowledge of various red flags that could have apprised them of their customer's nefarious activities.  See Phelps v. Kapnolas, 308 F.3d 180, 187 (2d Cir. 2002) (stating that, "through discovery," a plaintiff might "uncover direct evidence of Defendants knowledge").[9]  I am aware of no financial institution (or any other institution for that matter) that would so freely and publicly air its own dirty laundry or otherwise prematurely disclose sensitive internal

---

[8] See, e.g., Honickman for Estate of Goldstein v. BLOM Bank SAL, 432 F. Supp. 3d 253, 265 (E.D.N.Y. 2020), appeal docketed, No. 20-575 (2d Cir. Feb. 13, 2020); Kaplan v. Lebanese Canadian Bank, SAL, 405 F. Supp. 3d 525, 535 (S.D.N.Y. 2019), appeal docketed, No. 19-3522 (2d Cir. Oct. 21, 2019); O'Sullivan v. Deutsche Bank AG et al., No. 17-cv-8709, 2019 WL 1409446, at *10 (S.D.N.Y. March 28, 2019).

[9] 10B, Wright & Miller, Federal Practice and Procedure § 2730 (4th ed. 1998) ("Since the information relating to state of mind generally is within the exclusive knowledge of one of the litigants and can be evaluated only on the basis of circumstantial evidence, the other parties normally should have an opportunity to engage in discovery before a summary judgment is rendered.").

communication among its agents from which a plaintiff could piece together a complaint adequate to satisfy the pleading standard defendant would have me impose.

It is for this reason that even in the context of a fraud claim brought under the Securities Act of 1993, "[a]ctual knowledge may be proven or disproven by direct evidence, circumstantial evidence, or a combination of the two." Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 122 (2d Cir. 2017) (citing Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003)).  Consequently, "[p]ublicly available information may provide relevant circumstantial evidence of actual knowledge." Id.  In fact, when considering a motion to dismiss in such an action, courts are expected to be "lenient in allowing scienter issues … [t]o survive motions to dismiss" – even "on fairly tenuous inferences." In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 693 (2d Cir. 2009) (internal citation and quotation marks omitted). Further, a court must "view the alleged facts in their totality, not in isolation" in determining their adequacy.  Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 171 (2d Cir. 2015).

If a plaintiff can rely on circumstantial evidence when facing a heightened pleading standard when alleging fraud under Rule 9(b), it must logically follow that a plaintiff asserting an ATA/JASTA claim may as well.  In material support cases, for example, courts in this district have denied motions to dismiss where there is publicly available information from which the bank could have learned of their clients' terrorist identities or connections prior to receiving and transferring funds to and from them. See, e.g., Weiss, 453 F. Supp. 2d at 626-27 (bank's customers designated as Hamas fronts by Israeli government); Strauss v. Credit Lyonnais, S.A., No. 06-cv-702, 2006 WL 2862704, at *14-15 (E.D.N.Y. Oct. 5, 2006) (stating it was reasonable to believe a bank, after noticing large transfers of money to the West Bank and Gaza strip, would

17

have investigated the organizations receiving the transfers, including designations made by the Israeli government).

      If I were to adopt defendant's position, it would be rare and fortuitous that any potential plaintiff could survive a motion to dismiss and obtain crucial discovery as to the bank's actual knowledge of whether it was assuming a role in an illicit activity.  In fact, it would be virtually impossible.  This would vitiate Congress's entire purpose behind enacting JASTA: "to provide civil litigants with the *broadest possible basis* to seek relief against those who have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United State."  Siegel, 933 F.3d at 223 n.5 (emphases in original). See also S. Rep. 102-342, at 22 (1992) (stating the ATA was intended to permit "the imposition of liability at *any point* along the causal chain of terrorism" and meant to "interrupt, or at least imperil, the flow of money") (emphasis added); Linde, 882 F.3d at 320 ("Congress enacted JASTA, which *expands* ATA civil liability") (emphasis added).

      Most relevant here, when enacting JASTA, Congress expressly laid out the statute's findings, including the following:

- Some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States.

- Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States … necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.

JASTA §§ 2(a)(3) and 2(a)(6), respectively.  It would therefore make little sense to relieve a financial institution of liability for aiding and abetting Hamas simply because the terrorist organization intentionally raised funds through an intermediary, an alter ego, or a mere front to

engage in violence.  Congress's intent to reach financial institutions providing indirect support through conduits is evidenced by its broad use of the term "person" in the statute.  See 18 U.S.C. § 2333(d)(1) and (2) (defining the term "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies as well as individuals."). To demand such an insurmountable pleading standard would "thwart the obvious purpose of the statute."  See Comm'r v. Brown, 380 U.S. 563, 571 (1965).

