April 11, 2023

**VIA ECF**
Hon. Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza
Brooklyn, N.Y. 11201

Re:    **Kuveyt Türk Notice of Supplemental Authority, *Henkin v. Kuveyt Türk*, No.
1:19-cv-05394 (E.D.N.Y.) (BMC)**

Dear Judge Cogan:

We, along with Mayer Brown LLP, represent defendant Kuveyt Türk in this action. We write to inform the Court of two recent decisions from this District addressing personal jurisdiction over non-U.S. banks in the context of Anti-Terrorism Act claims: *Przewozman v. Qatar Charity*, 2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023) (Garaufis, J.) (attached as Exhibit A) and *Henkin, et al. v. Qatar Charity et al.*, 2023 WL 2734788 (E.D.N.Y. Mar. 31, 2023) (Donnelly, J.) (attached as Exhibit B). Both decisions are instructive in light of Kuveyt Türk's pending motion to dismiss for lack of personal jurisdiction.

In *Przewozman*, the court found allegations that a Qatari bank used a correspondent account in New York to facilitate transactions for a customer associated with Hamas to be insufficient to demonstrate a prima facie case of jurisdiction. 2023 WL 2562537, at *15. The court recognized the plaintiffs' obligation to plead that the defendant "used an actual, specific transaction through a New York correspondent account in the course of bringing about the [plaintiffs'] injuries," and found that they "entirely fail[ed] to do so." *Id*. at *13 (quoting *Daou v. BLC Bank*, 42 F.4th 120, 132 (2d Cir. 2022)). The plaintiffs' failure to allege a connection between the terrorist attack at issue and the alleged correspondent transactions precluded a finding of personal jurisdiction over the bank, as there was not a sufficient "nexus between the forum contacts and the injuries asserted." *Id*. at *15. The court also denied the plaintiffs' request for jurisdictional discovery, which it held would amount to "a fishing expedition into the existence of" transfers "regarding which the Complaint is wholly silent." *Id.* at *18.

In *Henkin*, the court expressly adopted the "detailed and persuasive analysis" of *Przewozman*, dismissing claims against one defendant bank for lack of personal jurisdiction while concluding that the plaintiffs' vague allegations of correspondent bank activity by the other two defendants were insufficient to demonstrate the requisite purposeful availment or relatedness.

2023 WL 2734788, at *3, *9-10.  Although the court exercised its discretion to allow the plaintiffs to pursue limited jurisdictional discovery into whether there was deliberate use of the correspondent bank account by the latter two defendants, and that "the plaintiffs' claims arose from" that activity, it was clear that such connection had not yet been established.  *Id*. at *13.

Both decisions support arguments advanced by Kuveyt Türk in its pending motion to dismiss.  *See* Kuveyt Türk MTD at 7-10; Reply at 2-3 (Plaintiffs' failure to meaningfully connect alleged use of Kuveyt Türk's correspondent account with their injuries precludes the exercise of jurisdiction); Kuveyt Türk MTD at 10-12; Reply at 3-4 (Plaintiffs' failure to allege details regarding Kuveyt Türk's correspondent banking activity, or how that activity relates to Plaintiffs' claims, warrants dismissal for lack of personal jurisdiction).

Sincerely yours,

*/s/ Steven T. Cottreau*

Steven T. Cottreau

# EXHIBIT A

2023 WL 2562537
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

CHAIM DOV PRZEWOZMAN, HADASSAH
PRZEWOZMAN, individually, as personal
representative of Estate of Pinches Menachem
Przewozman, and as parent and natural guardian
of Y.P., a minor, and P.P., a minor, CHAYA
RACHEL PRZEWOZMAN, individually and as
parent and natural guardian of A.M.P., a minor,
and F.P., a minor, SARA PRZEWOZMAN-
ROZENBAUM, YAFA PRZEWOZMAN, and
TZVI YOSEF PRZEWOZMAN, Plaintiffs,
v.
QATAR CHARITY, QATAR NATIONAL
BANK, and MASRAF AL RAYAN, Defendants.

20-CV-6088 (NGG) (TAM)
|
Filed 03/17/2023

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS United States District Judge

**\*1** Pending before the court are Defendants Masraf
al Rayan, Qatar National Bank, and Qatar Charity's
("Defendants") motions to dismiss for lack of personal
jurisdiction, improper service of process, and failure to state
a claim. (*See* Masraf al Rayan Mot. (Dkt. 48); Qatar National
Bank Mot. (Dkt. 50); Qatar Charity Mot. (Dkt. 52).) Each
Defendant also filed a request for oral argument on these
motions. (*See* Dkt. 49; Dkt. 51; Dkt. 53.) Plaintiffs filed an
omnibus opposition brief responding to all three motions. (*See*
Dkt. 48-3 ("Opp.").) For the following reasons, Defendants'
motions to dismiss are GRANTED WITHOUT PREJUDICE.

**I. BACKGROUND**[1]
This case arises out of a rocket attack launched by Hamas
and the Palestinian Islamic Jihad ("PIJ") that struck Ashdod,
Israel, on May 5, 2019 and killed Pinches Menachem
Przewozman, a United States citizen. (Compl. (Dkt. 1) ¶¶
26-27, 334.) Plaintiffs are members of Mr. Przewozman's
family. (*Id.* ¶¶ 26, 32, 33, 36-38.) Each brings claims
individually; two Plaintiffs also bring claims as guardians of

minor members of the family; and one additionally brings
a claim as the personal representative of Mr. Przewozman's
estate. (*Id.* ¶¶ 26, 28-38.) Each Plaintiff, as well as each
minor represented by guardians, brings claims for loss of
consortium and intentional infliction of emotional distress;
Mr. Przewozman's estate also brings claims for wrongful
death, pain and suffering, and intentional infliction of
emotional distress. (*Id.* ¶¶ 28-29.)

**A. The Rocket Attacks**
On May 4 and 5, 2019, "Hamas and PIJ terrorists launched
over 600 rockets and mortars" from the Gaza Strip. (*Id.* ¶¶
327-28.) At this time, Mr. Przewozman lived in the Israeli city
of Ashdod, close to the Gaza Strip. (*Id.* ¶ 332.) On May 5, Mr.
Przewozman was walking in Ashdod when sirens, warning
of an incoming rocket attack, were sounded; he took shelter
in a nearby building, which was hit by a rocket, and Mr.
Przewozman was hit with shrapnel. (*Id.* ¶¶ 334-36.) Although
Mr. Przewozman was rushed to the hospital and treated by
emergency personnel, he succumbed to his injuries. (*Id.* ¶¶
337-38.)

**B. Role of the Defendants**
The various claims in this case are brought against three
Defendants: Qatar Charity, Qatar National Bank, and Masraf
al Rayan. (*Id.* ¶¶ 39, 66, 77, 340, 354, 368, 385.) Plaintiffs
allege that each of these defendants facilitated the attacks in
some way by providing resources to Hamas and PIJ.

1. Qatar Charity

**\*2** Qatar Charity was originally founded under the name
"Qatar Charitable Society." (*Id.* ¶ 39.)[2] According to
Plaintiffs, Qatar Charity ostensibly engages in philanthropic
endeavors which provide cover for its secret funding of
terrorist activity. (*Id.* ¶¶ 127-29.)

Plaintiffs allege that a variety of countries designated Qatar
Charity as a "financial supporter of terrorism." (*Id.* ¶ 64.)
In July 2008, Israel banned Qatar Charity from operating
branches in the Palestinian territories. (*Id.* ¶ 54.) The only
allegation regarding the United States' treatment of Qatar
Charity, however, is that the United States Interagency
Intelligence Committee on Terrorism of the United States
National Counterterrorism Center designate Qatar Charity
"as a 'priority III terrorism support entity' " in March

2008. (*Id.* ¶ 41.) [3] The Complaint includes no allegation that the United States designated Qatar Charity as a Foreign Terrorist Organization ("FTO") or Specially Designated Global Terrorist ("SGDT"). (*See generally id.*)

The Complaint also alleges that Qatar Charity is a member of the Union of Good, "a notorious hinder of Hamas and international terrorism" and an organization that the United States designated an SGDT in 2008. (*Id.* ¶¶ 7, 54.) The designation declared that "the Union of Good was 'an organization created by Hamas leaders to transfer funds to the terrorist organization'" and intended to "(i) divert[ ] charitable donations to support Hamas members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas." (*Id.* ¶ 57.) Such use of donations included "martyr" payments made to the families of suicide bombers and direct payments to the families of individuals serving time in Israeli jails. (*Id.* ¶ 58.)

Although the Complaint references direct connections between Qatar Charity and a variety of terrorist organizations around the world, (*see, e.g.*, *id.* ¶¶ 43-51), the only two organizations alleged to be implicated in Mr. Przewozman's death are relevant for the purposes of Plaintiffs' claims: Hamas and PIJ. Regarding those organizations, the Complaint alleges that Qatar Charity provided funding to Islamic Relief Worldwide, "which Israel banned in 2014 for funding Hamas," (*id.* ¶ 53), and indirectly provided support as a member of the Union of Good. (*Id.* ¶ 54.) From March 1, 2015, until September 7, 2015, Qatar Charity transferred over $28 million to its two branches in the Palestinian Territories, and ultimately "transferred a substantial portion of those funds" to Hamas, PIJ, and supposed charities controlled by those terrorist organizations." (*Id.* ¶ 128-29.) Qatar Charity transferred at least $150,000 between March 2011 and September 2015 to one such organization, the Hebron Islamic Charity Society, which Israel allegedly "outlawed ... because it operated as an arm of Hamas." (*Id.* ¶¶ 130-31.)

**\*3** According to the Complaint, these transfers were identified from two sources. *First*, the Director and other employees of Qatar Charity's Ramallah Branch were convicted in Israeli courts of operating an illegal organization and transferring funds to Hamas. (*Id.* ¶¶ 132, 143-45.) They confessed to a scheme by which Qatar Charity transferred more than $3.5 million of donations between 2009 and 2015 from the organization to the branches in the Palestinian Territories, and then "distributed a portion of those funds" to Hamas and PIJ. (*Id.* ¶ 132.) *Second*, Qatar Charity's

annual reports for the years 2013, 2014, and 2015 reflected fund transfers and joint programs with "various Hamas and PIJ fronts," including an organization called the "Elehssan Society." (*Id.* ¶¶ 133-34.)

Additionally, Qatar Charity (at an unspecified time) purchased "thousands of anonymous debit cards known as 'Sanabel Cards' from the Bank of Palestine," which were distributed to PIJ and Hamas operatives for personal use and to purchase supplies for attacks, and to individual terrorists and family members, particularly after those terrorists' deaths. (*Id.* ¶¶ 150-56.)

### 2. Qatar National Bank

Qatar National Bank is a commercial bank in Qatar. (Opp. at 5; *see also* Compl. ¶¶ 77-78.) Plaintiffs allege that Qatar National Bank maintained bank accounts and provided banking services for Qatar Charity and a variety of individuals with ties to Hamas. (*Id.* ¶¶ 14-15.) Six of the accounts for Qatar Charity were opened in 2012, and another was opened in 2006. (*Id.* ¶ 172.) The different individuals opened bank accounts at a variety of times over the period discussed in the Complaint, including shortly after they were released from Israeli custody in prisoner exchanges. (*See, e.g., id.* ¶¶ 174-78.)

By virtue of providing banking services to Qatar Charity and these individuals, the Complaint alleges that Qatar National Bank violated internal policies and international banking requirements, including know-your-customer and due diligence obligations. (*Id.* ¶¶ 170, 229, 317.) The Complaint further alleges that "[t]he accounts that [Qatar National Bank] maintained for the above-mentioned terrorists were used to finance Hamas and PIJ terrorist activities in Israel." (*Id.* ¶ 226.) Finally, Qatar National Bank also allegedly contributed funding to Qatar Charity, including a donation of approximately $275,000, in November 2013, and an additional $550,000 in February 2020, "to assist Syrian refugees." (*Id.* ¶ 227-28.)

### 3. Masraf al Rayan

Masraf al Rayan is a bank headquartered in Qatar. (*Id.* ¶ 66.) It provides "banking, financing and investing" services. (*Id.* ¶ 67.) Like Qatar National Bank, Masraf al Rayan provided financial services to Qatar Charity. (*Id.* ¶ 70.) These services

included the use of a correspondent banking account at Bank of New York Mellon, which allowed Masraf al Rayan to transact in U.S. dollars on behalf of clients including Qatar Charity. (*Id.* ¶¶ 158, 163-64.) Masraf al Rayan facilitated the transfer of $28 million between March to September, 2015, from Qatar Charity to its Palestinian branches, (*id.* ¶ 128), and the conversion of $3.5 million worth of dollars and Euros into Israeli shekels and transfer of the same to the Palestinian territories between 2009 and 2015. (*Id.* ¶ 132.) Some portion of this latter transfer is explicitly alleged to have utilized the New York-based correspondent account. (*Id.*) Some portion of each amount was ultimately transferred to Hamas, PIJ, or affiliated organizations. (*Id.* ¶¶ 129, 132.)

### C. Plaintiffs' Claims

On December 15, 2020, Plaintiffs filed the Complaint. (*See generally* Compl.) The four counts alleged therein are: (1) aiding and abetting foreign terrorist organizations, specifically Hamas and PIJ, in violation of the Anti-Terrorism Act ("ATA") and Justice Against Sponsors of Terrorism Act ("JASTA"), (*id.* ¶¶ 339-52); (2) conspiracy to violate the ATA and JASTA by facilitating acts of terrorism conducted by Hamas and PIJ, (*id.* ¶¶ 353-66); (3) primary violations of the ATA by providing material support to Hamas and PIJ with the intent or knowledge that support will facilitate terrorism, (*id.* ¶¶ 367-83); and (4) primary violations of the ATA by providing material support to Hamas and PIJ with the knowledge those organizations were designated Foreign Terrorist Organizations, (*id.* ¶¶ 384-95.) Plaintiffs allege that they were injured by Defendants' support of Hamas and PIJ when Mr. Przewozman died in the rocket attack, causing loss of consortium and intentional infliction of emotional distress to his relatives, and, with respect to claims brought by Mr. Przewozman's estate, wrongful death, pain and suffering, and intentional infliction of emotional distress. (*Id.* ¶¶ 28-38.)

**\*4** Each Defendant individually moved to dismiss under Rules 12(b)(2), for lack of personal jurisdiction; 12(b)(5), for improper or insufficient service of process; [4] and 12(b)(6), for failure to state a claim.

## II. LEGAL STANDARD

"In order to survive a motion to dismiss for lack of personal jurisdiction, the plaintiffs must make a *prima facie* showing that jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013). [5] To satisfy this requirement, plaintiffs must provide "an averment

of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). The court neither "draw[s] argumentative inferences in the plaintiffs favor," *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994), nor does it "accept as true a legal conclusion couched as a factual allegation," *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998).

