UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

ESTATE OF EITAM HENKIN, et al.,                    :
                                                    :
                        Plaintiffs,                 :        Case No. 19-cv-05394 (BMC)
                                                    :
        -against-                                   :
                                                    :
KUVEYT TÜRK KATILIM BANKASI A.Ş.,                  :
                                                    :
                        Defendant.                  :
_____            :


**MOTION FOR RECONSIDERATION OF
MOTION TO DISMISS RULING (ECF Nos. 62 & 63)**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

PROCEDURAL BACKGROUND ............................................................................ 3

STANDARD OF REVIEW ...................................................................................... 6

ARGUMENT ........................................................................................................... 6

I.  The Court Erred by Holding that Plaintiffs Must Allege that Jurisdictionally Relevant Transactions Are Tied to the Attacks that Injured Plaintiffs. .......................................... 6

A.  The Relatedness Standard in JASTA Banking Cases Is Satisfied if the Bank "Provided Material Support to a Customer Linked to Hamas." .................................. 7

B.  Plaintiffs Need Not Allege a "Relationship Between Transfers and Attacks" to Plead Personal Jurisdiction ................................... 9

C.  The Court Misconstrues the Material Facts Alleged in the Controlling Antiterrorism Act Cases on Personal Jurisdiction ........................................ 11

1.  The Transactions Alleged in *Licci* Were Not Directly Linked to the Terrorist Attacks that Injured the Plaintiffs in that Case. ...................................... 12

2.  The Holy Land Foundation Transfer in *Spetner* Was Not Earmarked for Terrorism .............................................................. 16

3.  The Plaintiffs in *Daou* Complained About the Defendant's *Failure* to Transfer Funds to Its New York Correspondent Bank. ................................ 17

II.  This Court Made Impermissible Inferences from the Complaint and Omitted Material Allegations from Its Analysis. .................................. 18

III.  This Court Should Resolve Personal Jurisdiction After Conducting Discovery. ........... 20

CONCLUSION ....................................................................................................... 21

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Averbach v. Cairo Amman Bank*,
No. 19-cv-4, 2023 WL 5016884, (S.D.N.Y. June 30, 2023) ............................................. 10, 12

*Axginc Corp. v. Plaza Automall Ltd.*,
14 Civ. 4648 (ARR) (VMS), 2021 WL 1030228 (E.D.N.Y. Mar. 2, 2021) ............................ 10

*Axginc Corp. v. Plaza Automall, Ltd.*,
2021 WL 1026497 (E.D.N.Y. Mar. 17, 2021) ......................................................... 10

*Best Van Lines, Inc. v. Walker*,
490 F.3d 239 (2d Cir. 2007) ............................................................................. 7

*Daou v. BLC Bank, S.A.L.*,
42 F.4th 120 (2d Cir. 2022) ............................................................................. 17

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
495 F. Supp. 3d 144 (E.D.N.Y. 2020) ........................................................... *passim*

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ..................................................................................... 12, 13

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ............................................................................ 11, 12

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ........................................................... 10, 11, 13, 19

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust* (*Kolel*),
729 F.3d 99 (2d Cir. 2013) .............................................................................. 6

*Licci v Lebanese Can. Bank, SAL*,
20 N.Y.3d 327 (2012) ............................................................................... 8, 10, 13

*Licci v. Lebanese Canadian Bank*,
732 F.3d 161 (2d Cir. 2013) ..................................................................... 7, 8, 17

*Licci v. Lebanese Canadian Bank, SAL*,
673 F.3d 50 (2d Cir. 2012) ............................................................................ 7, 13

*Lichtenberg v. Besicorp Grp. Inc.*,
28 F. App'x 73 (2d Cir. 2002) ........................................................................... 6

*Miller v. Arab Bank, PLC*,
   372 F. Supp. 3d 33 (E.D.N.Y. 2019) .................................................................. 9

*Pall Corp. v. 3M Purification, Inc.*,
   Nos. 97-CV-7599 (PKC), 03-CV-92 (PKC), 2015 WL 5009254 (E.D.N.Y. Aug. 20, 2015).... 6

*Shrader v. CSX Transp., Inc.*,
   70 F.3d 255 (2d Cir. 1995) ............................................................................. 6

*Singer v. Bank of Palestine*,
   2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021) ..................................................... 21

*Spetner v. Palestine Inv. Bank*,
   70 F.4th 632 (2d Cir. 2023) ...................................................................... *passim*

*Strauss v. Crédit Lyonnais, S.A.*,
   175 F. Supp. 3d 3 (E.D.N.Y. 2016) .................................................................. 9

*Twitter v. Taamneh*,
   143 S. Ct. 1206 (2023) .................................................................................. 10

**Statutes**

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222,
   130 Stat. 852 (2016) ..................................................................................... 15

**Other Authorities**

U.S. Br., *Holy Land Found. For Relief & Dev. v. Ashcroft*, No. 02-5307, 2003 WL 25586055
   (D.C. Cir. Jan. 24, 2003) ............................................................................. 12

**Rules**

Local Civil Rule 6.3 ........................................................................................ 6

## INTRODUCTION

The Court should reconsider its decision (the "Dismissal Decision" or "Op.") dismissing this case (with prejudice) for lack of personal jurisdiction because a key part of the jurisdictional standard it applied is contrary to controlling law.

The Court found that Plaintiffs failed to meet two elements of personal jurisdiction:

> Plaintiffs allege no relationship between these transfers and the attacks at issue outside of IUG's connection to Hamas in general. Nor have plaintiffs connected the IUG Eurodollar transfers to New York, except to claim that "[t]he vast majority of Eurodollar funds transferred from bank to bank are cleared and settled in New York."

Op. at 6. This standard is incorrect.