Defendant argues that the instant allegations do not rise to the level in Linde, where there were internal communications suggesting that the bank was aware that the transfers were payments for martyrdom operations.  However, the Second Circuit in Linde was not resolving a motion to dismiss.  Rather, the Court was discussing whether, as a matter of law, a properly instructed jury could infer the requisite awareness required to find aiding and abetting liability when "certain communications dating from [before the attack which] could have alerted the bank that the transfers being requested therein were payments for suicide bombings."  Linde, 882 F.3d at 330.  The Court remanded the case for a jury to decide that question, recognizing that it would be improper to invade "the function and province of the jury" to resolve the "question of whether the defendant possessed requisite knowledge."  See id. (quoting Harrison v. Mo. Pac. R. Co., 372 U.S. 248, 249 (1963)).  It would therefore be misguided to construe the Linde Court's discussion of evidentiary sufficiency after years of discovery and a fully contested trial as setting forth the minimum pleading standard under JASTA at the motion to dismiss stage.

Nor does the Second Circuit's decision in Siegel require a different result.  There, the Circuit affirmed the district court's dismissal of the plaintiffs' aiding and abetting claim against the defendant-bank, HSBC, premised on the allegation that HSBC provided banking services to another financial institution, Al Rajhi Bank ("ARB").  The complaint alleged the following: (1)

19

that it was publicly known that ARB's owner had links to financing organizations associated with terrorism; (2) that a few months before the attack, two individuals unaffiliated with HSBC and ARB were charged with cashing $130,000 in travelers checks at an ARB branch in Saudi Arabia and sending the money to suspected terrorists; (3) that the United States had designated several Saudi-based non-profits organizations – all clients of ARB – as terrorist organizations; and (4) that in 2002, an HSBC agent expressed concern to another colleague "that [ARB's] account [with HSBC] *may* have been used by terrorists," which "*if* true, … could potentially open [HSBC] up to public scrutiny and/or regulatory criticism." Siegel, 933 F.3d at 220 (emphases added).  The Circuit, however, found that the allegations at most "assert[ed] that HSBC was aware that ARB was believed by some to have links to [al-Qaeda] and other terrorist organizations," id. at 224, and affirmed the judgment of the district court.

Addressing the "general-awareness" element, the Circuit reasoned that HSBC had "little reason to suspect that it was assuming a role in [al-Qaeda's] terrorist activities." Id.  Foremost, HSBC's customer was a large bank with vast operations: it was Saudi Arabia's largest private bank, holding $80 billion in assets with over 500 branches throughout the Middle East.  Further, plaintiffs did "not allege that most, or even many, of ARB's banking activities [were] linked to terrorists[.]" Id.  In other words, HSBC's customer was a legitimate business and, before the terrorist attacks, ARB had never been publicly identified as a terrorist affiliate, alter ego, or routine conduit to al-Qaeda.

More importantly, or as the Siegel Court put it – "crucially" – the plaintiffs conceded that "ten months before the November 9 Attacks – HSBC ceased doing business with ARB altogether." Id.  Thus, the bank's conscious decision to cut off ARB well before the terrorist bombings at issue made it "implausible under the circumstances that HSBC knowingly assumed

20

a role in the Attack." <u>Id.</u>  Finally, although HSBC provided nearly $1 billion in U.S. dollars to

ARB, the Court found that the plaintiffs had failed to advance any plausible, factual allegation

that "HSBC knew or intended that those funds would be sent to [al-Qaeda] or any other terrorist

organization.  This forecloses their JASTA claim." <u>Id.</u> at 224-25.

      Several crucial factors distinguish our case from <u>Siegel</u>.  Principally, unlike the instant

case, in <u>Siegel</u>, there was an extra link in the chain: ARB had never been publicly identified as a

terrorist organization or as a mere conduit for one by any government before the November 2005

attack.[10]  Thus, it was never alleged that HSBC was directly dealing with a terrorist organization

or any of its known affiliates during the relevant timeframe.  Rather, as far as HSBC was

concerned, it was in business with a large bank with vast and legitimate operations and, because

the customer's legitimate banking activities far outweighed any supposedly nefarious ones,

HSBC had "little reason to suspect" it was assuming a role in terrorist activities by providing

banking services to Saudi Arabia's largest private bank. <u>Id.</u> at 224.  Finally, plaintiffs do not

concede that Kuveyt Bank ever ceased providing financial services to its three customers before

the October 2015 attack.

      Where the <u>Siegel</u> Court could excuse HSBC's ignorance of its customer's customers, a

different standard should apply when a defendant-bank is dealing directly with a known terrorist

organization, its fundraisers, mere conduits, or alter egos.  <u>See, e.g.</u>, <u>Lelchook v. Islamic</u>

<u>Republic of Iran</u>, 393 F. Supp. 3d 261, 264, 267-68 (E.D.N.Y. 2019) (finding that a bank was

"generally aware" of its "role" in Hezbollah's violent or life-endangering activities by

---

[10] The plaintiffs attempted to demonstrate HSBC's knowledge circumstantially, in part, by pointing towards a *classified* and thus non-publicly available 2003 Central Intelligence Agency report in which ARB was identified as a conduit for financing extremists.  The existence of this report, however, only became a matter of public record in July 2007 after a Wall Street Journal news article by Glenn Simpson quoted excerpts from the CIA report.  <u>See</u> https://www.hsgac.senate.gov/imo/media/doc/PSI%20REPORTHSBC%20CASE%20HISTORY%20(9.6).pdf.  It was thus not plausible that HSBC knew of the CIA's determination before the November 2005 terrorist attack.