Similarly, on a Rule 12(b)(5) motion to dismiss for insufficient service of process, "the plaintiff bears the burden of establishing that service was sufficient." *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010) (Summary Order) (citing *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 298 (2d Cir. 2005)). Service on a corporation in a foreign country is governed by Federal Rules of Civil Procedure 4(f) and (h).

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) asks whether the complaint pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court "must accept as true all of the allegations contained in a complaint," but may discard "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 122 (2d Cir. 2013).

"Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues before considering whether a claim is stated in the complaint." *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 310 (S.D.N.Y. 2008) (collecting cases); *see also Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) (en banc) ("[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim[.]").

## III. DISCUSSION

### A. Improper Service of Process

**\*5** Service of corporations generally is governed by Rule 4(h). Where service is effected outside of the United States, Rule 4(h) incorporates by reference most methods

prescribed by Rule 4(f)—"Serving an Individual in a Foreign Country"—excluding personal delivery to an individual under Rule 4(f)(2)(C)(i). *See* Fed. R. Civ. P. 4(h); Fed. R. Civ. P. 4(f). Excluding individual service, Rule 4(f) provides the following options:

(1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

(A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

(B) as the foreign authority directs in response to a letter rogatory or letter of request; or

(C) unless prohibited by the foreign country's law, by ... (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f). Plaintiffs do not assert that Qatar is subject to an "internationally agreed means of service" under Rule 4(f)(1). Instead, Plaintiffs moved for issuance of letters rogatory on January 4, 2021, (Dkt. 7), and the court granted this request on January 5, 2021. (Dkt. 10). On September 2, 2022, the Department of State confirmed that the American Embassy had executed the letters rogatory and transmitted them to the foreign authorities as of June 2, 2022, but it appears Plaintiffs have not yet received a response from Qatari authorities or confirmation that service was executed. (Dkt. 58.)

In their opposition, Plaintiffs now rely on Rule 4(f)(2)(C)(ii) for their apparent use of Federal Express to deliver service. (*See* Masraf al Rayan Mot. at 12.) This Rule only allows such service by mail if not "prohibited by the foreign country's law." Fed. R. Civ. P. 4(f) (2) (C). Plaintiffs do not put forward evidence that Qatar law specifically allows such service. [6] As a result, the parties argue over whether "prohibited" means explicitly barred (Defendants' position) or not affirmatively permitted (Plaintiffs'). (*See, e.g.*, Masraf al Rayan Mot. at 12; Opp. at 53.)

Plaintiffs' position is correct. To carry the burden generally to show the legal sufficiency of service, Plaintiffs state that they have not identified any decisions in the United States concluding that Qatari law prohibits service by mail; point out that Qatari law does allow for service by mail in other contexts (specifically, service of individuals); and most importantly, state that Qatari law does not include any prohibition of service by mail. (*See* Opp. at 52-54.) This is all that the law requires, *See Soc. Enter. LLC v. Sociedad Agricola Cato S.A.*, 15-CV-4158 (RJD), 2015 WL 13743436, at *3 (E.D.N.Y. Oct. 6, 2015) (holding that service by signed receipt Federal Express in Chile is permitted under Rule 4(f) because " 'prohibited' in this context means that the foreign country's law expressly prohibits the method, not merely that it does not recognize or provide for it"). This interpretation best aligns with another provision of Rule 4(f), which allow for service by any method "prescribed by the foreign country's law." Fed. R. Civ. P. 4(f)(2)(A). If Rule 4(f)(2)(C) required an affirmative showing that the method of service used was permitted by foreign law, as the Defendants urge, it would be entirely duplicative of Rule 4(f)(2)(A). *See SEC v. Alexander*, 248 F.R.D. 108, 111 (E.D.N.Y. 2007) (noting that most courts to read the two provisions alongside each other have held that "Rule 4(f)(2)(C)(i) permits personal service so long as the law of the foreign jurisdiction does not specifically forbid personal service"); *see also* Wright & Miller, 4B Fed. Prac. & Proc. Civ. § 1134 (4th ed. 2022) ("[T]his reading of the rule seems inconsistent with the text on its face, which indicates that personal service and service by mail are permissible so long as they are not forbidden by the foreign country's laws."). While the court would prefer the certainty of the letters rogatory process, Plaintiffs' approach here comports with the Federal Rules.

**\*6** Masraf al Rayan [7] next argues that service was improper because Plaintiffs have failed to demonstrate the individual who received service was "authorized to accept service" on Masraf al Rayan's behalf. (Masraf al Rayan Mot. at 12; *see also* Dkt. 24-2 (email from Federal Express stating package was received by "M.Mo-hamed" at address in Qatar).) Service made under subsection (f)(2), as here, must be proved "by a receipt signed by the addressee, or by other evidence satisfying the court that the summons and complaint were delivered to the addressee." Fed. R. Civ. P. 4(1)(2)(B). But this language includes no clarification for contexts where the service is effected on a foreign corporation, who can only "sign[ ]" a "receipt" through an agent. As a result, at least one court in this district has required, where the addressee

is a corporation, that the plaintiff further show why the recipient was "authorized to accept service on behalf of" the defendant. *Rosenberg v. Lashkar-e-Taiba*, No. 10-CV-5381 (DLI) (CLP), 2017 WL 11647006, at *4 (E.D.N.Y. Mar. 31, 2017), *adopting* R&R, No. 10-CV-5381 (Dkt. 61).

Plaintiffs have not attempted to prove "the accuracy of the address where" Masraf al Rayan was served, *NYKCool AB. v. Pacific Int'l Servs., Inc.*, 2013 WL 6799973, at *8 (S.D.N.Y. Dec. 10, 2013), nor have they offered any evidence that the individual who accepted delivery at that address was authorized to accept service on behalf of Masraf al Rayan. Since service by registered mail (with receipt) is not explicitly authorized for service of corporations by Qatari law, it is unclear how Masraf al Rayan would designate the individual who received the Federal Express package to accept service. [8] Accordingly, Plaintiffs' failure to provide evidence beyond the receipt by an identified, but unknown, individual at the address designated leaves the court unable to determine whether service was effected. Nonetheless, "[f]ailure to prove service does not affect the validity of service" and "[t]he court may permit proof of service to be amended." Fed. R. Civ. P. 4(1)(3). If Plaintiffs seek to amend the Complaint in compliance with this Memorandum and Order, the court will permit them to cure these deficiencies regarding proof of service (or, alternately, to effect service via the conclusion of the letters rogatory process). Therefore, Masraf al Rayan's motion to dismiss for improper service is GRANTED with leave to amend.

Because the court has concluded that two avenues remain available for Plaintiffs to effect service pursuant to Rule 4(f)(2)(B) and (C)(ii), the court declines to exercise its discretion to issue an order under Rule 4(f)(3) directing service of Defendants by email. Fed. R. Civ. P. 4(f)(3) (allowing service "by other means not prohibited by international agreement, as the court orders"); (*see* Opp. at 54-55). "[T]here is no hierarchy among the subsections in Rule 4(f)"—that is, there is no preference in the Rule for service under subsection (f)(2) instead of (f)(3). *Group One Ltd. v. GTE GmbH*, 523 F. Supp. 3d 323, 341 (E.D.N.Y. 2021). Nonetheless, some courts have adopted additional requirements before granting leave to effect service by other means, such as: "(1) a showing that the plaintiff has reasonably attempted to effectuate service on the defendant, and (2) a showing that the circumstances are such that the court's intervention is necessary." *Equipav S.A. Pavimentação, Engenharia e Comercia Ltda. v. Bertin*, No. 22-CV-4594 (PGG), 2022 WL 2758417, at *4 (S.D.N.Y. July 14, 2022). Plaintiffs have failed to show the necessity of the

court's intervention, so their motion for a court order pursuant to Rule 4(f)(3) is DENIED without prejudice.

## B. Personal Jurisdiction

**\*7** It is undisputed that all three Defendants are domiciled outside of the United States. The Complaint alleges that Qatar Charity and Masraf al Rayan are based in Qatar, (*see* Compl. ¶¶ 7, 66), and although no domicile is alleged for Qatar National Bank, Plaintiffs concede in their opposition brief that it is a "Qatari bank headquartered in Doha." (Opp. at 5; *see also* Compl. ¶ 77.)

Because these are non-domiciliary defendants, the court must engage in two steps of analysis to determine whether a plaintiff has sufficiently established personal jurisdiction to survive a motion to dismiss under Rule 12(b) (2). *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015). *First*, the court applies the long-arm statute used by the forum state. *Id.* (quoting *Chloé*, 616 F.3d at 163). If, as Plaintiffs argue, "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction," this first step may rely instead on the plaintiff's proper service of federal claims rather than the state long-arm statute. Fed. R. Civ. P. 4(k) (2). *Second*, whether relying on the state long-arm statute or Rule 4(k)(2), the court must analyze "whether personal jurisdiction comports with due process protections established under the Constitution." *Eades*, 799 F.3d at 168; Fed. R. Civ. P. 4(k)(2)(B). [9]

Plaintiffs' asserted statutory basis of personal jurisdiction has shifted over the course of this litigation. In the Complaint, they assert that "Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because, pursuant to a conspiracy, they: transacted business and committed tortious acts within the United States (and New York)[.]" (Compl. ¶ 23.) In their pre-motion letter opposing the Defendants' request to file this motion to dismiss, Plaintiffs relied solely on defendants' use of a correspondent banking account in New York pursuant to a conspiracy, a legal theory founded in C.P.L.R. § 302(a)(1), *see Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339 (2012); *Licci*, 732 F.3d at 165; they made no mention of personal jurisdiction under section 2334(a) or Rule 4(k), or on the basis of any tortious acts. (*See* Pls.' Pre-Mot. Letter (Dkt. 44) at 2-4.) In their Opposition, Plaintiffs relied primarily on Rule 4(k) (2), but also raised arguments that they satisfied the requirements of C.P.L.R. sections 302(a)(1) and

(2), and requested the opportunity to perform jurisdictional discovery. (*See* Opp. at 55-80.) Despite the mutable nature of Plaintiffs' theories of jurisdiction, the court will analyze each of the asserted New York and federal bases in turn. [10]

#### 1. Masraf al Rayan and Qatar Charity

#### *a. New York's Long-Arm Statute*

**\*8** New York's long-arm statute is codified at C.P.L.R. § 302(a). That statute provides four situations where personal jurisdiction may be established over a non-domiciliary defendant who, acting in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state ...; or

3. commits a tortious act without the state causing in-jury to person or property within the state ..., if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real personal property situated within the state.

C.P.L.R. § 302(a). As discussed above, Plaintiffs only assert jurisdiction under section 302(a)(1) or (2).

Section 302(a)(2) is more easily assessed, so the court begins there. That provision extends jurisdiction to parties who "commit[ ] a tortious act within the state." *Id.* Under longstanding New York law, this section extends only to acts committed within the state—that is, the defendant must have been physically present in New York when committing the tort. *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 461-62 (1965) ("[T]he Legislature chose to adopt language which, in so many words, demands that the tortious act be one committed by the defendant, in person or through an agent, within this State."); *see also Harvey v. Chemie Grunenthal, G.m.b.H.*, 354 F.2d 428, 431 (2d Cir.

1965) (following *Longines-Wittnauer* and concluding that the location of the consequence of the tort is irrelevant under section 302(a) (2)). The question is the location of the act, not the location of any consequences thereto. *Platt Corp. v. Platt*, 17 N.Y.2d 234, 237 (1966). [11] The only act allegedly committed in New York was the use of a correspondent banking account—a normal commercial activity which is plainly not a tort—and there is no allegation that Masraf al Rayan or Qatar Charity was ever physically present in the state. Accordingly, section 302(a)(2) cannot provide jurisdiction over either.

**\*9** Section 302(a)(1) raises a more complex question. That provision provides specific jurisdiction when a party "transacts business within the state and the cause of action arises from that transaction." *Reed Int'l, Inc. v. Afghanistan Int'l Bank*, __ F. Supp. 3d __, 2023 WL 2138600, at \*5 (S.D.N.Y. Feb. 21, 2023) (citing C.P.L.R. § 302(a)(2)). "Proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Eades*, 799 F.3d at 168. "Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007).

Plaintiffs allege that Masraf al Rayan transacted business in New York, as an agent of Qatar Charity, [12] when Masraf al Rayan utilized its correspondent banking account at Bank of New York Mellon, in New York, on behalf of Qatar Charity. (Compl. ¶¶ 163, 166.) Correspondent banking is a system through which banks are able to effect transactions in areas where they do not have a branch or office. (*See* Compl. ¶¶ 158-60); *see also Berdeaux v. OneCoin, Ltd.*, 561 F. Supp. 3d 379, 403 n.25 (S.D.N.Y. 2021) ("Correspondent banking is a system of interbank relationships in which a bank sells services to other financial institutions and involves banks establishing relationships with one another to facilitate transactions involving remote customers of certain banks."). Typically, the foreign bank (here, Masraf al Rayan) will utilize a "correspondent account" at a local bank (Bank of New York Mellon), which is used to send and receive financial transfers in the area; the local bank will provide services in the region on behalf of customers of the foreign bank, including (for example) transfers or currency exchange transactions. (*See, e.g., id.* ¶ 165.)

The New York Court of Appeals has addressed the use of a correspondent account in a very similar context. *See Licci,* 20 N.Y.3d 327. In *Licci,* individuals brought ATA claims against a foreign financial institution, Lebanese Canadian Bank ("LCB"), among other defendants, for injuries and deaths of their family members who were victims in rocket attacks allegedly carried out by Hizballah in Israel. *Id.* at 330-31. The district court initially dismissed the claims for lack of personal jurisdiction under section 302(a)(1), holding that the plaintiffs had failed to allege a nexus between LCB's use of its correspondent account for wire transfers and the specific terrorist activity underlying the claim. *Licci v. Am. Express Bank Ltd.,* 704 F. Supp. 2d 403, 407-08 (S.D.N.Y. 2010). On appeal, the Second Circuit certified two questions to the New York Court of Appeals:

> **\*10** (1) Does a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect "dozens" of wire transfers on behalf of a foreign client, constitute a "transaction" of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?
>
> (2) If so, do the plaintiffs' claims under the Anti-Terrorism Act, the ATS, or for negligence or breach of statutory duty in violation of Israeli law, "arise from" LCB's transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 74-75 (2d Cir. 2012). The Court of Appeals' response is highly instructive.