Under controlling law, JASTA plaintiffs do not need to allege a direct connection between the transfers (or even the individual or entity receiving assistance) and the attacks at issue to prevail on the merits—let alone to sufficiently plead personal jurisdiction. As the Second Circuit recently explained, "[b]y … knowingly providing material support to *a customer linked to Hamas*, a designated Foreign Terrorist Organization, PIB [defendant Palestine Investment Bank] facilitated the attacks that are at the heart of this litigation. At this stage, we accept plaintiffs' allegations as true and find that they make out an articulable nexus between PIB's alleged conduct and their injuries." *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 643-44 (2d Cir. 2023) (emphasis added). Indeed, *Spetner* and the *Licci* family of cases involved similar jurisdictional allegations as those present here: transactions that foreign banks processed on behalf of customers that were separate legal entities from, but allegedly controlled by, an FTO where those transfers bore no facial indicia of violent terrorist purposes.

As the Court previously held in this case, Congress intended JASTA to "reach financial institutions providing indirect support through conduits." *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 158 (E.D.N.Y. 2020). Accordingly, "[i]t would therefore make

1

little sense to relieve a financial institution of liability for aiding and abetting Hamas simply because the terrorist organization intentionally raised funds through an intermediary, an alter ego, or a mere front to engage in violence." *Id.* Just as the Court previously held that two of the three "conduits" at issue—IUG and IHH—are a Hamas alter ego and a Hamas fundraiser, respectively, *id.* at 149-51, Plaintiffs here allege personal jurisdiction because Defendant transferred funds in U.S. dollars through New York on behalf of these Hamas conduits.

In rejecting personal jurisdiction in its most recent decision, the Court also overlooked material allegations in the operative complaint ("complaint" or "FAC") and made inferences in favor of *Defendant* which are impermissible at the motion to dismiss stage. This includes inferring IUG's "legitima[cy]" from the fact that it has produced Fulbright Scholars, *see* Op. at 2—omitting that the paragraph in the amended complaint cited for this fact explains that the United States State Department revoked the visas of those "scholars" after learning they were IUG students. The Dismissal Decision further speculates that transfers Defendant processed on behalf of IUG may have been intended "to pay IUG professors or one of the innumerable other legitimate costs" IUG incurred, Op. at 6, seemingly overlooking allegations that IUG's faculty included numerous Hamas leaders and that IUG science faculty members even helped develop Hamas weapons in IUG labs. Its "costs" included these weapons labs, storing weapons, and recruiting students as Hamas members. On a motion to dismiss, the Court is required to accept the plausible allegations of the complaint as true and make inferences in favor of Plaintiffs—as it did in denying Defendant's initial motion to dismiss. *See Henkin*, 495 F. Supp. 3d at 150 (noting that the "complaint alleges that, since the 1990s, IUG has been identified exclusively with Hamas and has served as a principal source for recruitment into the terrorist organization's ranks in Gaza, including the al-Qassam Brigades – Hamas' terrorist apparatus").

Finally, this Court held that discovery would be fruitless here given Plaintiffs' allegations, "particularly with respect to relatedness." Op. at 8. The Court previously stated, and Defendant previously agreed, that the sufficiency of those jurisdictional allegations would be the subject of full case discovery. Plaintiffs respectfully request that the Court reconsider and adopt its prior position by holding that personal jurisdiction will be the subject of merits discovery or, at minimum, that the Court order jurisdictional discovery.

## PROCEDURAL BACKGROUND

Plaintiffs filed their initial complaint on September 23, 2019, and this Court scheduled a pre-motion conference on Defendant's request to file a motion to dismiss on December 18, 2019.

At the conference, Defendant argued that "[w]hen a defendant has only limited contacts with the state, it may be appropriate to say that he will be subject to suit only if the plaintiff's injury was proximately caused by those contacts. Those contacts here are wire transactions so they have to show, I think under Second Circuit precedent, that the wire transactions that were cleared through New York proximately caused plaintiff's injury." Dec. 18, 2019, Hr'g Tr. at 8:21-25-9:1-3.

In response the Court stated:

A plaintiff doesn't have an obligation to allege personal jurisdiction in his complaint at all. I mean, the federal rules say you have to allege subject matter jurisdiction, you have to have a short and plain statement of claim, but you don't have to allege personal jurisdiction. That is the rule in New York State court. I don't think it's the rule in New York federal practice.

So what you are going to have to do in this motion is you are going to have to make a motion saying the complaint is inadequate on its face and then it will be up to the plaintiff to come up with affidavits and exhibits which show, in fact, there was extensive jurisdiction, extensive contacts, and it's very common on these motions for me to say, well, we're now into the substance of how many contacts were there and what was the money used for.

So, I generally – I have a choice. I can put off that motion until trial after full discovery has gone, I can deny it outright saying it's subject to discovery or I can

order preliminary discovery just on the jurisdictional issue, but what I'm not going to do is say – I mean, again, I can change my mind. You can change my mind. I haven't decided anything. What I am disinclined to do is say, well, the complaint on its face is inadequate as to personal jurisdiction and, therefore, it is dismissed, because I think personal jurisdiction requires a full factual record of the defendant's contacts and a plaintiff is entitled to that at some point before I throw the plaintiff out of court.

So, do you understand that by making that jurisdictional motion, you are going to likely, unless you persuade me otherwise, invite extensive discovery on that?

*Id.* at 11:9-25-12:1-13. The Court further suggested that Kuveyt Türk might wish to postpone presenting its arguments on the jurisdictional issue until after discovery has taken place and focus its brief on its other arguments in favor of dismissal. *Id.* at 18:20-19:10. As a result, when Defendant filed its motion to dismiss the initial complaint on February 13, 2020, its motion to dismiss on personal jurisdiction grounds (made to avoid the possibility of future waiver) stated that Defendant:

does not believe that it makes sense to have personal jurisdictional discovery separate from and in advance of merits Court is unwilling to dismiss this case prior to discovery. If the Court holds that dismissal is unwarranted after considering the allegations in the Complaint, Kuveyt Türk suggests that its personal jurisdiction defense should be reconsidered by the Court with all other applicable arguments at the time a summary judgment motion is filed.