transferring funds to its branch offices in Hezbollah-controlled regions); Estate of Hirshfeld v. Bank of China, No. 18-cv-1982, Dkt. No. 61, at *13 (S.D.N.Y. Aug. 9, 2019) (order denying a motion for judgment on the pleadings when it was alleged that the bank executed transfers for known Hamas operatives).[11]

Here, there were plenty of warning flags providing Kuveyt Bank reason to know that the funds it transferred on its customers behalf would flow to Hamas and thus create a need to investigate the background of its customers.  As stated above, in a highly-publicized and historic order banning 36 Islamic associations, Israel designated IHH as a member of the Union of Good complicit in funneling funds to Hamas; IHH was the only Turkish organization identified.  A single online search at any time between 2008 and October 2015 would have confirmed IHH's status as a substantiated Hamas conduit and terrorist organization.  The bank had even a greater reason to investigate IHH and IUG when the U.S. Treasury Department designated the Union of Good as an SDGT in November 2008, explicitly stating it worked through "affiliates" to transfer funds to Hamas-controlled institutions in the West Bank and Gaza.  The inextricable connection between IHH and Hamas was also arguably apparent after the two international incidents involving the arrest of the IHH representative for funding terrorism in Gaza and the internationally-publicized and deadly "flotilla" incident many years before the October 2015 attack.

---

[11] Defendant argues that the three gunmen responsible for the killings were not actual customers of Kuveyt Turk. This is immaterial.  As noted above, the gunmen admitted to Israeli authorities that they were Hamas operatives and that Hamas had committed the terrorist attack.  Further, Hamas leaders and the terrorist organization's official website ratified the killings by praising the attack, which occurred in Hamas-controlled West Bank.  Congress expressly stated that JASTA applies to any defendant who provides material support or resources, "directly or indirectly, to the persons or organizations responsible for … injuries."  JASTA § 2(a)(7).  Even indirect support to a terrorist organization is actionable under JASTA.  See Miller v. Arab Bank, PLC, 372 F. Supp. 3d 33, 48 (E.D.N.Y. 2019) ("[A] defendant may be liable under the ATA for aiding and abetting organization behind the attacks, not only the individual 'triggerman' or suicide bomber.").

Whereas public information specifically linking ARB and al-Qaeda before November 2005 was missing in <u>Siegel</u>, there were a litany of red flags to keep Kuveyt Bank's compliance department busy during the relevant timeframe.  In fact, it would defy credulity that a sophisticated bank with a robust Anti-Laundering and Terrorism policy was oblivious that Israel had identified IHH as a Turkish fundraiser and member of the Union of Good and declared it as a terrorist organization in 2008 and 2012, respectively.

As to the third element of aiding and abetting liability under JASTA – "substantial assistance" – I must consider six factors: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance."  <u>Siegel</u>, 933 F.3d at 225 (citing <u>Linde</u>, 882 F.3d at 329).

Plaintiffs have adequately pled this final element.  Even if Kuveyt Bank did not know about the specific attack at issue when it provided banking services to its customers for several years, plaintiffs have plausibly alleged that the bank was generally aware of its role in terrorist activities in light of the ubiquitous information available concerning its customers from which the Court can infer that the bank knowingly and substantially assisted the principal violation – a natural and foreseeable risk under the <u>Halberstam</u> framework.

The attack on the Henkin family was caused by Hamas and its operatives.  For many years before and even during the time of the terrorist attack at issue, Kuveyt Bank continued to provide banking services to three customers with "many" known connections to Hamas or terrorist activities, one of which was identified as a terrorist organization and a member of the Union of Good by the Israeli government.  Despite this designation, the bank continued to do business with IHH, further demonstrating the bank's state of mind and close relationship with an

entity known as a conduit for Hamas.  And, on several occasions, the bank transferred at least

hundreds of thousands of Eurodollars in the name of IUG, a Hamas-controlled institution – at the

direction of a Hamas Minister, who also served as the university's Chairman of the Board of

Trustees and another individual designated as an SDGT by the U.S. government for being a

Hamas fundraiser.  These factual allegations are sufficient at this stage.[12]

## **CONCLUSION**

Defendant's motion to dismiss [24] is denied, except as to personal jurisdiction, the

decision on which is deferred pending discovery.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
         October 20, 2020

---

[12] Siegel is distinguishable on this issue as well: (1) HSBC ceased doing business with ARB ten months before any terrorist attack; (2) HSBC's client was another financial institution, not merely the alter ego or mere front for one; (3) there was no non-conclusory allegation that al-Qaeda received any funds or that HSBC knew or intended that it would receive the funds; and (4) although HSBC had provided banking services to ARB for 25 years, the relationship's longevity was mitigated by the fact that ARB was a large bank with vast, legitimate operations.  933 F.3d at 225-26.