In answering the first question, the Court of Appeals agreed that a defendant may "transact business" within New York under section 302(a)(1) by "use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, *if* the defendant's use of that account was purposeful." 20 N.Y.3d at 338 (quoting *Licci,* 673 F.3d at 66) (emphasis in original). The court emphasized the importance of the intent inquiry and distinguished *Amigo Foods Corp. v. Marine Midland Bank-N.Y.,* 39 N.Y.2d 391 (1976), in which the only relevant interaction between the defendant bank and New York—the "adventitious" maintenance of a correspondent account in the jurisdiction—was insufficient to show purposeful transaction of business.[13] *Id.*

The Court of Appeals concluded that the intentional use of a correspondent account "to effect 'dozens' of wire transfers on behalf of a foreign client" constitutes a "transaction of business" pursuant to section 302(a)(1). 20 N.Y.3d at 334, 341. However, the court noted that "[i]n the banking context, the requisite inquiry ... may be complicated by the nature of inter-bank activity, especially given the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States." *Id.* at 338. In a later decision, the Court of Appeals explained that the relevant distinction is between a "non-domiciliary bank [that] is a passive and unilateral recipient of funds later rejected" and the "[r]epeated, deliberate use that is approved by the foreign bank on behalf and for the benefit of a customer." *Al Rushaid v. Pictet & Cie,* 28 N.Y.3d 316, 326-27 (2016).

**\*11** The facts alleged here fall somewhere in between *Amigo Foods* and *Licci.* The Complaint alleges that Masraf al Rayan "passed" funds "through" its New York-based correspondent account at Bank of New York Mellon while facilitating currency exchanges and transfers of money from Qatar Charity to its branches in the Palestinian territories. (Compl. ¶ 132.) The money was initially obtained by Qatar Charity from donations "in Qatar and around the world," although not specifically in the United States; transferred into Qatar Charity's Doha-based account at Masraf al Rayan; converted from U.S. dollars or Euros into Israeli shekels, in Doha; then transferred to Qatar Charity's Palestinian accounts ("pass[ing] through" New York) before being distributed to Hamas, PIJ, or their affiliates. (*Id.*) Plaintiffs specifically allege that, between 2009 and 2015, Masraf al Rayan moved approximately $3.5 million in U.S. dollars and Euros through this process, and transferred $25 million from Doha (through Masraf al Rayan, and possibly the correspondent account) to a Qatar Charity branch in the Gaza Strip between 2011 and 2013. (*Id.* ¶ 128.) Plaintiffs additionally allege the planned transfer through Masraf Al Rayan of $28 million from Qatar Charity to its branches in Palestine between March and September of 2015, although the Complaint does not mention whether this sum was routed through the correspondent account, (*Id.* ¶ 128.) Some unspecified portions of these amounts ultimately reached Hamas, PIJ, and their affiliates, potentially including $150,000 provided to the Hebron Islamic Charity Society between March 2011 and September 2015 and unspecified amounts to "the Elehssan Society." (*Id.* ¶¶ 130-33.)

The Complaint's lack of clarity and specificity on *how* Masraf al Rayan used the Bank of New York Mellon account causes significant difficulties in applying *Licci*'s guidance. Plaintiffs do not allege that the transactions using the correspondent account transferred money to and from New York or the United States, a context which would clearly illustrate that the bank transacted business in New York, because the correspondent account was the mechanism that made New York banking activity possible. *See, e.g.,* *Peterson v. Islamic Republic of Iran*, No. 10-CV-4518 (KBF), 2013 WL 1155576, at *16 (S.D.N.Y. Mar. 13, 2013) (describing how bank used correspondent account in New York to distribute sales proceeds and interest payments from bonds held in New York). Nor does the Complaint allege that the correspondent account was used for currency exchanges—to the contrary, it states that those too occurred in Doha. (Compl. ¶ 132.) It merely alleges that some portion of the money transferred by Masraf al Rayan on behalf of Qatar Charity "passed through" the correspondent account as part of "currency exchange transactions" converting dollars into Israeli shekels. (*Id.*)

Nor do Plaintiffs allege facts giving rise to the inference that Masraf al Rayan specifically chose a New York-based account to take advantage of "New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci*, 20 N.Y.3d at 339. The allegations here regarding the volume of the transactions fall somewhere between *Amigo Foods* and *Licci*, as the Complaint plainly states more than mere maintenance of a correspondent account, (*see, e.g.,* Compl. ¶ 132), and the allegations could arguably be read to indicate that the transactions using the correspondent account "totaled several million dollars." [14] *Licci*, 673 F.3d at 56. But unlike in *Licci*, there is no indication that "dozens" of transactions occurred, *id.*; indeed, the Complaint is entirely devoid of statements regarding the volume and frequency of transfers.

Underlining this concern, none of the typical markers of deliberate use of the New York correspondent account are alleged in the Complaint. Courts in this circuit have pointed to four such indicators:

> (1) the defendant bank's level of control over the transfers, (2) the defendant bank's marketing of the correspondent account or encouragement of others to use it,

> (3) the necessity of the correspondent account to the alleged scheme, and (4) other conduct by which the bank projected itself into the New York market.

**\*12** *Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 258 (S.D.N.Y. 2020). Other than the number of transfers to the correspondent account and amount of money involved—which, as discussed, are both undefined—there is no indication in the Complaint that Masraf al Rayan made any specific choices regarding the use of the correspondent account. [15] *Cf. Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 68-69 (S.D.N.Y. 2016) ("The Banks ... set the terms of each placement transaction.... The Banks selected U.S. dollars as the currency in which to execute the transaction. The Banks designated New York correspondent bank accounts to receive the funds[.]"). The Complaint is entirely devoid of allegations that Masraf al Rayan encouraged or marketed use of its correspondent account in New York, or that use of the correspondent account was necessary to exchange dollars for other currencies (or even "cheaper or easier" than other options) *See* *Vasquez v. Hong Kong & Shanghai Banking Corp.*, No. 18-CV-1876 (PAE), 2019 WL 2327810, at *12 (S.D.N.Y. May 30, 2019); *Vasquez*, 477 F. Supp. 3d at 259. And the Complaint affirmatively states that "Masraf al Rayan had no U.S. branch or office." (Compl. ¶ 158.)

Therefore, although Plaintiffs' allegations are not wholly devoid of details, they are too insubstantial to clearly establish purposeful availment of the New York banking system. *See, e.g.,* *Singer v. Bank of Palestine*, No. 19-CV-6 (ENV) (RML), 2021 WL 4205176, at *5-6 (E.D.N.Y. Apr. 30, 2021) (concluding there was a lack of jurisdiction where the jurisdictional allegations were a "conclusory web" lacking "information as to dates, dollar amounts, number of transactions, senders or recipients of these transfers," but allowing limited jurisdictional discovery). Absent any specificity regarding the scope and extent of the use of the account, and without any indication of *why* the transfers were made "through" New York, the Complaint alleges an example of "the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide ... for transactions that otherwise have no other connection to New York," *Licci*, 20 N.Y.3d at 338, and comes dangerously close to asserting New York jurisdiction over any financial transaction conducted in U.S. dollars. [16] *See Cmty. Fin. Grp.,*

*Inc. v. Stanbic Bank Ltd.*, No. 14-CV-5216 (DLC), 2015 WL 4164763, at \*4 (S.D.N.Y. July 10, 2015) (routing of U.S. dollar wire payment through New York correspondent account was adventitious, not purposeful use of forum); *Hau Yin To v. HSBC Holdings PLC*, No. 15-CV-3590 (LTS) (SN), 2017 WL 816136, at \*7 n.6 (S.D.N.Y. Mar. 1, 2017), *aff'd* 700 F. App'x 66 (2d Cir. 2017) (Summary Order) (dismissing for lack of personal jurisdiction where wiring of U.S. dollars through correspondent account was "passive, rather than 'integral' to the alleged" fraud).

**\*13** Because of these deficiencies, the court harbors serious doubts that Plaintiffs have alleged purposeful actions in New York. Nonetheless, section 302(a)(1) is a "single act statute," meaning "one transaction in New York is sufficient" if it bears the markers of a purposeful transaction. *Deutsche Bank Secs., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006); *see also Chloé*, 616 F.3d at 170. Plaintiffs must—and possibly could, if given the opportunity in jurisdictional discovery, addressed further *infra*—fill in the many gaps in their allegations regarding how, why, when, and how much money was transferred into and from the New York correspondent account. *See Vasquez*, 2019 WL 2327810, at \*12. Accordingly, the court declines to grant Masraf al Rayan and Qatar Charity's motions to dismiss for lack of personal jurisdiction on this basis.

The same cannot be said, however, with respect to the second prong of section 302(a)(1), which requires that the claims at issue "arise from the transactions." *Al Rushaid*, 28 N.Y.3d at 323. In *Licci*, the Court of Appeals explained that this required an "articulable nexus" or "substantial relationship," but clarified that this was a liberal standard: "these standards connote, at a minimum, a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." 20 N.Y.3d at 339.

Even by this low standard, Plaintiffs have failed to allege facts giving rise to a *prima facie* case of personal jurisdiction. The transactions allegedly routed through the correspondent account, occurred, at latest, in 2015, while the rocket attacks did not happen until 2019. (Compl. ¶¶ 17, 128, 132-33; *see also id.* ¶ 106 ("From at least 2011 through *2015*, Hamas and PIJ knowingly, willfully, and unlawfully combined, conspired, confederated and agreed with Defendants to commit numerous acts of international terrorism[.]") (emphasis added).) This temporal gap leaves the nexus between the Defendants' New York-related acts and

Plaintiffs' injuries far too attenuated. *See Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016) ("That nexus would be too attenuated if, contrary to the facts alleged here, Defendant ... executed the New York transfers at a time far removed from the attacks that caused Plaintiffs' injuries."); *Universal Trading & Inv. Co, v. Credit Suisse (Guernsey) Ltd.*, No. 12-CV-198 (PAC), 2012 WL 6186598, at \*4 (S.D.N.Y. Dec. 12, 2012), *aff'd*, 560 F. App'x 52 (2d Cir. 2014) (Summary Order) (holding no articulable nexus or substantial relationship where there was a gap of nearly a decade between wire transfers and injury to plaintiffs). It is the Plaintiffs' burden to factually allege that the Defendants "used an actual, specific transaction through a New York correspondent account in the course of bringing about the injuries on which the claims are predicated." *Daou v. BLC Bank S.A.L.*, 42 F.4th 120, 132 (2d Cir. 2022). The Plaintiffs' general allegations of how Hamas and PIJ used money entirely fails to show 2015 (or earlier) transfers were used "in the course of" the 2019 rocket attacks.

Accordingly, Plaintiffs have failed to establish a *prima facie* case for personal jurisdiction over Masraf al Rayan and Qatar Charity pursuant to section 302(a)(1).

### *b. Rule 4(k)(2)*

Plaintiffs argue that, if Masraf al Rayan and Qatar Charity's contacts with New York are insufficient under New York's long-arm statute, the court may still exercise personal jurisdiction over them pursuant to Rule 4(k)(2). (Opp. at 56.) That Rule states that proper service establishes personal jurisdiction in federal courts over a defendant for claims arising under federal law if "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2); *see also Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008).

**\*14** It is undisputed that Plaintiffs' claims arise under federal law. *See Kaplan v. Cent. Bank of Islamic Republic of Iran*, No. 19-CV-3142 (ILG) (RLM), 2022 WL 1120455, at \*5 (E.D.N.Y. Apr. 14, 2022) (holding that claims pursuant to the ATA satisfy this requirement). Whether Masraf al Rayan or Qatar Charity are subject to jurisdiction under any state's long-arm statute, though, implicates an ongoing procedural debate in the federal courts: who bears the burden to show whether jurisdiction could be exercised somewhere?

Typically, a plaintiff bears the burden of alleging facts sufficient to state a *prima facie* case of jurisdiction, *Licci*, 732 F.3d at 167, but in the context of Rule 4(k)(2) that obligation "in effect requires a plaintiff to prove a negative fifty times over." *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 40 (1st Cir. 1999). Assigning the burden of proof to defendants, though, would require them to either concede amenability to suit in federal court or identify a forum where jurisdiction exists. *Id.* at 41. The First Circuit addressed this issue by developing a burden-shifting framework, under which the plaintiff must first certify that "based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state." *Id.* Only after this certification is made does the burden shift to the defendant to show "that one or more specific states exist in which it would be subject to suit[.]" *Id.* at 41. In the absence of guidance from the Second Circuit, some district courts within the circuit have relied on this burden-shifting framework. *See Abbott Laboratories v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (LB), 2017 WL 11665423, at *5 (E.D.N.Y. Mar. 30, 2017) (collecting cases). But other circuits have concluded that this element of Rule 4(k)(2) is met so long as "the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible." *ISI Int'l, Inc. v. Borden Ladner Gaervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001); *see also Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005); *Adams v. Unione Mediterranea Di Scurta*, 364 F.3d 646, 651 (5th Cir. 2004).

Plaintiffs have failed to certify that the Defendants are not subject to jurisdiction in any state, but Defendants have declined to identify any state forum where suit is possible. The court is sympathetic to the "Catch-22" situation Defendants would face if forced to bear the burden of providing an alternate location for jurisdiction, *Swiss Am.*, 191 F.3d at 41, but in light of the due process analysis below and absent guidance from the Second Circuit, it declines to dismiss Plaintiffs' claims at this time solely on the basis of their failure to certify. If Plaintiffs ultimately file an amended complaint, they are encouraged to submit a certification, as would be required in the First Circuit, to assist the court's analysis of jurisdiction pursuant to Rule 4(k)(2).

Further complicating the issue, Plaintiffs allege no further contacts between the Defendants and the United States beyond those with New York. But Rule 4(k)(2) was added to the Federal Rules to address the "significant lacuna when the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law ... but having insufficient contact with any single state to support jurisdiction under state long-arm legislation[.]" *Porina*, 521 F.3d at 127. This case does not fall into that gap, because the Defendants appear not to have *any* general contacts with the United States. By raising solely New York contacts, Plaintiffs attempt to use Rule 400(2) to evade the limited extent to which section 302(a)(1) may require more than constitutional due process. *Licci*, 732 F.3d at 170 ("[S]ection 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive[.]"). Nonetheless, nothing in the text of the Rule requires Plaintiffs to allege contacts with the United States generally, so the court will analyze the alleged contacts with New York to determine whether they comport with due process. [17] *Dardana Ltd. v. Yugansknefteqaz*, 317 F.3d 202, 207 (2d Cir. 2003) ("Rule 4(k)(2) confers personal jurisdiction over a defendant so long as the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment.").

### c. Due Process

**\*15** In determining whether exercising personal jurisdiction over a defendant would comport with due process, the court once again proceeds in two steps. First, "due process requires ... [the defendant] have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Where, as here, a plaintiff asserts specific jurisdiction, amenability to suit depends on an "affiliation between the forum and the underlying controversy"—in other words, a connection between the defendant's minimum contacts with the forum and the claim brought. *Goodyear Dunlop Tires Operations S.A. v. Brown*, 564 U.S. 915, 919 (2011); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-76 (1985)). *Second*, if minimum contacts and a nexus to the claims asserted are found, the court is then asked to consider several factors to determine "whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King*, 471 U.S. at 476. Such factors include "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining convenient and

effective relief." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).