Mem. in Supp. Mot. Dismiss Initial Compl., ECF No. 24-1, at 27-28.

Accordingly, when this Court denied Defendant's motion to dismiss on October 20, 2020, it did so "*except as to personal jurisdiction, the decision on which is deferred pending discovery.*" *Henkin*, 495 F. Supp. 3d at 161 (emphasis added). The Court denied the motion to dismiss for failure to state a claim and held that the parties "have agreed that, should the Court deny the motion, any discovery on personal jurisdiction should proceed simultaneously with any discovery on the merits. *I will therefore reserve decision on this issue and permit discovery since plaintiff may be able to establish jurisdiction when given an opportunity to develop a full factual record.*" *Id.* at

148 n.1 (emphasis added). Thereafter, on November 2, 2020, Defendant moved for permission to file a motion asking this Court to certify its order denying dismissal of Plaintiffs' claims for interlocutory appeal under 28 U.S.C. § 1292(b) and a related stay of discovery. The Court granted the motion on November 13, 2020, and certified a question for appeal (unrelated to personal jurisdiction), ECF No. 27. The Second Circuit granted the appeal by order dated March 4, 2021.

On September 29, 2022, the Second Circuit issued the following Order:

> In light of this Court's subsequent decisions in *Honickman v. BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021); *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021); and *Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2866 (2022), it is ordered that the appeal is dismissed as improvidently granted and remanded for further proceedings in the district court consistent with these decisions.

Order, *Estate of Eitam Henkin, et al. v. Kuveyt Türk Katilim Bankasi A.Ş.*, No. 21-513 (2d Cir. Sept. 29, 2022) (ECF No. 104). *See also* Mandate, *Henkin*, No. 19-cv-05394-BMC (E.D.N.Y. Oct. 20, 2022), ECF No. 47.[1]

Prompted by the Court, Plaintiffs filed an amended complaint, ECF No. 48, to account for the Second Circuit's clarification of the standard for pleading "general awareness" under JASTA in *Kaplan* and *Honickman*. Defendant again moved to dismiss, this time presenting its personal jurisdiction arguments without its prior agreement that, should the Court deny dismissal on Rule 12(b)(6) grounds, "its personal jurisdiction defense should be reconsidered by the Court with all other applicable arguments at the time a summary judgment motion is filed." *See supra* at 4 (citing Mem. in Supp. Mot. Dismiss Initial Compl., ECF No. 24-1, at 27-28).

On June 21, 2023, Plaintiffs advised the Court of the Second Circuit's June 16, 2023, decision in *Spetner v. Palestine Investment Bank*, 70 F.4th 632 (2d Cir. 2023), Defendant replied

---

[1] Notably, *none* of the three decisions cited in that order related to personal jurisdiction. Personal jurisdiction was established in *Weiss* and in *Kaplan*, which are the *Licci* set of cases under a different name; the defendant in *Honickman* did not contest personal jurisdiction.

on June 28, 2023, and this Court issued its decision granting Defendant's motion to dismiss for lack of personal jurisdiction and denying jurisdictional discovery on July 28, 2023. The Court entered judgment on July 31, 2023. This motion for reconsideration timely follows.

## STANDARD OF REVIEW

A motion for reconsideration pursuant to Local Civil Rule 6.3 "is the proper vehicle for bringing to the Court's attention matters it may have overlooked in its initial ruling or [O]rder." *Pall Corp. v. 3M Purification, Inc.*, Nos. 97-CV-7599 (PKC), 03-CV-92 (PKC), 2015 WL 5009254, at *1 (E.D.N.Y. Aug. 20, 2015). To prevail on a motion for reconsideration, "the moving party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion," *Lichtenberg v. Besicorp Grp. Inc.*, 28 F. App'x 73, 75 (2d Cir. 2002) (summary order) (citations and internal quotation marks omitted), and that those matters "might reasonably be expected to alter the conclusion reached by the [C]ourt," *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). The grounds for reconsideration include "the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust* (*Kolel*), 729 F.3d 99, 104 (2d Cir. 2013) (quotation marks and citation omitted). Plaintiffs respectfully submit that they are entitled to reconsideration of the Opinion in the respects summarized above because Plaintiffs have identified (a) controlling law which should alter the Court's conclusion in the Opinion and (b) the need to correct a clear error or prevent manifest injustice.

## ARGUMENT

### I. The Court Erred by Holding that Plaintiffs Must Allege that Jurisdictionally Relevant Transactions Are Tied to the Attacks that Injured Plaintiffs.

The Court stated an incorrect standard for satisfying the "relatedness" prong of pleading personal jurisdiction in JASTA cases because it required Plaintiffs to allege a "relationship

between these transfers and the attacks at issue outside of IUG's connection to Hamas in general."[2]

Op. at 6. *See id.* at 5 ("[Plaintiffs'] allegations are conclusory, vague, and fail to establish any connection between the attacks at issue and the Bank's correspondent bank accounts in New York."). The Court elaborated:

> Moreover, we have no idea whether those funds were used to pay IUG professors or one of the innumerable other legitimate costs incurred by a university or whether they were passed on to Hamas and used to fund terrorist attacks. It cannot be that any transfer of money made on behalf of an agent of a large organization is presumptively related to any action that any member of that organization takes. And even if this money did benefit Hamas, that weak and tangential relation to the specific attacks is "completely unmoored" from plaintiffs' claim.

*Id.* Under this view, knowingly providing financial services for "a 'Hamas Institution' … '[i]n the years immediately preceding the acts of terrorism at issue here,' … is far too tenuous" for personal jurisdiction purposes. *Id.* at 5-6. As explained below, this articulation of the relatedness standard for pleading personal jurisdiction is contrary to controlling law.

### A. The Relatedness Standard in JASTA Banking Cases Is Satisfied if the Bank "Provided Material Support to a Customer Linked to Hamas."