After the Court of Appeals ruled on the certified questions in *Licci*, the Second Circuit held that an exercise of personal jurisdiction over the defendant bank was consistent with due process. *Licci*, 732 F.3d at 165. The circuit analyzed due process separately from the long-arm statute because, in some cases, "personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis," but noted that such cases would be "rare." *Id.* at 170. Ultimately, the court concluded that "the selection and repeated use of New York's banking system" was sufficient contact with New York to justify jurisdiction under the Constitution, and because "the correspondent account at issue is alleged to have been used as an instrument to achieve the very wrong alleged," the first step of the due process analysis was met. *Id.* at 171.

As above, it is fatal to jurisdiction over Masraf al Rayan and Qatar Charity that Plaintiffs have failed to allege a causal link between the use of the correspondent account, which ended in 2015, and the rocket attacks that caused their injury in 2019. There is no basis from which the court can conclude that "the correspondent account at issue" was "used as an instrument to achieve the very wrong alleged." *Id.* Without such a nexus between the only contacts alleged with the United States and the claims at issue, the court cannot exercise personal jurisdiction consistent with due process.

In sum, Plaintiffs have failed to make out a *prima facie* case for jurisdiction over Masraf al Rayan and Qatar Charity under New York's long-arm statute or Rule 4(k)(2). They have also not successfully shown that the exercise of personal jurisdiction would be consistent with due process, as is required under both approaches. Accordingly, Masraf al Rayan and Qatar Charity's motions to dismiss for lack of personal jurisdiction are GRANTED. If Plaintiffs seek to amend their Complaint in accordance with this Memorandum & Order, the court would welcome allegations curing the deficiencies detailed with respect to purposeful availment and nexus between the forum contacts and the injuries asserted.

## 2. Qatar National Bank

Unlike Masraf al Rayan and Qatar Charity, Plaintiffs allege no contacts whatsoever between Qatar National Bank and New York or the United States generally. Instead, Plaintiffs

claim that personal jurisdiction over Qatar National Bank may be established based on their participation in a conspiracy with the other Defendants, who used a correspondent banking account in New York to transact in United States Dollars. (Compl. ¶¶ 23, 158-66.)

**\*16** As with any theory of personal jurisdiction, Plaintiffs' argument that jurisdiction over Qatar National Bank is established by the actions of its alleged co-conspirators must both have a statutory basis and comport with the Constitution. *Suber v. WP Servs., LLC*, No. 21-2649, 2023 WL 115631, at *2 (2d Cir. Jan. 10, 2023) [Summary Order] ("[A] plaintiff must demonstrate a statutory basis for jurisdiction and show that exercising personal jurisdiction comports with due process.") (citing *Licci*, 732 F.3d at 168)).

The Second Circuit has held that conspiracy jurisdiction satisfies the requirements of due process where a plaintiff alleges "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that coconspirator to jurisdiction in that state." *Berkshire Bank v. Lloyds Banking Grp. Plc*, No. 20-CV-1987, 2022 WL 569819, at *2 (2d Cir. Feb. 25, 2022) (Summary Order) (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) ("*Schwab I*"). "[T]here is no requirement that a plaintiff demonstrate that a defendant 'directed, controlled, and/or supervised the co-conspirator who carried out the overt acts in the forum." Id, (quoting *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. Plc*, 22 F.4th 103, 124 (2d Cir. 2021) ("*Schwab II*")).

However, numerous district courts sitting in New York have held that Section 302(a)(1) of New York's long-arm statute, the only section that potentially applies here, *see supra* Part III.A.1.a., does not provide for co-conspirator jurisdiction. [18] *See, e.g., Suber v. WP Servs., LLC*, No. 20-CV-8177 (AJN), 2021 WL 4429237, at *6 (S.D.N.Y. Sept. 27, 2021), *aff'd in relevant part by* 2023 WL 115631 (2d Cir. Jan. 10, 2023) (collecting cases); *Berdeaux*, 561 F. Supp. 3d at 400 (rejecting theory of personal jurisdiction where "the only adequately pled allegation tying [defendant] to New York is that" a co-conspirator misrepresented material facts within New York); [19] *United States v. Besneli*, No. 14-CV-7339 (JFK), 2018 WL 443747, at *5 (S.D.N.Y. Jan. 16, 2018) (collecting cases and stating that "in cases where courts have considered conspiracy-based jurisdiction over a non-domiciliary defendant, jurisdiction over the alleged co-

conspirator has usually been premised on § 302(a) (2)"). It appears that New York state courts have not weighed in on the precise question, but the court is unable to find any New York case relying on a co-conspirator theory to establish personal jurisdiction under section 302(a)(1). *Cf. New Media Holding Co. v. Kagalovsky*, 949 N.Y.S.2d 22, 24 (1st Dep't 2012) (holding that personal jurisdiction could be established over defendant pursuant to 302(a) (1) based on the acts of companies that were also *alter egos* of defendant). [20] In the closest case, the First Department rejected a conspiracy theory of jurisdiction because the alleged business activity in New York was not a tort, and therefore section 302(a) (2) (under which conspiracy jurisdiction is available) could not apply; the decision implicitly assumed that co-conspirator jurisdiction could not extend under section 302(a)(1). *See Bluewaters Comms. Holdings, LLC v. Ecclestone*, 966 N.Y.S.2d 232, 233-34 (1st Dep't 2014) (rejecting the use of co-conspirator jurisdiction because "[a co-conspirator's] purchase of ... shares was not a tort, and the complaint does not allege that [co-conspirator] bought those shares at the direction, under the control, at the request, or on behalf of the personal jurisdiction defendants."). With tacit approval (and no contrary statements) from the state courts, the court agrees with the many federal decisions concluding New York law does not support coconspirator jurisdiction under section 302(a)(1). Accordingly, the New York long-arm statute does not establish personal jurisdiction over Qatar National Bank.

*\*17* Plaintiffs' arguments in response do not change this analysis. They primarily rely on *Berkshire Bank* and the two *Schwab* decisions to assert that conspiracy jurisdiction is appropriate under New York law. (Opp. at 73-76.) But these decisions had no opportunity to address section 302(a) (1); instead, they focused on the requisite *constitutional* considerations for a co-conspirator theory of jurisdiction. *See Berkshire Bank*, 2022 WL 569819, at *3-4 (Summary Order) (applying section 302(a)(2) and determining that co-conspirator jurisdiction comports with the standards of constitutional due process); *Schwab I*, 883 F.3d at 86-87 (discussing whether a co-conspirator's minimum contacts were in furtherance of the conspiracy and therefore indicated purposeful availment). The *Schwab* decisions, which arose in subsequent appeals from the LIBOR multi-district litigation, had no occasion to engage with the line of decisions discussed above because personal jurisdiction there rested on the California long-arm statute, rather than New York's. *See* 883 F.3d at 82. Further, the specific subset of defendants at issue did not contest the statutory basis for personal jurisdiction, *id.*; the only question before the court was whether members

of the conspiracy with no connection to California beyond the acts of co-conspirators had sufficient minimum contacts to satisfy constitutional standards. *Id.* at 86-87. [21]

But the analysis does not end there, because Plaintiffs' reliance on Rule 4(k)(2) could have, allowed for personal jurisdiction over Qatar National Bank notwithstanding the state forum long-arm statute. If a theory of jurisdiction based on Rule 4(k)(2) provided an independent basis for jurisdiction over Qatar National Bank, the court would need to determine whether the acts of Qatar National Bank's alleged co-conspirators create sufficient contact with the United States to comport with the requirements of due process. *See Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003) ("Rule 4(k)(2) confers personal jurisdiction over a defendant so long as the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment"). For this purpose, the *Schwab* cases provide the relevant analysis. In *Schwab* 7, the Second Circuit laid out a three-prong test for determining whether allegations established minimal contacts with the forum jurisdiction under a conspiracy theory of jurisdiction. *Schwab I*, 883 F.3d at 87. Plaintiffs must allege "that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Id.* The court determined that the *Schwab I* plaintiffs had failed to adequately allege overt acts in furtherance of the conspiracy that occurred in the forum, and therefore affirmed the district court's dismissal of certain defendants for lack of personal jurisdiction. *Id.*

Only in *Schwab II*, after the plaintiffs amended the complaint to include "several overt, conspiratorial acts" by co-conspirators within the United States, did the Second Circuit allow suit against these defendants to proceed. *Schwab II*, 22 F.4th at 123. The decision emphasized, however, that the *Schwab I* test "*serves* the purposeful availment requirement, rather than supplants it." *Id.* at 125 (emphasis in original). Although the constitutional analysis "does not require a relationship of control, direction, or supervision" between the defendant and their co-conspirator, the overt acts and connection to the jurisdiction must be foreseeable. *Id.*

*\*18* Although the Complaint repeatedly asserts a conspiracy existed, (*see, e.g.*, Compl. ¶¶ 1, 20, 359), it fails to allege in a non-conclusory manner any facts from which an inference of agreement between Qatar National Bank and the other defendants can be drawn. *See Halberstam v. Welch*, 705 F.2d

472, 477 (D.C. Cir. 1983) ("[T]he separate elements of civil conspiracy [are]: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; [and] (4) which overt act was done pursuant to and in furtherance of the common scheme."). The factual allegations regarding Qatar National Bank are limited to maintaining bank accounts and providing banking services for Qatar Charity and various Hamas-affiliated individuals, (Compl. ¶¶ 14-15, 171-172, 174-225), contributing to Qatar Charity, (*id.* at 11 227-28), and it being controlled by members of the Qatari government and royal family, who themselves have ties to Hamas. (*Id.* ¶¶ 79-82, 111-124.) The Complaint makes no attempt to factually tie the Qatari government or royal family to the rocket attacks at issue (it lacks even a connection between Qatar National Bank and the transfers effected by Masraf al Rayan), and the only connection with the accounts maintained at Qatar National Bank is the conclusory statement that they "were used to finance Hamas and PIJ terrorist activities in Israel" because they "allowed the released terrorists to finance their personal expenditures, thereby freeing them to continue to conduct activities on behalf of Hamas and PIJ" and were "directly used ... to further the efforts of Hamas and PIJ to carry out terrorist attacks." (*Id.* ¶ 226.) How or when these accounts were used is left to the imagination.

Putting aside the court's doubts that the Complaint has sufficiently alleged Qatar National Bank's agreement to conspire to finance rocket attacks or other specific terrorist activity, the *Schwab I* test also relies on the sufficiency of a co-conspirator's contacts with the jurisdiction. *Schwab I*, 883 F.3d at 87 (including requirement that the "co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state"). For the reasons discussed above with respect to Masraf al Rayan and Qatar Charity, the allegations regarding any Defendant's contacts with the United States are insufficient to support personal jurisdiction, and therefore the conspiracy theory of jurisdiction under Rule 4(k) (2) set forth with respect to Qatar National Bank also fails.

Accordingly, Qatar National Bank's motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b) (2) is GRANTED.

**C. Jurisdictional Discovery**

Having found that Plaintiffs failed to state a *prima facie* case for personal jurisdiction over any of the three defendants, the court turns to Plaintiffs' request to conduct jurisdictional discovery. The court has "broad discretion" in deciding whether to allow jurisdictional discovery. *Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93 (2d Cir. 1975). "Courts frequently permit jurisdictional discovery where the plaintiff has made a sufficient start toward establishing jurisdiction, but will not permit jurisdictional discovery on the basis of a generalized request more akin to a fishing expedition." *Alexander v. Porter*, No. 13-CV-6834 (SLT) (JO), 2014 WL 7391683, at *6 (E.D.N.Y. Dec. 29, 2014).

As mentioned above, Plaintiffs could benefit from jurisdictional discovery into the specifics of the correspondent account utilizing transfers described in the Complaint. But none of these transfers could establish jurisdiction even if more detail were provided because, absent some factual allegation to the contrary, there is no causal connection between the transfers and the injuries suffered by Plaintiffs, which are not proximate in time. Any jurisdictional discovery at this stage would therefore amount to a fishing expedition into the existence of *later* transfers touching New York—transfers regarding which the Complaint is wholly silent.

Accordingly, Plaintiffs' request for jurisdictional discovery is DENIED.

## IV. CONCLUSION

For the aforementioned reasons, Masraf al Rayan, Qatar National Bank, and Qatar Charity's motions to dismiss are GRANTED WITHOUT PREJUDICE. Defendants' request for oral argument is DENIED as moot. Plaintiffs will be given leave to amend their Complaint within thirty days of the date of this Memorandum and Order. If Plaintiffs fail to amend their Complaint by this time, the Complaint will be dismissed with prejudice.

SO ORDERED.

Dated: Brooklyn, New York

March 16, 2023

**All Citations**

Slip Copy, 2023 WL 2562537

## Footnotes

1     The following facts are taken from the Complaint and, for the purposes of this motion to dismiss, are assumed to be true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022). Defendants also submitted a variety of exhibits, affidavits, and declarations attached to the motion to dismiss. These extrinsic documents have been excluded by the court as required by Federal Rule of Civil Procedure ("Rule") 12(b) and were not considered in resolving this motion. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002).

2     The Complaint states that Qatar Charity was founded in 2002, (Compl. ¶ 39) but alleges a variety of activities that occurred earlier. (*See, e.g., id.* ¶¶ 43 (1993), 44 (1998), 50 ("the 1990s").) The court takes judicial notice of the fact that public sources, including Qatar Charity's website, state the organization was founded in 1992, and assume the Complaint's discrepancy is attributable to a typo. *See, e.g., What We Do*, Qatar Charity, https://www.qcharity.org/en/qa/home/whatwedo (last visited Mar. 6, 2023).

3     Qatar Charity disputes this characterization as unsupported, and potentially sourced from "a webpage found at wildleals.org." (Qatar Charity Mot. at 5.) Plaintiffs are not tasked with proving their factual allegations, though, and—as noted above—the court disregards the extrinsic evidence submitted by Defendants on these motions to dismiss.

4     Only Masraf al Rayan brings a motion to dismiss on the basis of improper service, but Qatar National Bank asserts improper service as part of their Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. (*See* Qatar Nat'l Bank Mot. (Dkt. 50-1) at 5-6.). Qatar Charity's brief adopts the arguments made by the other Defendants. (Qatar Charity Mot at 35.)

5     When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

6     Plaintiffs' statement that "the Qatari Civil and Commercial Procedures Law (Law No. 13 of 1990) expressly authorizes ... Qatari courts ... to deliver process to any person inside or outside of Qatar by registered mail or any other appropriate means," (Opp. at 54), appears to argue by implication that such service would similarly be proper on a corporation. Plaintiffs do not dispute that Qatari law addresses service on corporations in another section lacking the quoted language. (*See* Masraf al Rayan Mot. at 13.)