Under the due process test, relatedness is satisfied if "the correspondent account at issue is alleged to have been used as an instrument to achieve the very wrong alleged," which here is "the allegedly unlawful provision of banking services of which the wire transfers are a part…." *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 171 (2d Cir. 2013) ("*Licci IV*"); *see also Spetner*, 70 F.4th at 645-46 (same).[3] To allege that transfers were the instrument to achieve the wrong alleged

---

[2]  The term "relatedness" is the Second Circuit's useful shorthand for the requirement that there must be "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." Op. 4 (quoting *Licci IV*, 732 F.3d at 168-69). The other requirement, that Defendant transacted business within the forum, *i.e.*, purposeful availment, was not addressed in the Dismissal Decision and so is not discussed here.

[3]  Although the Court focused on the due process standard for relatedness, the corresponding New York "articulable nexus" standard is also instructive, which "simply ensures that the transaction is 'not completely unmoored' from the claim." *Spetner*, 70 F.4th at 644. Indeed, the Court here uses it as well. Op. 6, 7. This is because New York's personal jurisdiction standard is *narrower* than the due process one. *See Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60-61 (2d Cir. 2012) ("*Licci II*") ("The New York long-arm statute does not extend in all respects to the constitutional limits…."). *See also Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007).

in a JASTA case, it is sufficient to allege the transfers were made for an entity "linked" to an FTO: "By … knowingly providing material support to a customer linked to Hamas, a designated Foreign Terrorist Organization, PIB facilitated the attacks that are at the heart of this litigation. At this stage, we accept plaintiffs' allegations as true and find that they make out an articulable nexus between PIB's alleged conduct and their injuries." *Id.* at 643-44.

This rule obtains under both due process and the *narrower* New York rule for pleading a nexus between claim and in-forum conduct (*see* section I.B, below), which states:

> We have consistently held that causation is not required, and that the inquiry under the statute is relatively permissive. But these standards connote, at a minimum, a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim. In effect, the "arise-from" prong limits the broader "transaction-of-business" prong to confer jurisdiction only over those claims in some way arguably connected to the transaction.

*Licci v Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 339-340 (2012) ("*Licci III*") (citations omitted).

As explained in *Licci* and *Spetner*, a claim for injuries from a Hamas terrorist attack is clearly more than "in some way arguably connected to [a] transaction" the defendant processed for a customer linked to Hamas. Plaintiffs have clearly met this standard, because they alleged that:

> [O]n several occasions, the bank transferred at least hundreds of thousands of Eurodollars in the name of IUG, a Hamas-controlled institution — at the direction of a Hamas Minister, who also served as the university's Chairman of the Board of Trustees and another individual designated as an SDGT by the U.S. government for being a Hamas fundraiser.

*Henkin*, 495 F. Supp. 3d at 161.

This Court held that for *merits* purposes, "*[t]hese factual allegations are sufficient at this stage.*" *Id.* (emphasis added). Accordingly, discovery revealing the number and timing of transfers

---

As this Court acknowledged, the Second Circuit found that a case satisfying § 302 but not due process standards would be "rare," Op. at 3; moreover, the Second Circuit has held that "[i]ndeed, we have been pointed to no such decisions in this Circuit," *Licci IV*, 732 F.3d at 170. Nothing suggests this case is the singular outlier.

Defendant directed through New York to customers "linked to Hamas," *Spetner*, 70 F.4th at 643-44, would not be "fruitless."

## B. Plaintiffs Need Not Allege a "Relationship Between Transfers and Attacks" to Plead Personal Jurisdiction

No case requires Plaintiffs to plead the standard the Court established here: "a relationship between these transfers and the attacks at issue outside of [a customer's] connection to [the FTO] in general," Op. at 6, particularly at the pleading stage (and indeed, that holding is directly contrary to *Spetner*'s "customer linked to Hamas" requirement). That includes cases from *this Court*, which held in *Miller v. Arab Bank, PLC*, that "to establish personal jurisdiction, ATA claims 'do not necessarily [have to] correspond one-to-one with particular transfers, but instead *[may] rest upon the millions of dollars [d]efendant allegedly transferred to Hamas front organizations in close temporal proximity to the ... attacks in which Plaintiffs were injured*.'" *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 43 (E.D.N.Y. 2019) (Cogan, J.) (quoting *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 24 (E.D.N.Y. 2016)) (emphasis added).[4] Notwithstanding the difference in the dollar amounts pleaded here (before discovery), the jurisdictional premises of this case and *Miller* are the same. Yet, the *Miller* holding appears to be directly contrary to the holding in the Dismissal Decision that the "implied connection" between the attacks and the transfers for a "'Hamas Institution' … '[i]n the years immediately preceding the acts of terrorism at issue here,' … is far too tenuous" for personal jurisdiction purposes. Op. at 5-6.

---

[4] To be sure, the Plaintiffs in *Miller* (with the benefit of evidence presented at trial in *Linde v. Arab Bank, PLC*) alleged far more New York transfers than alleged here, but none of those transfers in *Miller* stated on their face they were for terrorism versus some more facially "legitimate" purpose. The plaintiffs in *Miller* (again relying on the evidentiary record from the *Linde* trial) did allege that the bank knew that some of the bank's (non-U.S.) payments were marked as relating to martyrs (including suicide bombers), but as the Court pointed out in this case, that proof came "after years of discovery and a fully contested trial," not at the pleading stage. *Henkin*, 495 F. Supp. 3d at 158. Moreover, the "martyr lists" in that case were not resident in the United States and formed no part of the jurisdictional analysis in that case.