7     Qatar National Bank does not raise an argument in its motion regarding insufficient proof of proper service. Although Qatar Charity adopts the arguments of the other Defendants, Masraf al Rayan's argument on this point is specific to the proof regarding its service; without its own argument regarding the evidence presented, Qatar Charity cannot adopt this point.

8     Plaintiffs argue that Defendants' appearance in this case is sufficient to prove service. (Opp. at 53.) But the case they cite in support of this argument, *NYKCool*, addressed an entirely different case: the defaulting defendant had not appeared, and repeatedly refused to accept delivery of mailed service in a transparent attempt to evade jurisdiction. 2013 WL 6799973, at *8. "Nor can defective service be ignored on the mere assertion that defendant had actual notice." *Weston Funding, LLC v. Consorcio G Group Dina, S.A. de C.V.*, 451 F. Supp. 2d 585, 589 (S.D.N.Y. 2006). The court will not adopt a legal conclusion that implies defendants always waive an ineffective service argument merely by appearing in the case to assert such an argument.

9     The court discusses the due process requirements at length *infra*, but includes a brief summary here to aid the reader. The constitutional analysis proceeds in two steps: *first*, the court "evaluate[s] the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test. Where the claim arises out of, or relates to, the defendant's contacts with the forum—*i.e.*, specific jurisdiction is asserted

—minimum contacts necessary to support such jurisdiction exist *where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." Licci,* 732 F.3d at 170. *Second*, if minimum contacts are established, the court must determine "whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985).

10    Unlike the other presented bases for personal jurisdiction, the Complaint's citation to 18 U.S.C. § 2334(a) as a basis for jurisdiction has not been reiterated in any of Plaintiffs' filings since. In any event, that provision allows for venue and service "in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent." 18 U.S.C. § 2334(a), Even if this provision could be read to apply to personal jurisdiction, there are no allegations to support a claim that any Plaintiff resides, or that any Defendant resides or has an agent, in New York.

11    The resulting gap in New York's personal jurisdiction law, for torts committed without the state which caused injury within, was closed by section 302(a)(3), upon which Plaintiffs do not rely. *See Bensusan Rest. Corp. v. King,* 126 F.3d 25, 29 (2d Cir. 1997). Even if Plaintiffs did assert that basis for jurisdiction, though, that provision includes additional requirements not satisfied by the Complaint. *Id.* (noting section 302(a)(3)'s requirements that the party "expect or should reasonably expect the tortious act to have consequences in the state and in addition derive substantial revenue from interstate commerce"); *see also* C.P.L.R. § 302(a) (3) (adding that jurisdiction may extend where the alleged tortfeasor "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state").

12    Plaintiffs do not allege any direct ties between Qatar Charity and New York, However, Plaintiffs do allege in a few instances that Qatar Charity intentionally used Masraf al Rayan's correspondent banking account. (*See* Compl. ¶¶ 24 ("Qatar Charity and Masraf [a]l Rayan ... knowingly effectuated U.S. dollar-denominated funds transfers on behalf of Qatar Charity through the Bank of New York Mellon in New York."), 132 (alleging that Qatar Charity intentionally passed U.S. dollars through the American banking system via Bank of New York Mellon).) While these statements appear to insufficiently allege factual contacts between Qatar Charity and New York or the United States, the court could charitably read the allegations to imply that Masraf al Rayan was acting as Qatar Charity's agent. Because the court holds that Plaintiffs have failed to demonstrate the contacts with New York have a sufficient nexus to the claims to exercise jurisdiction, the court does not reach whether Plaintiffs have sufficiently alleged an agency relationship between Qatar Charity and Masraf al Rayan.

13    The facts of *Amigo Foods* are complicated, but provide useful context for developing the spectrum of purposeful to unintentional contact with the forum via banking activity. The plaintiff, Amigo Foods Corporation, purchased goods from a distributor; the contract called for payment to be made at or through a Maine bank, Aroostook Trust Company. *Licci,* 20 N.Y.3d at 335. Amigo obtained a letter of credit from a New York bank, who delivered payment on Amigo's behalf to Aroostook's correspondent account at a New York bank; but subsequently, the distributor rejected payment and refused to deliver products in accordance with the contract. *Id.* at 335, 337. Aroostook's only relevant, intentional contact with New York was therefore the maintenance of a correspondent account there; the choice of the New York bank to attempt to deposit payment with Aroostook's New York correspondent account, rather than sending it directly to Aroostook, was not at Aroostook's direction, and could not be considered Aroostrook "transacting business" pursuant to section 302(a)(1). *Id.* at 337-38.

14    Masraf al Rayan argues that Plaintiffs "fail to identify what amount or frequency of [the alleged] funds were actually U.S. dollars versus Euros, meaning their allegation may amount to only a *de minimis* amount of dollars passing through New York." (Masraf al Rayan Mot, at 6.) The court declines to conclude that it lacks jurisdiction solely on this basis, but acknowledges that the Complaint's failure to specify the amounts actually

transferred through the correspondent account makes it virtually impossible to undertake the "examination of the particular facts in each case" required by *Licci.* 20 N.Y.3d at 338.

15    Indeed, there is no allegation anywhere in the Complaint that Qatar Charity—who appears to have directed monetary transfers, (*see, e.g.*, Compl. ¶ 132)—intended to use or was even aware of the existence of a correspondent account in New York used by Masraf al Rayan. "Absent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York." *Berdeaux,* 561 F. Supp. 3d at 403 n.25. While allegations illustrating Masraf al Rayan's repeated, purposeful use of the New York banking system may be sufficient to establish jurisdiction, it is unclear how it would be sufficient to allege Qatar Charity requested currency exchange transactions that, without their knowledge, were effected in a New York-based account. (*See* Qatar Charity Mot. at 9-10.)

16    The Declaration submitted by Patrick J. McArdle on behalf of Plaintiffs, (Dkt. 48-4), implicitly makes the same argument. It makes no factual assertions regarding Masraf al Rayan's actions, (*see id.* ¶ 18 (stating that Masraf al Rayan's transfers on behalf of Qatar Charity "*almost certainly settled* and cleared in the U.S. (New York) by U.S. banks")), but merely describes how money likely flowed through the financial system based on the Complaint's description of the transactions. (*See generally id.*) McArdle opines that, due to various regulatory requirements, "foreign banks with no physical U.S. presence" cannot participate in the infrastructure which facilitates transfers of U.S. dollars, and instead must use a correspondent account at a bank with such a physical presence. (*Id.* ¶ 11.) If the court were to exercise jurisdiction without indicia of purposeful availment beyond a single use of a correspondent account to facilitate such transactions, McArdle's assertions would subject any bank transacting in U.S. dollars to New York (or United States) jurisdiction.

17    Because the court concluded that the New York long-arm statute was not satisfied, there is no need to reach the constitutional analysis for that asserted basis of jurisdiction. In this context, however, where Defendant's only alleged ties to the United States are in New York, the due process inquiry would be the same for both Rule 4(k) (2) and section 302(a) (1).

18    The statute allows for consideration of acts taken by a party's agent, see C.P.L.R. § 302(a), but there is no allegation that Masraf al Rayan's use of a correspondent account was done as Qatar National Bank's agent or in any way at the direction or under the control of Qatar National Bank.

19    Plaintiffs claim that *Berdeaux* did not address conspiracy jurisdiction because, in that case, the "plaintiffs expressly disclaimed reliance on conspiracy jurisdiction." (Opp. at 75 (quoting *Berdeaux,* 561 F. Supp. 3d at 399).) That decision, like this one, nonetheless reached all of the plaintiffs' arguments, including under section 302(a)(1), "to avoid resting its decision on Plaintiffs' abandonment." *Berdeaux,* 561 F. Supp. 3d at 399.

20    *Freeman v. HSBC Holdings PLC,* 413 F. Supp. 3d 67 (E.D.N.Y. 2019) presents a single outlier. In that case, a court in this district held that personal jurisdiction existed over a defendant on a co-conspirator theory pursuant to section 302(a)(1). *Id.* at 79-80. The defendant in question argued that such a theory was incompatible with due process pursuant to the Supreme Court's decision in *Walden v. Fiore,* 571 U.S. 277 (2014), and *Freeman's* analysis focused on the various facts that distinguished the case from *Walden* and illustrated that the defendant, by virtue of the alleged conspiracy, had the requisite intent to avail itself of the forum. *Id.* As a result, it appears the court did not have the occasion to examine the case law discussed above. In any event, the court is more persuaded by the case law discussed above than by *Freeman's* brief statement that, under section 302(a)(1), "activities of a co-conspirator may be imputed to an out-of-state tortfeasor for jurisdictional purposes under an agency rationale." *Id.* at 79 (quoting *In re N. Sea Brent Crude Oil Futures Litig.,* No. 13-

MD-2475 (ALC), 2017 WL 2535731, at *9 (S.D.N.Y. June 8, 2017), which concluded to the contrary that "an agency relationship is required to uphold jurisdiction based on a conspiracy theory")).

21    In a separate section addressing jurisdiction over a different subset of defendants, *Schwab I* did reference section 302(a) even though New York law was inapplicable to the case at issue. 883 F.3d at 85. In that section, the Second Circuit addressed whether jurisdiction could constitutionally be asserted over a party solely on the basis of its agent's contacts with the forum—a situation explicitly contemplated by every provision of section 302(a), including 302(a)(1). *Id.* In concluding that it could, the Second Circuit stated it was "instructive" that its extensive case law "never suggested that due process require[d] something more than New York law." *Id.* Here, there is no assertion, conclusory or otherwise, that Masraf al Rayan acted as Qatar National Bank's agent in using its correspondent account, so this section of *Schwab I* is irrelevant to the analysis herein.

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2023 WL 2734788
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

ANNE CHANA HENKIN, Individually and as
Personal Representative of the ESTATE OF JUDAH
HERZEL HENKIN, ADERET RIVKAH HENKIN
STERN, ELIASHIR ELIJAH HENKIN, JACOB
BECHOR-SHALOM HENKIN, JOSEPH GIL HENKIN,
TAAMA FREIDA HENKIN YAAKOVSON, MIRIAM
FULD, Individually, as Personal Representative
of the ESTATE OF ARI YOEL FULD, and as the
Natural Guardian of N.S.F. (a minor), NAOMI FULD,
TAMAR GILA FULD, ELIEZAR YAKIR FULD,
HARVEY JONAS YONAH FULD, MARY ALICE
FULD, DANIEL YAAKOV FULD, EYTAN FULD,
and HILLEL CHAIM SHLOMO FULD, Plaintiffs,
v.
QATAR CHARITY, QATAR NATIONAL
BANK and MASRAF AL RAYAN, Defendants.

21-CV-5716 (AMD) (VMS)
|
Filed 03/31/2023

**MEMORANDUM DECISION AND ORDER**

ANN M. DONNELLY United States District Judge

\*1  In October 2015, terrorists shot and killed Eitam and Na'ama Henkin in the West Bank. About three years later, another terrorist murdered Ari Fuld at the Gush Etzion Junction. The plaintiffs are the victims' family members. They allege that the defendants—Qatar Charity, Qatar National Bank and Masraf Al Rayan—enabled the attacks by providing material support and resources to Hamas, the terrorist organization behind the attacks. The plaintiffs bring this action under the Anti-Terrorism Act, 18 U.S.C. § 2333 (the "ATA"), as amended by the Justice Against State Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016) ("JASTA").

The defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[1] For the reasons that follow, Qatar National

Bank's motions is granted; Masraf Al Rayan and Qatar Charity's motions are denied without prejudice to renew, and jurisdictional discovery is ordered for those defendants.

**BACKGROUND**

**I. The Terrorist Attacks**
Hamas is an offshoot of the Muslim Brotherhood, dedicated to radical Islamist principles and the destruction of Israel using violence. (ECF No. 1 ¶¶ 88-90.) The United States government has designated Hamas a Foreign Terrorist Organization ("FTO"), a Specially Designated Terrorist ("SDT"), and a Specially Designated Global Terrorist ("SDGT"). (*Id.* ¶¶ 3, 100-01, 103.) Hamas routinely collects money for charitable and humanitarian purposes, which it then uses to fund terrorism, including the purchase of "weapons and explosives" and providing "transportation services, safehouses, training and salaries for its terrorist operatives and recruiters." (*Id.* ¶ 96.)

On October 1, 2015, Eitam and Na'ama Henkin were driving with their four children past Beit Furik in the West Bank when three Hamas-affiliated terrorists stopped their car and shot and killed them after a struggle. (*Id.* ¶ 325.)

On September 16, 2018, Khalil Yusef Ali Jabarin stabbed Ari Fuld to death outside a supermarket at the Gush Etzion Junction. (*Id.* ¶¶ 346-47.) Jabarin allegedly targeted Mr. Fuld because Mr. Fuld spoke English. (*Id.* ¶ 349.) Hamas took responsibility for the attack. (*Id.* ¶ 351.)

**II. The Defendants' Roles**
The plaintiffs allege that the three defendants—Qatar Charity, Qatar National Bank, and Masraf al Rayan—facilitated the attacks by providing resources to Hamas.

**a. Qatar Charity**
Qatar Charity was founded in 1992 as "Qatar Charitable Society." (*Id.* ¶ 44.)[2] The plaintiffs allege that Qatar Charity is a "key funding source for international terrorists," and cite examples of its funding activities. (*Id.* ¶¶ 44, 47-58.) The plaintiffs allege that in "March 2008, the U.S. Interagency Intelligence Committee on Terrorism of the U.S. National Counterterrorism Center listed Qatar Charity (then known as Qatar Charitable Society) as a 'priority III terrorism support entity (TSE)' because of its 'intent and willingness'

to support terrorist organizations that attack the U.S. and its interests." (*Id.* ¶ 46.) While the plaintiffs do not allege that the United States designated Qatar Charity as an FTO or SGDT, they allege that Israel designated Qatar Charity a member of the Union of Good in July 2008, and in November 2008, the U.S. Department of the Treasury designated the Union of Good as an SGDT. (*Id.* ¶¶ 59, 61.) The Treasury Department described the Union of Good as "an organization created by Hamas leaders to transfer funds to the terrorist organization" whose primary purpose was to "strengthen Hamas's political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support Hamas members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas." (*Id.* ¶ 62.) The Union of Good's "charitable services" in the West Bank and Gaza included "martyr" payments to the families of suicide bombers and direct payments to terrorist and their families as incentives to commit terrorist acts. (*Id.* ¶ 63.)