Courts have also specifically rejected the requirement, relied upon by the Court here, that plaintiffs eliminate "innocent explanations" for transfers in order to plead personal jurisdiction. *See, e.g.*, *Axginc Corp. v. Plaza Automall Ltd.*, No. 14-cv-4648 (ARR) (VMS), 2021 WL 1030228, at *9 (E.D.N.Y. Mar. 2, 2021), *report and recommendation adopted*, 2021 WL 1026497 (E.D.N.Y. Mar. 17, 2021) (rejecting defendant's "innocent explanation" for a monetary transfer as a "merits argument" that did not defeat nexus requirement under New York law); *Averbach v. Cairo Amman Bank*, No. 19-cv-4, 2023 WL 5016884, at *7 (S.D.N.Y. June 30, 2023) (same). Thus, the court in *Strauss*, 175 F. Supp. 3d at 29 (relied upon by the Court in *Miller*), found personal jurisdiction *after* discovery despite documentary evidence showing the transfers bore facial indicia of "charitable" purposes.

Ultimately, Plaintiffs bear the burden of establishing that IUG and Defendant's other Hamas-affiliated customers were "closely intertwined" with Hamas's violent activities, *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860-61 (2d Cir. 2021), but that is not the required showing for the "relatedness" prong of personal jurisdiction. At this stage, "whether or not these allegations state a claim under the various statutes, the pleadings establish the 'articulable nexus' or 'substantial relationship' necessary for purposes of personal jurisdiction." *Licci III*, 20 N.Y.3d at 340. For example, whether the defendant actually knew of that customer's links to the FTO "is more properly raised in a Rule 12(b)(6) challenge." *Spetner*, 70 F.4th at 632.

Furthermore, requiring a "relationship between these transfers and the attacks" is not even required to establish liability, provided the Defendant's conduct in assisting the FTO that committed the attacks was "pervasive and systemic." *Twitter v. Taamneh*, 143 S. Ct. 1206, 1230 (2023). The Second Circuit has made clear that tracing transactions to specific attacks (though sufficient) is not necessary, especially at the pleading stage. *See Honickman v. BLOM Bank SAL*,

6 F.4th 487, 500 (2d Cir. 2021) ("Plaintiffs did not need to allege the funds 'actually went to Hamas.'"), which is directly contrary to this Court's faulting Plaintiffs for not alleging "whether [funds for IUG] were passed on to Hamas and used to fund terrorist attacks," Op. at 6. In fact, *Honickman* makes clear that a bank's "[customers] do not themselves need to be 'engaged in ... violent or terrorist acts.'" 6 F.4th at 499 n.15 (citation omitted). Moreover, the Court did not require pleading a "relationship between these transfers and the attacks" in its prior decision denying Defendant's motion to dismiss for failure to state a claim, finding allegations that "the bank transferred at least hundreds of thousands of Eurodollars in the name of IUG, a Hamas-controlled institution [] at the direction of" two Hamas members "sufficient at this stage." *See Henkin*, 495 F. Supp. 3d at 161.

No intervening case in the Second Circuit or this Court since that decision suggests a different result should obtain here, particularly regarding personal jurisdiction. Since that decision, the Second Circuit issued *Kaplan* and *Honickman*, which rejected narrower interpretations of JASTA's liability provisions, and *Spetner*, which emphasized that processing transactions for a "customer linked to Hamas" is sufficient for personal jurisdiction purposes. And in that time Plaintiffs have added many *more* allegations confirming that Defendant's customers "were so closely intertwined with [the FTO's] violent terrorist activities that one can reasonably infer that [defendant bank] was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which the rocket attacks were foreseeable." *Kaplan*, 999 F.3d at 860-61.

**C.     The Court Misconstrues the Material Facts Alleged in the Controlling Antiterrorism Act Cases on Personal Jurisdiction.**

As stated above, the Court's relatedness standard here is contrary to *Licci* and *Spetner*. That appears to be because the Court has misconstrued the factual allegations in those cases, reading

both of them to require banking services more closely related to specific attacks than are the services alleged here.

> **1.     The Transactions Alleged in *Licci* Were Not Directly Linked to the Terrorist Attacks that Injured the Plaintiffs in that Case.**

*First,* reviewing *Licci*, the Court here summarized:

> There, the complaint specifically alleged that the banks' [*sic*] wire transfers through correspondent accounts in New York "caused, enabled, and facilitated the terrorist rocket attacks in which the plaintiffs and their decedents were harmed and killed" and "substantially increased and facilitated H[e]zbollah's ability to plan, to prepare for and to carry out rocket attacks on civilians, including the" attacks at issue.

Op. at 6. The Court noted that these allegations were "arguably conclusory," *id.*, and, indeed, the *Licci* complaint merely asserts that:

> Hizbollah planned, made the preparations necessary for and carried out the Hizbollah Rocket Attacks utilizing funds received by Hizbollah as part of the Hizbollah Wire Transfers, and/ or utilizing funds received by Hizbollah in exchange or consideration for the Hizbollah Wire Transfers, and/ or utilizing funds that were freed up and/ or otherwise made available to Hizbollah as a result of the Hizbollah Wire Transfers, and/ or using funds drawn from a pool of funds created in part by the Hizbollah Wire Transfers.

Amended Complaint, *Licci*, No. 08-cv-07253-GBD (S.D.N.Y. filed Jan. 22, 2009), ECF No. 23, ¶ 117.

As a general proposition, Plaintiffs agree that funds provided to an FTO are fungible and therefore "free up" or "otherwise make available" funds that FTOs use to carry out terrorist attacks. This allegation echoes the U.S. government's long standing assertion that Hamas's charitable fundraising "free[s] other resources for use in terrorist operations." U.S. Br., *Holy Land Found. For Relief & Dev. v. Ashcroft*, No. 02-5307, 2003 WL 25586055 (D.C. Cir. Jan. 24, 2003).[5] But,

---

[5]     *Honickman* holds that fungibility of money is not alone sufficient to plead a bank's *general awareness*. *See* 6 F.4th at 498-99. *See also Averbach*, 2023 WL 5016884, at *9 (discussing *Honickman*'s fungibility ruling). But *Honickman* did not override the Supreme Court's finding that "[m]oney is fungible, and Congress logically concluded that money a terrorist group such as the PKK obtains using the techniques plaintiffs propose to teach could be redirected to funding the group's violent activities." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 37 (2010). *See*

in any event, the *Licci* transfers were no more related to the specific rocket attacks at issue there than the transfers are to the attacks at issue here. LCB's relevant customers were five Hezbollah-linked entities and individuals: a charity called "Shahid" or the "Martyrs Foundation," two financial institutions, and two officers of those financial institutions. *See Kaplan*, 999 F.3d at 849 (describing the customers). The Second Circuit and New York Court of Appeals appeared to focus entirely on Shahid: "LCB's use of its AmEx correspondent account to transfer money for Shahid provided money for Hizballah to carry out terrorist violence, including the 2006 rocket attacks." *Licci III*, 20 N.Y.3d at 340. (In any event, the other four customers are alleged to have played financial roles for Hezbollah but not a direct role in acts of terrorism).