**\*2** Although the plaintiffs allege that Qatar Charity funded various terrorist organizations globally, they implicate only Hamas in the deaths of the Henkins and Ari Fuld. The complaint alleges that Qatar Charity funded and was a partner of Islamic Relief Worldwide, which Israel banned in 2014 for funding Hamas. (*Id.* ¶ 58.) Additionally, the plaintiffs allege that from March 1, 2015, until September 7, 2015, Qatar Charity transferred over $28 million to its two branches in the Palestinian Territories, and ultimately "transferred a substantial portion of those funds to Hamas and supposed charities that it controlled." (*Id.* ¶¶ 126-27.) Qatar Charity transferred at least $150,000 between March 2011 and September 2015 to one such organization, the Hebron Islamic Charity Society, which Israel allegedly "outlawed ... because it operated as an arm of Hamas." (*Id.* ¶¶ 128-29.) Qatar Charity also transferred money to the Elehssan Society, another "Hamas front[ ]." (*Id.* ¶ 131.)

According to the plaintiffs, Qatar Charity's Ramallah Branch Director and two other staff members were convicted in Israel of operating an illegal organization and transferring funds to Hamas. (*Id.* ¶¶ 130, 141-43.) Those individuals confessed to a scheme in which Qatar Charity transferred donations worth more than $3.5 million in U.S. dollars and Euros to its branches in the Palestinian Territories between 2009 and 2015, and then "distributed a portion of those funds" to Hamas and its affiliates. (*Id.* ¶ 130.) In support of their claims, the plaintiffs attach the July 26, 2017 "amended indictment, guilty plea, conviction and sentencing of Qatar

Charity employee Fadi Manasra" to their opposition. (ECF No. 79 at 5.) The indictment describes the scheme to which Manasra confessed: "The funds were transferred from Main Jam'iya to the Al-Rayan Bank in Doha. From there, funds in Euros were transferred to Deutsche Bank in Germany and funds in dollars were transferred to a bank in New York. Afterwards, all the funds were transferred to the Bank of Palestine or to the Islamic Bank in Ramallah and were deposited in the bank account of the Jam'iya Ramallah." (ECF No. 79-1, Ex. A at 11.) The plaintiffs allege additionally that Qatar Charity's annual reports from 2013 to 2015 show that Qatar Charity transferred funds to various Hamas fronts, including the Elehssan Society. (ECF No. 1 ¶ 131.)

Finally, the plaintiffs allege that Qatar Charity purchased "thousands of anonymous debit cards known as 'Sanabel Cards' from the Bank of Palestine," which "effectively operated as a source of financing for Hamas." (*Id.* ¶¶ 149-51.) According to the plaintiffs, Hamas terrorists used the cards to fund terrorist attacks and for their financial needs while they planned the attacks. (*Id.* ¶ 151.) In addition, the defendants used the cards to support families of Hamas terrorists who were imprisoned or killed. (*Id.* ¶¶ 152-53.)

### b. Qatar National Bank

Qatar National Bank was founded in 1964 and is Qatar's first domestically owned commercial bank. (*Id.* ¶ 82.) The plaintiffs allege that during the relevant time period, Qatar National Bank maintained at least seven bank accounts for Qatar Charity; six accounts were opened in March 2012, and one was opened in September 2006. (*Id.* ¶¶ 169-70.) Additionally, Qatar National Bank gave money directly to Qatar Charity—approximately $275,000 in November 2013 and approximately $550,000 in February 2020—to "promote Qatar Charity's ability to fund Hamas and other terrorist organizations." (*Id.* ¶¶ 225-26.)[3] The plaintiffs also allege that Qatar National Bank served as "a principal banker for Hamas leadership," maintaining bank accounts and providing banking services to multiple Hamas terrorists, whose bank accounts were "used to finance Hamas terrorist activities in Israel." (*Id.* ¶¶ 172-99, 210-24.)

The plaintiffs allege that Qatar National Bank violated internal policies and international banking requirements, including know-your-customer and due diligence obligations, by providing banking services to terrorists and Qatar Charity. (*Id.* ¶¶ 168, 315.)

### c. Masraf al Rayan

**\*3** Masraf al Rayan, one of the largest Islamic banks in the world, was founded in 2006 and is a publicly held banking company headquartered in Doha that "purports to engage in banking, financing and investing activities in conformity with the principles of Islamic Sharia Law." (*Id.* ¶¶ 71-72.) Like Qatar National Bank, Masraf al Rayan provided banking services to Qatar Charity. The plaintiffs allege that between March and September 2015, Masraf al Rayan facilitated the transfer of $28 million from Qatar Charity to its Palestinian branches (*id.* ¶ 126), and between 2009 and 2015, the conversion of $3.5 million of dollars and Euros into Israeli shekels, which were then transferred to the Palestinian territories. (*Id.* ¶ 130.) As noted above, the Manasra confession specifically identified Masraf al Rayan in the scheme. (*See* ECF No. 79-1, Ex. A at 11 ("The funds were transferred from Main Jam'iya to the Al-Rayan Bank in Doha.").) The plaintiffs also allege that Masraf al Rayan used its correspondent bank account with Bank of New York Mellon to effectuate these transfers. (ECF No. 1 ¶ 130.) A portion of these funds was later transferred to organizations affiliated with Hamas, which the plaintiffs allege gave Hamas access to U.S. dollars, a "coveted currency." (*Id.* ¶¶ 130, 164.)[4]

### III. The Plaintiffs' Claims

The plaintiffs, family members of the victims, bring claims individually. Anne Henkin also brings claims as the personal representative of Mr. Henkin's estate, and Miriam Fuld brings claims as the personal representative of Mr. Fuld's estate and on behalf of her minor child. (*Id.* ¶¶ 25-43.)

The complaint alleges four counts: (1) aiding and abetting foreign terrorist organizations—specifically Hamas—in violation of the ATA and JASTA (*id.* ¶¶ 353-66); (2) conspiracy to violate the ATA and JASTA by facilitating acts of Hamas-led terrorism (*id.* ¶¶ 367-80); (3) primary violations of the ATA by providing material support to Hamas with the intent or knowledge that support will facilitate terrorism, (*id.* ¶¶ 381-97); and (4) primary violations of the ATA by providing material support to Hamas with the knowledge that it was designated an FTO. (*Id.* ¶¶ 398-409.) The plaintiffs allege that the defendants' support of Hamas enabled Hamas to engage in the acts that killed Mr. Henkin and Mr. Fuld, causing the plaintiffs significant physical, psychological, and emotional injuries. (*Id.* ¶¶ 364, 379, 396, 408.)[5] The defendants moved to dismiss on March 18, 2022 (ECF Nos.

54, 56, 58); the plaintiffs filed an omnibus opposition on May 3, 2022. (ECF No. 61.) The Court held oral argument on March 16, 2023, and the parties filed supplemental letters on March 23, 2023. (ECF Nos. 77, 78, 79, 80.)

There are two substantially similar cases pending against these defendants in this district, both of which raise nearly identical claims: that the defendants supported Hamas—and in those cases also the Palestinian Islamic Jihad—in violation of JASTA and the ATA. *See Force, et al. v. Qatar Charity et al.*, No. 20-CV-2578 (E.D.N.Y.); *Przewozman, et al. v. Qatar Charity, et al.*, No. 20-CV-6088 (E.D.N.Y.). The defendants also moved to dismiss those cases for lack of personal jurisdiction and for failure to state a claim. *Force*, No. 20-CV-2578 (ECF Nos. 55, 56, 57); *Przewozman*, No. 20-CV-6088 (ECF Nos. 48, 50, 52). The motions in *Force* are pending before Judge Brian Cogan. On March 17, 2023, Judge Nicholas Garaufis granted the defendants' motions to dismiss for lack of personal jurisdiction. *Przewozman*, No. 20-CV-6088, 2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023). There is one significant factual difference between this case and *Przewozman:* the terrorist attack in *Przewozman* occurred in 2019, more than four years after the last Bank of New York Mellon transaction alleged in the complaint, 2023 WL 2562537, at \*1-3, while the first attack in this case took place in 2015, and the second in 2018. As explained below, the Court adopts Judge Garaufis' detailed and persuasive analysis of the jurisdictional questions but grants jurisdictional discovery with respect to Qatar Charity and Masraf al Rayan.

### LEGAL STANDARD

### I. Rule 12(b)(2)

**\*4** "A court facing challenges as to both its jurisdiction over a party and the sufficiency of any claims raised must first address the jurisdictional question and must dismiss the action against any defendant over whom it lacks personal jurisdiction." *Romero v. 88 Acres Foods, Inc.*, 580 F. Supp. 3d 9, 14 (S.D.N.Y. 2022) (internal quotation marks and citation omitted).

When a defendant moves to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of establishing jurisdiction. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). "Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction." *Id.*;

*see also Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996) ("[U]ntil discovery takes place, a plaintiff is required only to make a *prima facie* showing by pleadings and affidavits that jurisdiction exists."); *Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) ("[A] complaint will survive a motion to dismiss for want of personal jurisdiction so long as its allegations, taken as true, are legally sufficient allegations of jurisdiction." (citations and quotation marks omitted)).

When evaluating whether the plaintiffs have met their burden at this stage, "the Court may look beyond the four corners of the complaint and consider materials outside of the pleadings, including accompanying affidavits, declarations, and other written materials." *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 245 n.1 (S.D.N.Y. 2020). The Court "constru[es] all pleadings and affidavits in the light most favorable to the plaintiff and resolv[es] all doubts in the plaintiff's favor." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).

## II. Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Although detailed factual allegations are not required, the pleading standard "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (noting that courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (citation omitted)).

## DISCUSSION

## I. Personal Jurisdiction

It is undisputed that the defendants are domiciled outside of the United States. The complaint alleges that Masraf al Rayan and Qatar Charity are based in Qatar, (*see* ECF No. 1 ¶¶ 7, 71), and although the complaint does not allege a domicile for

Qatar National Bank, the plaintiffs concede that it is a "Qatari bank headquartered in Doha." (ECF No. 61 at 5; *see also* ECF No. 1 ¶¶ 77, 82.)

Because these are non-domiciliary defendants, the Court applies a two-step analysis to determine whether the plaintiffs have met their burden to establish personal jurisdiction for purposes of Rule 12(b)(2). *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015). First, the Court applies the long-arm statute used by the forum state. *Id.* If, as the plaintiffs argue, "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction," the Court considers whether the plaintiffs effected proper service of federal claims, instead of looking to a state long-arm statute. (ECF No. 61 at 60; Fed. R. Civ. P. 4(k)(2).) Second, whether relying on the state long-arm statute or Rule 4(k)(2), the Court must analyze "whether personal jurisdiction comports with due process protections established under the Constitution." *Eades*, 799 F.3d at 168; Fed. R. Civ. P. 4(k)(2)(B).

**\*5** In the complaint, the plaintiffs assert that "Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because, pursuant to a conspiracy, they: transacted business and committed tortious acts within the United States (and New York)[.]" (ECF No. 1 ¶ 22.) In their pre-motion letter, the plaintiffs relied solely on C.P.L.R. § 302(a)(1), on the theory that the defendants used a correspondent banking account in New York pursuant to a conspiracy. (ECF No. 52 at 2-4 (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339 (2012) ("*Licci II*").) The plaintiffs did not claim in that letter that there was personal jurisdiction under section 2334(a) or Rule 4(k), or because the defendants committed tortious acts within New York. (*Id.*) However, in their brief opposing dismissal, the plaintiffs cited Rule 4(k)(2) as a basis for personal jurisdiction, as well as C.P.L.R. sections 302(a)(1) and (2); they also requested jurisdictional discovery. (ECF No. 61 at 60-86.) I address each argument in turn. [6]

### a. Masraf al Rayan and Qatar Charity

### *i. New York's Long-Arm Statute*

The plaintiffs assert jurisdiction under sections 302(a)(1) and (2) of New York's long-arm statute. The statute provides that personal jurisdiction may be established over a non-domiciliary defendant who, acting in person or through an

agent: (1) "transacts any business within the state," or (2) "commits a tortious act within the state." C.P.L.R. § 302(a)(1), (2).

Under longstanding New York law, section 302(a)(2) extends only to acts committed within the state—that is, the defendant must have been physically present in New York when committing the tort. *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 461-62 (1965) ("[T]he Legislature chose to adopt language which, in so many words, demands that the tortious act be one committed by the defendant, in person or through an agent, *within* this State." (internal quotation marks omitted) (emphasis in original); *see also Harvey v. Chemie Grunenthal, G.m.b.H.*, 354 F.2d 428, 431 (2d Cir. 1965) (following *Longines-Wittnauer* and concluding that the location of the consequence of the tort is irrelevant under section 302(a)(2)). It is the location of the act itself, not the location of the consequences of the act, that governs. *Platt Corp. v. Platt*, 17 N.Y.2d 234, 237 (1966). The single New York act that the plaintiffs allege is the use of a correspondent banking account, but that is a plainly not a tort. And, the plaintiffs do not allege that either Masraf al Rayan or Qatar Charity was ever physically present in New York. Accordingly, section 302(a)(2) does not confer jurisdiction over either defendant.

Section 302(a)(1) provides for specific jurisdiction when a party " 'transacts business within the state' and the 'cause of action arises from' that transaction." *Reed Int'l, Inc. v. Afghanistan Int'l Bank*, No. 21-CV-10626, 2023 WL 2138600, at *5 (S.D.N.Y. Feb. 21, 2023) (citing C.P.L.R. § 302(a)(2)). "Proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Eades*, 799 F.3d at 168 (citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010). "Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (internal quotation marks and citation omitted).

**\*6** The plaintiffs allege that Masraf al Rayan transacted business in New York as an agent of Qatar Charity when Masraf al Rayan utilized its correspondent banking account at Bank of New York Mellon, in New York, on behalf of Qatar Charity. (ECF No. 61 at 68-73.) "Correspondent

banking is a system of interbank relationships in which a bank sells services to other financial institutions and involves banks establishing relationships with one another to facilitate transactions involving remote customers of certain banks." *Berdeaux v. OneCoin, Ltd.*, 561 F. Supp. 3d 379, 403 n.25 (S.D.N.Y. 2021) (internal quotation marks omitted); (ECF No. 1 ¶¶ 157-60.) Typically, the foreign bank—in this case, Masraf al Rayan—utilizes a "correspondent account" at a local bank—here, Bank of New York Mellon—to send and receive financial transfers in the area; the local bank provides services in the region on behalf of the foreign bank's customers including transfers or currency exchange transactions. (*See, e.g., id.*)

The New York Court of Appeals held in *Licci II* that a defendant may "transact business" within New York under section 302(a)(1) by "use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, *if* the defendant's use of that account was purposeful." 20 N.Y.3d at 338 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 66 (2d Cir. 2012) ("*Licci I*") (emphasis in original)). The court held that whether a defendant purposefully availed itself of the New York forum is a fact-intensive inquiry, but as a general matter, "complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Id.* at 339. After analyzing the facts alleged in the complaint, the court found that the defendant's intentional use of a correspondent account "to effect 'dozens' of wire transfers on behalf of a foreign client" constituted a "transaction of business" pursuant to section 302(a)(1). *Id.* at 334, 340.