The *Licci* plaintiffs did *not* allege that the transfers for Shahid (or any other customer) were in any way earmarked for terrorism. *See Licci* Amended Complaint, ¶¶ 53-54 ("Specifically, between 2004 and July 12, 2006 (and subsequently), Hizbollah made and received dozens of dollar wire transfers via defendants Amex Bank and LCB, totaling several million dollars …. All the Hizbollah Wire Transfers were made to, from and/or between the Hizbollah Accounts, via Amex Bank in New York."). Shahid is only described in the *Licci* decisions as "part of Hizbollah's financial arm." *Licci II*, 673 F.3d at 56.

While Shahid—which runs several hospitals in Lebanon—was also alleged to make suicide bombing incentive payments generally, *none* of those incentive payments were alleged to have flowed through New York or to have been directly *relevant to the Licci plaintiffs' injuries*. Indeed, the *Licci* plaintiffs were injured by rockets fired over Israel's border with Lebanon, not by suicide bombings. Aside from an "arguably conclusory" allegation that the transfers benefitted

---

*also id.* at 31 ("Money is fungible, and '[w]hen foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put.'") (citation omitted).

Hezbollah's violent activities, there is no suggestion that the transfers in *Licci* were more specifically tied to the injury-causing Hezbollah attacks there than the transfers alleged for IUG are to the Hamas attacks at issue here. As with funds made available to Shahid, funds made available to IUG "free other resources for use in terrorist operations." They also supported IUG's multifaceted role in Hamas's violent activities.

Indeed, IUG is equally central to Hamas's violent activities as the *Licci* customers were to Hezbollah. Whereas the *Licci* customers facilitated various forms of funding to Hezbollah and one paid martyr payments for (other) attacks, IUG provided Hamas (indeed, Qassam Brigades) recruits, provided employment to Hamas leaders, stored weapons, and developed and manufactured Hamas weapons in science labs—in addition to channeling funding. *See, e.g.*, FAC ¶ 363 ("The Qassam Brigades also used the IUG's facilities for its terrorist purposes, such as storing weapons in it; using the university's laboratories for developing and manufacturing weapons; and holding meetings of the Qassam Brigades' commanders and members in it. This was true both before and during the period relevant to this case."). *See also id.* ¶¶ 392 & n.77 (reporting that Israeli operations against Hamas targeted its "arms labs such as the well-known ones in the Islamic University of Gaza").

The Court also found that "the Licci complaint identified specific account numbers for Hezbollah-held accounts at the defendant banks," whereas Plaintiffs here "do not allege that Hamas itself held an account at Kuveyt Turk…." Op. at 7. As a result, the Court concluded that "the connection between Kuveyt Turk's contacts with New York and the claim is far weaker than that in *Licci*." *Id.* While the *Licci* complaint did list account numbers for Shahid, it did *not* allege that Hezbollah held any accounts at the defendant bank under the name "Hezbollah." As stated above, the customers in *Licci* were each (at least formally) separate legal entities from Hezbollah—

albeit acting under its control—just as IUG is a nominally separate legal entity from Hamas but is part of Hamas and acted under Hamas's control. The *Licci* entities were (and are) "integral" to Hezbollah, but so is IUG to Hamas: "'Hamas built this institution,' says Jameela El Shanty, a professor of education at the school and a newly elected Hamas member of the Palestinian parliament. 'The university presents the philosophy of Hamas. If you want to know what Hamas is, you can know it from the university.'" FAC ¶ 385. Arabic language press called IUG "'the main stronghold of Hamas in Gaza.'" *Id.*, ¶ 386. The United States Department of Justice identified IUG as one of the entities that were part of the HAMAS social infrastructure in the list of unindicted co-conspirators in the criminal case of the *United States v. Holy Land Foundation*, No. 04-cr-000240-L (N.D. Tex.). *Id.*, ¶ 390.

Reporting from Arab, Israeli, and foreign figures and media have called IUG "[t]he principal organization known to be affiliated with [Hamas]," *id.*, ¶ 355; "one of Hamas's leading institutions," *id.*, ¶ 379; "a principal source for Hamas recruitment" and "main stage" for recruitment, *id.*, ¶¶ 358-60; a Hamas "stronghold," *id.*, ¶¶ 220, 365, 369 & n.73, 380, 381, 386, 391 ("a notorious Hamas stronghold"), 395 ("a key military stronghold"); "a center of Hamas support," *id.*, ¶ 367; and a "Hamas institution," *id.*, ¶ 371. The Israeli military reported that "'[t]he Islamic University' in Gaza is a HAMAS stronghold and is in fact run by the movement." *Id.*, ¶ 381. Indeed, this Court, "accept[ing] all of plaintiffs' factual allegations as true," credited allegations that IUG is "a 'Hamas institution'" (and "deeply connected with Hamas"), a "'recruiting ground[]' for Hamas and has stored and developed weapons for Hamas in its facilities." Op. at 2. No JASTA case requires that the FTO hold an account in the FTO's proper name. In fact, Congress expressly found, when enacting JASTA, that FTOs "act[] through affiliated groups or individuals." JASTA § 2(a)(3).