Here, the complaint alleges that Masraf al Rayan "pass[ed]" funds "through" its New York-based correspondent account at Bank of New York Mellon while facilitating currency exchanges and transfers of money from Qatar Charity to its branches in the Palestinian territories. (ECF No. 1 ¶ 130.) The complaint also alleges Qatar Charity received the money from donations "in Qatar and around the world," although not specifically in the United States. The money was then transferred into Qatar Charity's Doha-based account at Masraf al Rayan, where it was converted from U.S. dollars or Euros into Israeli shekels, transferred to Qatar Charity's Palestinian accounts ("pass[ing] through" New York) before

being distributed to Hamas affiliates. (*Id.*) The scheme alleged in the complaint is supported by the Manasra confession, although the confession does not name Bank of New York Mellon; it simply refers to transfers from Masraf al Rayan to "a bank in New York." (ECF No. 79-1, Ex. A at 11.)

The plaintiffs allege that between 2009 and 2015, Masraf al Rayan used this process to move approximately $3.5 million in U.S. dollars and Euros, and transferred $25 million from Doha (through Masraf al Rayan, and possibly the correspondent account) to a Qatar Charity branch in the Gaza Strip between 2011 and 2013. (ECF No.1 ¶ 130.) The plaintiffs additionally allege the planned transfer through Masraf Al Rayan of $28 million from Qatar Charity to its branches in Palestine between March and September of 2015, although the complaint does not mention whether this sum was routed through the correspondent account. (*Id.* ¶ 126.) Some unspecified portions of these amounts ultimately reached Hamas and its affiliates, potentially including $150,000 to the Hebron Islamic Charity Society between March 2011 and September 2015 and unspecified amounts to "the Elehssan Society." (*Id.* ¶¶ 128-32.)

**\*7** It is not especially clear what the plaintiffs are alleging about Masraf al Rayan's use of the Bank of New York Mellon account. The plaintiffs allege in the complaint that Masraf al Rayan used the account to "access USD and distribute [ ] dollars to terrorists and their family members in the Palestinian Territories, where USD were a coveted currency." (ECF No. 1 ¶ 164.) On the other hand, they also maintain that Masraf al Rayan used the account to convert "USD and Euros held by Qatar Charity in Doha into Israeli shekels." (*Id.* ¶ 130.) Moreover, the complaint does not allege that Masraf al Rayan used the correspondent account for currency exchanges; on the contrary, the plaintiffs say that the currency exchanges took place in Doha. (ECF No. 1 ¶ 130; *see also* ECF No. 79-1, Ex. A at 11.) [7] The plaintiffs allege only that some portion of the money that Masraf al Rayan transferred for Qatar Charity "passed through" the correspondent account as part of "currency exchange transactions" that converted dollars into Israeli shekels. (*Id.*; *see also* ECF No. 61 at 13-14 (stating that the funds at issue were "passed through" and "transferred ... through" the correspondent bank account at issue).)

Nor do the plaintiffs allege that Masraf al Rayan chose a New York-based account specifically to take advantage of "New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the

predictable jurisdictional and commercial law of New York and the United States." *Licci II*, 20 N.Y.3d at 339. While the complaint alleges more than mere maintenance of a correspondent account, (ECF No.1 ¶ 130), and the allegations could arguably be read to state that the transactions using the correspondent account "totaled several million dollars," *Licci I*, 673 F.3d at 56, there is no indication, as there was in *Licci*, that there were "dozens" of transactions. (*Id.*) Indeed, the complaint is silent on the volume or frequency of the transfers. (*See also* ECF No. 79-1, Ex. A at 11 (stating that unspecified "funds" were transferred to a bank in New York).)

Courts in this circuit consider four factors to determine whether the use of a New York correspondent account is deliberate: "(1) the defendant bank's level of control over the transfers; (2) whether the defendant bank marketed the correspondent account or encouraged others to use it; (3) the extent to which the use of correspondent account was necessary to carry out the alleged scheme, and; (4) whether the defendant bank took other steps to project itself into the New York market." *Przewozman*, 2023 WL 2562537, at \*11 (citing *Vasquez*, 477 F. Supp. 3d at 258). As noted above, the complaint does not include any detail about the number of transfers through the account, or about the amounts. Nor do the plaintiffs allege that Masraf al Rayan directed or controlled the way the correspondent account functioned. *Cf. Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 68-69 (S.D.N.Y. 2016) ("The Banks ... set the terms of each placement transaction.... The Banks selected U.S. dollars as the currency in which to execute the transaction. The Banks designated New York correspondent bank accounts to receive the funds[.]"). Similarly, there are no allegations that Masraf al Rayan marketed the correspondent account, or encouraged others to use it, or that the correspondent account was necessary to exchange dollars for other currencies (or even "cheaper or easier" than other options). *See Vasquez v. Hong Kong & Shanghai Banking Corp.*, No. 18-CV-1876, 2019 WL 2327810, at \*12 (S.D.N.Y. May 30, 2019); *Vasquez*, 477 F. Supp. 3d at 259. [8]

In short, the allegations do not establish that Masraf al Rayan purposefully availed itself of the New York banking system. *See, e.g.*, *Singer v. Bank of Palestine*, No. 19-CV-6, 2021 WL 4205176, at \*5-6 (E.D.N.Y. Apr. 30, 2021) (concluding there was a lack of jurisdiction where the jurisdictional allegations were a "conclusory web" lacking "information as to dates, dollar amounts, number of transactions, senders or recipients of [the] transfers," but allowing limited

jurisdictional discovery). Due to the nature of interbank activity, and "the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide ... for transactions that otherwise have no other connection to New York," *Licci II*, 20 N.Y.3d at 338, allegations of jurisdiction based on a correspondent bank account need to be specific regarding the scope and the extent to which the account was used. *See Przewozman*, 2023 WL 2562537, at \*12. Otherwise, jurisdiction would be established for any financial transaction conducted in U.S. dollars that is routed through New York, regardless of whether it was purposeful. *See id.*; *see also Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, No. 14-CV-5216, 2015 WL 4164763, at \*4 (S.D.N.Y. July 10, 2015) (routing of U.S. dollar wire payment through New York correspondent account was adventitious, not purposeful use of forum); *Hau Yin To v. HSBC Holdings PLC*, No. 15-CV-3590, 2017 WL 816136, at \*7 n.6 (S.D.N.Y. Mar. 1, 2017), *aff'd* 700 F. App'x 66 (2d Cir. 2017) (dismissing for lack of personal jurisdiction where wiring of U.S. dollars through correspondent account was "passive, rather than 'integral' to the alleged" fraud). Accordingly, the Court cannot at this point determine whether there is personal jurisdiction under the first prong of § 302(a)(1) because of the deficiencies in the complaint.

 **\*8**  The plaintiffs' allegations of jurisdiction over Qatar Charity are also premised on Masraf al Rayan's use of its correspondent account. While the plaintiffs do not allege any direct ties between Qatar Charity and New York, they allege that Masraf al Rayan was Qatar Charity's agent and that by directing Masraf al Rayan to "make certain USD transfers that could only be effectuated through a U.S. correspondent bank," (ECF No. 61 at 70), Qatar Charity is subject to this Court's jurisdiction.

"A correspondent bank relationship, standing alone, does not create an agency relationship." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 122 (2d Cir. 1984). "The Second Circuit has directed that courts focus on the realities of the relationship in question rather than the formalities of agency law when determining whether an agency relationship exists for the purpose of establishing personal jurisdiction under section 302. But even this practical analysis turns on the elements of the classic agency relationship: that the in-forum intermediary acted (1) for the benefit of, (2) with the knowledge and consent of, and (3) under some degree of control of the non-resident principal." *Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 110 (E.D.N.Y. 2020) (internal quotation marks and

citations omitted). [9] These elements are satisfied when the non-resident defendant "played an active role in directing the intermediary's activities relating to the specific in-forum transactions at issue." *Id.* at 111. In *Spetner*, the court found that there was no agency relationship, because the plaintiffs did not allege that the defendant bank chose the providers of the intermediary bank's correspondent accounts in New York or had any say about which of the accounts were used for specific transactions. *Id.* at 111-12. [10]

The plaintiffs' claims of an agency relationship between Masraf al Rayan and Qatar Charity do not sufficiently allege that Qatar Charity exercised control over Masraf al Rayan in its dealings with the correspondent bank. The plaintiffs cite the Manasra confession as evidence of a "conspiracy to fund Hamas" that involved Qatar Charity and Masraf al Rayan (ECF No. 1 ¶ 130; ECF No. 79-1, Ex. A at 11), but Manasra admitted only that "funds in dollars were transferred to a bank in New York;" he said nothing about whether Qatar Charity controlled the way Masraf al Rayan selected or used the correspondent account. The only allusion to control is conclusory: "Qatar Charity originated multiple USD transfers that Masraf, at Qatar Charity's direction, processed through New York." (ECF No. 61 at 72); *see Pincione v. D'Alfonso*, 506 F. App'x 22, 24 (2d Cir. 2012) (holding that "allegations concerning [ ] agency were entirely conclusory and thus inadequate" to establish personal jurisdiction); *Schwab*, 883 F.3d at 86 ("Schwab's sparse allegations of agency, however, are too conclusory to make a prima facie showing of personal jurisdiction."); *Polansky v. Gelrod*, 20 A.D.3d 663, 664 (3d Dep't 2005) (declining to find agency where "plaintiff offer[ed] only the conclusory allegation that [the alleged agent] was their agent, with no supporting evidentiary facts establishing control"). [11] Finally, "[a]bsent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York." *Berdeaux*, 561 F. Supp. 3d at 403 n.25.

 **\*9**  Accordingly, based on the plaintiffs' allegations, the Court cannot at this point determine whether an agency relationship existed between Masraf al Rayan and Qatar Charity sufficient to confer jurisdiction over Qatar Charity based on Masraf al Rayan's use of its correspondent bank account. [12]

*ii. Rule 4(k)(2)*

Rule 4(k)(2), the federal long-arm statute, allows federal courts to exercise personal jurisdiction if "(1) plaintiff's cause of action arise[s] under the federal law; (2) ... the defendant is not subject to the jurisdiction of the courts of general jurisdiction of any one State; and (3) ... the defendant's total contacts with the United States as a whole are sufficient to confer the court with personal jurisdiction without offending due process." *Hartford Fire Ins. Co. v. M/V MSC INSA*, No. 03-CV-2196, 2003 WL 22990090, at *3 (S.D.N.Y. Dec. 18, 2003) (quoting *Aerogroup Int'l, Inc. v. Marlboro Footworks*, Ltd., 956 F. Supp. 427, 434 (S.D.N.Y. 1996)). Due process considerations require that the defendant "have certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks omitted). "The personal jurisdiction analysis under Rule 4(k)(2) mirrors the standard personal jurisdiction analysis ... except the question of whether exercising personal jurisdiction comports with due process depends on whether the non-resident has sufficient minimum contacts with the United States as a whole." *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 178 (S.D.N.Y. 2021).

"In this Circuit, to meet the second requirement of Rule 4(k)(2), plaintiffs need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state." *Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 125 (S.D.N.Y. 2020); *see also In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 240 (S.D.N.Y. 2019). Because the plaintiffs have not certified that the defendants are not subject to general jurisdiction in another state, they have not met all of the elements of Rule 4(k)(2). *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13-CV-981, 2015 WL 1514539, at *13 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir. 2019) ("Accordingly, the second prerequisite for application of Rule 4(k)(2) has not been met. A contrary holding would encourage similarly-situated plaintiffs—those suing foreign corporations under federal law—to omit any allegations tying defendants to a specific state, in hopes of engaging the broader minimum contacts analysis of Rule 4(k)(2), which only requires contacts with the United States as a whole.") [13] Moreover, as noted above, the plaintiffs have not satisfied their burden to show that the defendants had sufficient minimum contacts with the United States. In *Licci*, the court found that wire transfers through a correspondent

bank in New York account created minimum contacts because the defendant was purposefully using the account to affect the alleged harm; the court emphasized, however, the "recurring" nature of the transfers at issue, which demonstrated the "selection and repeated use of New York's banking system." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170-71 (2d Cir. 2013) (finding that because the defendant effectuated dozens of wire transfers totaling several million dollars, its contacts with New York were not random, isolated, or fortuitous, but rather, the transfers were deliberate and recurring and constituted purposeful availment).

**\*10** As noted above, "key supporting facts such as number of transfers, dates, and monetary amounts, which other courts have relied upon to find a prima facie showing of personal jurisdiction are lacking here." *Singer*, 2021 WL 4205176, at *7. "When determining whether the use of a bank branch constitutes purposeful availment, courts typically consider the number of transfers identified and volume of money transferred, as well as whether plaintiffs allege the dates of the transfers." *Brown v. Nat'l Bank of Pakistan*, No. 19-CV-11876, 2022 WL 1155905, at *3 (S.D.N.Y. Apr. 19, 2022). Finally, as noted above, the plaintiffs merely allege that some portion of the money transferred by Masraf al Rayan on behalf of Qatar Charity "passed through" the correspondent account. (ECF No. 1 ¶ 130.) Accordingly, just as the plaintiffs' generalized allegations are insufficient to satisfy New York's long-arm statue, they are insufficient to satisfy the due process requirement. *Brown*, 2022 WL 1155905, at *3. ("The allegations do not allege plausibly a course of dealing, or that Defendant has purposefully availed itself of the forum by engaging in a frequent and deliberate use of its New York branch.").

**b. Qatar National Bank**

The plaintiffs advance the same theory of jurisdiction for Qatar National Bank that they advanced in *Przewozman*: that "personal jurisdiction over Qatar National Bank may be established based on their participation in a conspiracy with the other Defendants, who used a correspondent banking account in New York to transact in United States Dollars." *Przewozman*, 2023 WL 2562537, at *15; (*see generally* ECF No. 61 at 60-82.) In *Przewozman*, Judge Garaufis dismissed the claims against Qatar National Bank for lack of personal jurisdiction. I adopt that thorough and cogent analysis of the plaintiffs' claims against Qatar National Bank, and conclude, as Judge Garaufis did, that the claims against Qatar National Bank should be dismissed for lack of personal jurisdiction.

New York's long-arm statute does not provide for co-conspirator jurisdiction, *Przewozman*, 2023 WL 2562537, at *16, and thus does not establish personal jurisdiction over Qatar National Bank.