Finally, there is no personal jurisdiction requirement that JASTA plaintiffs allege an account number for a customer in their pre-discovery pleadings. *See* Op. at 7. But if the Court were to reconsider its prior decision, Plaintiffs would amend their complaint with the Court's leave to, provide, *inter alia*, the following account number for IUG's U.S. dollar-denominated account at Defendant: 6127955-101, and its U.S. dollar-denominated account at Defendant for IHH: 99999-101.

### 2. The Holy Land Foundation Transfer in *Spetner* Was Not Earmarked for Terrorism.

*Second*, in reviewing *Spetner*, the Court wrote:

> There, the Court held that "relatedness" was satisfied when the defendant bank facilitated incentive payments to families of suicide bombers in the region where the suicide bombings occurred. These incentive payment checks, many of which included the word "martyr" in the memo line, "were cleared and settled in New York before reaching their ultimate recipients' accounts at other banks." *Spetner*, 70 F.4th at 638. Although there was no causal connection alleged, this is an example of a "strong" relationship that is not "completely unmoored from the claim." Here, however, allegations of transfers for the benefit of Hamas somewhere down the line are not nearly as related to the claim and do not satisfy this requirement.

Op. at 7.

However, these checks which (sometimes) bore the word "martyr" in the memo line related to only *one* of the *two* separate sets of transfers the Second Circuit credited for personal jurisdiction purposes. The other set consisted of funds transfers through New York for the Holy Land Foundation ("HLF"). Like IUG, HLF was a separate legal entity controlled by Hamas, and although it did distribute "martyr payments" in the Palestinian Territories, the New York transfers on behalf of HLF themselves did not indicate that they were for that purpose, nor were they earmarked specifically for that purpose elsewhere. Instead, it is simply "[b]y ... knowingly providing material support to a customer [i.e., HLF] linked to Hamas ... [that] PIB facilitated the attacks that are at the heart of this litigation. At this stage, we accept plaintiffs' allegations as true

and find that they make out an articulable nexus between PIB's alleged conduct and their injuries."

*Spetner*, 70 F.4th at 643-44.

> The Second Circuit further explained:

> PIB also argues that plaintiffs omit a "causal connection" between the funds transferred from HLF's Texas-based account to its account at PIB and plaintiffs' injuries from Hamas's terrorist operations. PIB's argument reflects a fundamental misunderstanding of the "arising from" requirement. The nexus element simply ensures that the transaction is "not completely unmoored" from the claim. Plaintiffs' allegations are sufficient: by directing the transfers to AJIB's account in New York, PIB used New York's financial system to facilitate financial support for Hamas that is the basis of certain of plaintiffs' claims.

*Id.* at 644.

### 3. The Plaintiffs in *Daou* Complained About the Defendant's *Failure* to Transfer Funds to Its New York Correspondent Bank.

Third, the Court also appears to misread *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120 (2d Cir. 2022), stating that that the complaint there lacked "'a single allegation that defendant used any actual, specific transaction through a New York correspondent account in the course of bringing about the injuries on which the claims are predicated.'" Op. at 7 (quoting *Daou*, 42 F.4th at 132). But *Daou* did not contain a requirement linking transfers to attacks. That case instead involved the defendant Lebanese banks' *refusal* to permit certain customers, including the plaintiffs, to withdraw their money from their accounts in Lebanon. There, New York wire transfers were not "a part" of the claim, *see Licci IV*, 732 F.3d at 171—the jurisdictional problem was that the plaintiffs' claim was predicated on the Defendant's *failure* to make transfers they requested, i.e., no relevant transfers through New York *occurred at all.* The plaintiffs were only able to allege that the banks made transfers through New York "*in the past* and likely would have done so if, counterfactually, they had transferred the Daous' money to the United States as promised." *Daou*, 42 F.4th at 131 (emphasis original). Here, as the Court acknowledged, Plaintiffs alleged that actual transfers through New York *did* occur, and during the appropriate time frame. Op. at 5-6.

## II. This Court Made Impermissible Inferences from the Complaint and Omitted Material Allegations from Its Analysis.

This Court also drew impermissible inferences in favor of Defendant about IUG's legitimacy (which, as stated above, is not a personal jurisdiction element). For example, in determining—contrary to Plaintiffs' allegations—that IUG is "partially operating as a legitimate educational institution," the Court stated that IUG "has even produced Fulbright scholars." Op. at 2. The Court presumably drew that fact from a quotation from a news article set forth in FAC ¶ 391 (as all facts at this stage must come from the complaint), but it omitted the rest of that paragraph which states that the U.S. State Department *revoked those students' visas upon learning they were from IUG*:

> On August 10, 2008, the *New York Post* reported that three Fulbright scholarships were awarded to individuals linked to the Islamic University of Gaza:
>
>> But the Israelis remained adamant about the [these] three, all of whom were either students or teaching assistants at the Islamic University of Gaza – a notorious Hamas stronghold.
>>
>> Now State has taken a closer look, and guess what? Washington has notified all three that "information has come to light that you may be inadmissible to the United States" – and their visas once again have been revoked.
>>
>> No one's saying precisely what that information is, but we can well imagine.
>>
>> Islamic University, after all, is where Gilad Shalit, an Israeli soldier whose kidnaping by Hamas helped fuel the 2006 Lebanon war, initially was held, according to Israel's largest newspaper. The paper also reported that a raid last year by Fatah forces at the university found a cache of rocket launchers and rifles.

FAC ¶ 391. Drawing inferences in favor of Plaintiffs, as the Court must, these allegations suggest that IUG was *not* viewed as a largely legitimate educational institution, but instead a "Hamas stronghold" that played a role in terrorist attacks, Hamas weapons storage, and whose students may even present security concerns for the United States. Indeed, the Court's first motion to

dismiss ruling credited these many connections to Hamas and described IUG as a "Hamas-controlled institution." *Henkin*, 495 F. Supp. 3d at 150-51.