I also agree with Judge Garaufis that Rule 4(k)(2) does not confer conspiracy jurisdiction over Qatar National Bank. As explained above, Rule 4(k)(2) states that proper service establishes personal jurisdiction in federal courts over a defendant for claims arising under federal law if "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). The Second Circuit has established a three-prong test to determine whether there are sufficient contacts with the forum jurisdiction under a conspiracy theory of jurisdiction. *Schwab*, 883 F.3d at 86-87. The plaintiffs must allege "that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Id.* at 87. Although the constitutional analysis "does not require a relationship of control, direction, or supervision" between the defendant and its co-conspirator, "the conspiratorial contacts must be of the sort that a defendant 'should reasonably anticipate being haled into court' in the forum as a result of them." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. Plc*, 22 F.4th 103, 125 (2d Cir. 2021) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

As Judge Garaufis observed in *Przewozman*, the plaintiffs did not "allege in a non-conclusory manner any facts from which an inference of agreement between Qatar National Bank and the other defendants can be drawn." *Przewozman*, 2023 WL 2562537, at *18. The plaintiffs allege that Qatar National Bank maintained bank accounts and provided banking services for Qatar Charity and various Hamas-affiliated individuals, (ECF No. 1 ¶¶ 14-15, 171-172, 174-225), contributed to Qatar Charity (*id.* ¶¶ 225-26), and was controlled by members of the Qatari government and royal family, who themselves have ties to Hamas. (*Id.* ¶¶ 85-87, 111-122.) The complaint does not allege that the Qatari government or royal family were involved in the terrorist attacks at issue, and as Judge Garaufis pointed out, the plaintiffs do not even establish a connection between Qatar National Bank and the transfers effected by Masraf al Rayan. *Przewozman*, 2023 WL 2562537, at *18. Indeed, the only allegation about the Qatar National Bank accounts are the conclusory statements that the accounts "were used to finance Hamas [ ] terrorist activities in Israel," and that they "allowed the released terrorists to finance their personal expenditures, thereby freeing them to continue to conduct activities on behalf of Hamas [ ]" and were "directly used ... to further the efforts of Hamas [ ] to carry out terrorist attacks. (ECF No. 1 ¶ 224.) "How or when these accounts were used is left to the imagination." *Przewozman*, 2023 WL 2562537, at *18. Accordingly, the plaintiffs have not sufficiently demonstrated that Qatar National Bank participated in the alleged conspiracy and this Court does not have personal jurisdiction over Qatar National Bank based on a conspiracy theory of personal jurisdiction.

### c. Jurisdictional Discovery

**\*11** Plaintiffs who do not make a *prima facie* showing of personal jurisdiction typically are not entitled to jurisdictional discovery. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 255 (2d Cir. 2007) (holding that "the district court acted well within its discretion in declining to permit discovery because the plaintiff had not made out a prima facie case"). Moreover, "[c]ourts ... will not permit jurisdictional discovery on the basis of a generalized request more akin to a fishing expedition." *Alexander v. Porter*, No. 13-CV-6834, 2014 WL 7391683, at *6 (E.D.N.Y. Dec. 29, 2014).

However, it is well settled under Second Circuit law that a court may order discovery, in its discretion, even where plaintiff has not made a *prima facie* showing of personal jurisdiction, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record. *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014). "[J]urisdictional discovery is only appropriate when Plaintiff has asserted 'specific, non-conclusory facts that, if further developed, could demonstrate substantial state contacts.' " *Russo v. Sys. Integrators Inc.*, No. 17-CV-4317, 2018 WL 4100493, at *5 (E.D.N.Y. Aug. 28, 2018) (quoting *Leon*, 992 F. Supp. 2d at 195); *see also Ayyash v. Bank Al-Madina*, No. 04-CV-9201, 2006 WL 587342, at *5 (S.D.N.Y. Mar. 9, 2006) ("Such discovery has typically been authorized where the plaintiff has made a threshold showing that there is some basis for the assertion of jurisdiction, facts that would support a colorable claim of jurisdiction." (internal quotation marks and citation omitted)). The Court has "broad discretion" in deciding whether to allow jurisdictional discovery. *Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93 (2d Cir. 1975).

Here, because the plaintiffs have pleaded facts which could support a colorable claim of jurisdiction over Masraf al Rayan, jurisdictional discovery will enable the plaintiffs to determine whether there are additional facts that would permit the Court to determine whether there is personal jurisdiction under the first prong of § 302(a)(1) and whether exercising personal jurisdiction would comport with due process.

The plaintiffs assert that Masraf al Rayan used a correspondent bank account in New York to conduct large-volume U.S. dollar transfers to organizations affiliated with Hamas during the relevant period. (ECF No. 1 ¶ 130.) The plaintiffs also allege that Masraf al Rayan knowingly assisted Hamas, the party responsible for the terrorist attacks at issue, by facilitating these dollar transfers. (*Id.* ¶¶ 161-67.) Because some of these allegations could support a colorable basis for personal jurisdiction, the plaintiffs have made a sufficient start to establishing personal jurisdiction. And indeed, as the plaintiffs noted at the March 16th conference, there is no way for them to know, without some discovery, anything about the number of transfers, the amounts transferred, or the denominations in which the transfers were made, information in the control of Masraf al Rayan and Qatar Charity. (Mar. 16 H'rg Tr. at 11-12, 20-21.)

In short, while the complaint currently lacks key supporting facts, the plaintiffs have plausibly pleaded that they might reasonably be able to identify these facts if given the opportunity to develop the record. Accordingly, limited jurisdictional discovery is appropriate to determine whether the Court has personal jurisdiction over Masraf al Rayan.

**\*12** The plaintiffs have also pleaded facts that could support a colorable claim that Masraf al Rayan was acting as Qatar Charity's agent. The plaintiffs allege that Qatar Charity directed Masraf al Rayan to use its account in the United States to gain access to U.S. dollars, which were "coveted" by Hamas. (ECF No. 1 ¶¶ 5, 164.) Moreover, Manasra, a former Qatar Charity employee, stated in his confession that "funds in dollars were transferred to a bank in New York," demonstrating that Qatar Charity may have had direct knowledge that Masraf al Rayan was using the Bank of New York Mellon account. (ECF No, 79-1, Ex. A at 11.) To be sure, Manasra also said that Qatar Charity had access to U.S. dollars *before* those funds were transferred to the New York bank, which is inconsistent with the plaintiffs' assertion that the correspondent bank was used to gain access to "coveted" U.S. dollars. The defendants also question as a factual matter whether the funds were transferred through the correspondent

bank at all. (*See* ECF No. 68 at 5-6.) However, at this stage of the proceedings, drawing inferences in the plaintiffs' favor, the Court finds that the plaintiffs could plausibly allege that Qatar Charity exercised some control over Masraf al Rayan.

Judge Garaufis denied jurisdictional discovery in *Przewozman* because the terrorist attack at issue in that case occurred in 2019, well after the last transaction through the correspondent account in 2015. *Przewozman*, 2023 WL 2562537, at \*13. Judge Garaufis concluded that under those circumstances, the "temporal gap [made] the nexus between the Defendants' New York-related acts and Plaintiffs' injuries far too attenuated." *Id.* In this case, however, there is no similar temporal gap with respect to the first attack, which took place in 2015, when Masraf al Rayan is alleged to have been using the correspondent New York account. [14]

While the second attack occurred later, in 2018, I cannot determine at this point whether the 2018 attack was attenuated, as it was in *Przewozman*. A nexus may be "too attenuated if, ... Defendant ... executed the New York transfers at a time far removed from the attacks that caused Plaintiffs' injuries." *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016). One court has determined that there is no articulable nexus or substantial relationship when ten years separates the wire transfers and the plaintiffs' injuries. *Universal Trading & Inv. Co. v. Credit Suisse (Guernsey) Ltd.*, No. 12-CV-198, 2012 WL 6186598, at \*4 (S.D.N.Y. Dec. 12, 2012), *aff'd*, 560 F. App'x 52 (2d Cir. 2014). However, a two-year gap does not preclude finding an articulable nexus. *See Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 632 (E.D.N.Y. 2006) ("I cannot conclude as a matter of law that [defendant's] transaction in 2000 could not be the proximate cause of an attack that occurred less than two years later in 2002."); *Averbach v. Cairo Amman Bank*, No. 19-CV-4, 2020 WL 486860, at \*2-3, 6-7 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted sub nom. Averbach for Est. of Averbach v. Cairo Amman Bank*, No. 19-CV, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) (finding an articulable nexus when the fund transfers at issue were made between December 1999 and September 2001 and the terrorist attacks occurred between December 1, 2001 and August 19, 2003).

In this case, because of "the fungible nature of money and the fact that it is difficult to say when the particular dollar given to a terrorist is actually used," *Weiss*, 453 F. Supp. 2d at 632, there could be an articulable nexus between the transfer of funds that occurred between 2009 and 2015 and

the 2018 terrorist attack. Qatar National Bank is different. The plaintiffs do not allege that it had any direct contact with New York, or the United States generally, and their allegations regarding its involvement in the alleged conspiracy are conclusory. The plaintiffs have not made a threshold showing that the record could be further developed to support a colorable claim of jurisdiction as to Qatar National Bank. Accordingly, granting jurisdictional discovery with respect to Qatar National Bank would amount to a fishing expedition, so that request is denied.

**\*13** Discovery will be limited to document requests and interrogatories that could show the frequency with which Masraf al Rayan used of the Bank of New York Mellon account, and whether that use was deliberate, during the time period relevant to the terrorist attacks, and that the plaintiffs' claims arose from Masraf al Rayan contacts with New York. For Qatar Charity, discovery will be limited to document requests and interrogatories sufficient to show whether Masraf al Rayan was acting as Qatar Charity's agent.

Discovery must be reasonably tailored to this jurisdictional issue. The parties will have 120 days from entry of this order to conduct this discovery.

### CONCLUSION

Accordingly, Qatar National Bank's motion to dismiss is granted without prejudice. Qatar Charity and Masraf al Rayan's motions to dismiss are denied without prejudice to renew as set forth in this Order. Magistrate Judge Vera M. Scanlon will manage the jurisdictional discovery and set a briefing schedule for any additional dispositive motions by Masraf al Rayan and/or Qatar Charity.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 2734788

### Footnotes

1    The defendants moved to dismiss for improper service, but subsequently withdrew those challenges. (*See* ECF Nos. 69, 70, 72.)

2    The complaint alleges that the charity was founded in 2002. However, public sources, including Qatar Charity's website, state the organization was founded in 1992. The Court assumes the discrepancy is a typographical error. *See, e.g.*, *What We Do*, Qatar Charity, https://www.qcharity.org/en/qa/home/whatwedo (last visited Mar. 20, 2023).

3    The February 2020 payment from Qatar National Bank to Qatar Charity was "purportedly to assist Syrian refugees." (*Id.* ¶ 226.)

4    The complaint states that "Qatar Charity [ ] distributed a portion of those funds to Hamas and its affiliates." (*Id.* ¶ 130.) However, during a March 16, 2023 hearing on the motions to dismiss, plaintiffs clarified that "the allegations in the complaint are that [the funds] went to entities that are controlled by Hamas." (Mar. 16, 2023 Hearing Transcript ("Mar. 16 H'rg Tr.") at 7-8.)

5    Although Hamas also killed Na'ama Henkin in the 2015 attack, the plaintiffs' claims relate only to Eitam Henkin.

6    Although the plaintiffs cited 18 U.S.C. § 2334(a) in their complaint as a basis for jurisdiction, they did not raise the argument in any subsequent filings. That statute provides for venue and service "in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent." 18 U.S.C. § 2334(a). Even assuming that § 2334(a) covers personal jurisdiction, the plaintiff does not claim that any party resides or has an agent in New York.

7    Manasra did not say in his confession that the account was used to exchange currency.

8    The complaint states that "Masraf al Rayan had no U.S. branch or office." (ECF No. 1 ¶ 156.)

9    The plaintiffs assert that they do not need to demonstrate that Qatar Charity had control over Masraf al Rayan, only that Masraf al Rayan knew that it was acting on Qatar Charity's behalf. (ECF No. 61 at 73.) Once the agency relationship is established, they argue, Masraf al Rayan's knowledge is then attributed to the Qatar Charity. "Under [New York law], there is jurisdiction over a principal based on the acts of an agent where the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (internal quotation marks and citations omitted). "This control requirement is vital: '[a]lthough the long-arm statute and the Due Process Clause are not technically coextensive, the New York requirements (benefit, knowledge, some control) are consonant with the due process principle that a defendant must have 'purposefully availed itself of the privilege of doing business in the forum.' " *Al Thani v. Hanke*, No. 20-CV-4765, 2021 WL 1895033, at *12 (S.D.N.Y. May 11, 2021) (quoting *Schwab*, 883 F.3d at 85).

10   The plaintiffs say that *Spetner* is different because Qatar Charity and Masraf al Rayan acted in concert, while the *Spetner* plaintiffs made no similar allegations. (ECF No. 61 at 68.) While the plaintiffs have alleged that Masraf al Rayan and Qatar Charity acted in concert, they have not alleged or demonstrated control, which they must do.

11   The plaintiffs submit the Declaration of Patrick McArdle for the proposition that wire transactions, like those here, must pass through a U.S.-based correspondent account, (ECF No. 61 at 64 n.36 (citing ECF No. 63 ¶¶ 6-14)); the plaintiffs say that the fact that Qatar Charity instructed Masraf al Rayan to make certain transfers demonstrates its knowledge that a U.S. correspondent bank would be involved. (*See* ECF No. 63 ¶ 19.) The McArdle declaration states only the transfers were "almost certainly settled in the U.S." because that was how a "transaction involving U.S. dollars would typically operate." (*Id.* at 6-7.) The Declaration does not establish that Qatar Charity intended that Masraf al Rayan effectuate transfers on its behalf in the United States specifically, or that Qatar Charity in any way controlled Masraf al Rayan's banking activities. Indeed, as the *Spetner* court pointed out, "[the defendant] may have expected, or even known for a fact, that [the intermediary] would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling." *Spetner*, 495 F. Supp. 3d at 110.

12   Because I find that personal jurisdiction over Qatar Charity may be established after jurisdictional discovery pursuant to a theory of agency jurisdiction, I decline to consider the plaintiffs' argument that the Court has personal jurisdiction over Qatar Charity pursuant to a conspiracy theory of jurisdiction. The parties can re-brief this issue after jurisdictional discovery.

13   Because the Court is ordering jurisdictional discovery, it also grants the plaintiffs the opportunity to submit a certification before jurisdictional discovery commences. *See, e.g.*, *Miami Prod. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 177 (W.D.N.Y. 2020).

14   The defendants do not address the temporal proximity of the 2015 attack. (*See* ECF No. 54 at 11 n.8; ECF No. 56-1 at 9-10, 17-18; ECF No. 58-1 at 16.)

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.