Second, the Court assumed (in favor of Defendant) that payments made at the direction of Hamas leaders could have been to "pay IUG professors or one of the innumerable other legitimate costs incurred by a university." Op. at 6. Again, speculating as to the particular uses of (fungible) money transferred to a "customer linked to Hamas" is not part of the personal jurisdiction analysis. But even if it were, the Court draws the less plausible inference about an institution where, "[u]sing the university laboratories and their readily available chemicals and equipment [i.e., costs], *the members of the science faculty* provide knowhow for the development and production of weapons (such as long-range rockets)." FAC ¶ 393 (emphasis added).

Moreover, IUG professors have included Hamas co-founders Mahmoud Zahar, *id.*, ¶ 397 & n.81, Ahmed Bahar, *id.*, ¶ 370, and Ismail Abu Shanab, *id.*, ¶ 398, and Hamas leaders Abdel Aziz Rantisi, *id.*, ¶ 383, and Jameela El Shanty, *id.*, ¶ 385; A newspaper reported that Zahar (who is also the dean of the nursing school) "trains medical students and nurses by day and runs a terror organization by night." *Id.*, ¶ 364. Hamas's *supreme leader*, Ismail Haniyeh, was once appointed dean of IUG. *Id.* at ¶¶ 402, 397 n.81. Senior HAMAS figure Dr. Isma'il Radwan served as dean of students at the IUG. *Id.*, ¶ 359. Hamas leader Khalil Isma'il Ibrahim al-Hayya also lectured there. *Id.*, ¶ 400. *See also id.*, ¶ 379 (news reporting on "prominent members of Hamas's local political leadership, such as Dr. Mahmud Zahar and Dr. Abd al-Aziz Rantisi, on [IUG's] staff"). At a minimum, these allegations, taken as true at the pleading stage strongly suggest that IUG was "closely intertwined" with Hamas's violent activities, *see Kaplan*, 999 F.3d at 860-61, and that any funds transfers for this "notorious Hamas stronghold" are not unmoored from Plaintiffs' claims.

**III.    This Court Should Resolve Personal Jurisdiction After Conducting Discovery.**

As stated above, when this Court denied Defendant's prior motion to dismiss, it noted the parties' agreement that, "should the Court deny the motion, any discovery on personal jurisdiction should proceed simultaneously with any discovery on the merits." *Henkin*, 495 F. Supp. 3d at 148 n.1. It would "therefore reserve decision on this issue and permit discovery since plaintiff may be able to establish jurisdiction when given an opportunity to develop a full factual record." *Id.* Since then, neither the parties nor the Court have identified a material change in the law of personal jurisdiction relevant to JASTA claims, except the Second Circuit's decision in *Spetner*, which vacated a dismissal on personal jurisdiction grounds, strongly supporting the exercise of personal jurisdiction here. *See* Pls' Ltr, ECF No. 59.

However, in its latest order, the Court concluded that, "given the vague jurisdictional allegations, particularly with respect to relatedness, plaintiffs have failed to make a threshold showing and their jurisdictional allegations are insubstantial. For these reasons, jurisdictional discovery would likely be fruitless and amount to a 'fishing expedition.'" Op. at 8.

For the reasons given above, this Court's relatedness analysis is incorrect. That leaves as the only relevant deficiency Plaintiffs' allegations "connect[ing] the IUG Eurodollar transfers to New York," which merely "claim that '[t]he vast majority of Eurodollar funds transferred from bank to bank are cleared and settled in New York.'" *Id.* at 6. However, this Court noted the same allegation in its prior decision, 495 F. Supp. 3d at 151 n.6, but indicated that discovery should proceed if the Court denied the motion to dismiss for failure to state a claim.

Moreover, in an analogous case involving allegations that a bank maintained multiple accounts for customers linked to Hamas, ***including IUG***, a court in this District ordered jurisdictional discovery:

> Although somewhat bare, plaintiffs' complaint asserts that [Bank of Palestine] used correspondent bank accounts in New York to issue large volumes of payments in U.S. dollars to organizations affiliated with Hamas during the relevant period. Account numbers have been identified as well as the locations of these correspondent bank accounts. They have also pleaded, again in somewhat bare terms, that BOP knowingly assisted Hamas, the party responsible for the terrorist bombings against plaintiffs, by providing financial services and facilitating these dollar transfers.

*Singer v. Bank of Palestine*, 2021 WL 4205176, at *6-7 (E.D.N.Y. Apr. 30, 2021). Notably, that case did not require that transfers to "organizations affiliated with Hamas" also facially indicate that they are for terrorism or that they were not for those organizations' "legitimate" work. *See, e.g.*, *id.* ("To be sure, plaintiffs need not allege a specific transfer for each attack or trace specific dollars to specific attacks, especially at this stage of the litigation.") (citing *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433 (E.D.N.Y. 2013)). Plaintiffs respectfully request that this Court return to its original assessment in this case and resolve personal jurisdiction either after granting jurisdictional discovery or after all discovery is completed.

## CONCLUSION

For the reasons stated above, this Court should reconsider its decision dismissing this case.

Dated: August 14, 2023
Hackensack, New Jersey

Respectfully submitted,

/s/ Gary M. Osen
Gary M. Osen
Michael Radine
Ari Ungar
Dina Gielchinsky
Aaron Schlanger
OSEN LLC
190 Moore Street, Suite 272
Hackensack, NJ 07601
Tel: (201) 265-6400
Fax: (201) 265-0303

Michael A. Petrino (*pro hac vice*)
Jonathan E. Missner (*pro hac vice*)
STEIN MITCHELL BEATO & MISSNER LLP
2000 K St NW, Suite 600
Washington, D.C. 20006
Tel: (202) 737-7777
Fax: (202) 296-8312

Gavriel Mairone
Adora Sauer (*pro hac vice*)
MM~LAW LLC
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
Tel: (312) 253-7444
Fax: (312) 275-8590

*Counsel for Plaintiffs*