UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
ESTATE OF EITAM HENKIN, et al., :
: **MEMORANDUM DECISION AND**
Plaintiffs, : **ORDER**
:
- against - : 19-cv-5394 (BMC)
:
KUVEYT TÜRK KATILIM BANKASI A.Ş., :
:
Defendant. :
----------------------------------------------------------- X

**COGAN**, District Judge.

This case is before the Court on plaintiffs' motion for reconsideration of this Court's Memorandum Decision and Order granting defendant's motion to dismiss. The Court denied jurisdictional discovery, dismissed the case for lack of personal jurisdiction over defendant Kuveyt Turk Katilimi Bankas, A.S. ("Kuveyt Turk" or "the Bank"), and did not reach the merits of the Bank's Rule 12(b)(6) challenge to the complaint. Upon reconsideration, the Court's prior decision to dismiss for lack of personal jurisdiction is VACATED. Kuveyt Turk's Rule 12(b)(6) motion is denied. As to personal jurisdiction, decision on that issue is deferred pending discovery.

## SUMMARY OF AMENDED COMPLAINT

This action arises after multiple victims were killed in terrorist attacks in the West Bank in 2015 and 2018. Their estates, survivors, and heirs bring a claim under the civil liability provision of the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333, as amended by the Justice Against State Sponsors of Terrorism Act ("JASTA"), against Kuveyt Turk. Kuveyt Turk is a bank headquartered in Turkey with no presence in the United States. The Bank maintained

"correspondent" bank accounts in the United States with New York banks in order to make US-dollar denominated transfers.

Plaintiffs allege that Kuveyt Turk aided and abetted Hamas, the terrorist organization responsible for the killings. The Bank maintained foreign bank accounts for three parties relevant to this action: (1) the Foundation for Human Rights and Freedoms and Humanitarian Relief ("IHH"), Hamas's "primary Turkish fundraiser;" (2) Islamic University Gaza ("IUG"), a "Hamas institution;" and (3) Jihad Yaghmour, a "high-ranking HAMAS operative and convicted murderer." IHH, IUG, Yaghmour, and even the Republic of Turkey have strong ties to Hamas and have repeatedly supported the terrorist organization.

IHH is "the most prominent non-governmental fundraising support organization in Turkey for HAMAS." The organization is a member of the "Union of Good," which has funneled large sums of money to Hamas as a large part of the Hamas fundraising network. Hamas has publicly linked itself to the Union of Good through a 2007 speech given by then-Hamas leader Khalid Mishal publicly thanking the Union of Good for its support, the inclusion of a link to the Union of Good's fundraising page on Hamas' political bureau's official website, and through the Hamas leaders who have openly served as the Union of Good's executive leadership. In February 2002, Israel's Minister of Defense designated the Union of Good as "part of the Hamas organization or supporting it and strengthening its infrastructure." A few years later, in November 2008, the U.S. Treasury Department designated the Union of Good as an SDGT, describing how the organization

> acts as a broker for HAMAS by facilitating financial transfers between a web of charitable organizations – including several organizations previously designated under E.O. 13224 for providing support for Hamas – and Hamas-controlled organizations in the West Bank and Gaza. The primary purpose of this activity is to strengthen Hamas' political and military position in the West Bank and Gaza including by: (i) diverting charitable donations to support Hamas members and

2

>the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas.

Notably, the Treasury Department identified that "[f]unds raised by the Union of Good affiliates have been transferred to Hamas-managed organizations in the West Bank and Gaza" and also diverted to "compensate[] Hamas terrorists by providing payments to the families of suicide bombers."

In July 2008, the Israeli Defense Minister signed a public order banning IHH from Israel due to its membership in the Union of Good and its role as "part of Hamas's fundraising network." By December 2012, the Israeli government had designated IHH as a Terrorist Organization.

For several years before the attacks that injured plaintiffs, IHH was recognized in Turkey as an organization that provided financial support to Hamas. In 2009, IHH sent a Turkish representative named Ezat Shahin to open an IHH branch office in Gaza, where Shanin operated through known Hamas institutions to funnel thousands of U.S. dollars to the terrorist organization. Within a year, he was arrested by the Israel Security Agency and charged with funding terrorism and working with Hamas. The same year, IHH and other Turkish associations organized a public demonstration in Turkey's capital in support of Hamas.

In 2010, IHH purchased three ships, including a passenger ship called the Mavi Marmara, to participate in the so-called Gaza Freedom Flotilla and attempt to break Israel's naval blockade of Gaza. As was reported in American and Turkish media, Hamas leader Ismail Haniyeh made a public visit to the Mavi Marmara in Istanbul in "a show of solidarity." While attempting to circumvent Israel's blockade, the Mavi Marmara was boarded by Israeli commandos, who were quickly attacked by IHH supporters armed with knives, axes, chains, and clubs. The Israeli

boarding party responded with lethal force and several IHH supporters aboard the ship were killed. This deadly incident was widely covered by the international media.

IUG, although partially operating as a legitimate educational institution, is also deeply connected with Hamas. Since the 1990s, IUG has served as a principal source for recruitment into Hamas' ranks in Gaza, including the Qassam Brigades – Hamas' terrorist apparatus. A former dean of IUG referred to it as "the main stage for preparing, recruiting and directing the faithful among the young" and noted that "the IUG has sacrificed both men and woman shaheeds [martyrs]." This quote was posted on one of Hamas' official websites. On May 29, 2007, the U.S. Department of Justice publicly identified IUG as part of Hamas' social infrastructure by listing it as an unindicted co-conspirator in a federal criminal prosecution against a separate charity and its officers for allegedly providing millions of dollars to Hamas.[1] That same year, an Arabic newspaper, *al-Mustaqbal*, described the university as "the main stronghold of Hamas in Gaza."

Numerous Hamas leaders had close ties to IUG, further suggesting that the university was an alter ego of Hamas. Hamas' external (and supreme) leader, Ismail Haniyeh, once served as the dean of the university, gave a public address at IUG in January 2010, and was the university's commencement speaker in June 2013. As of 2014, IUG's supervisory board was headed by Abu-Ubayadah Khayri Hafiz Al-Agha ("Al-Agha Jr."), who was designated an SDGT by the U.S. Treasury Department for being "a senior Hamas financial officer involved in the investment, funding and money transfers for Hamas in Saudi Arabia." The U.S. Treasury Department made this designation before the attacks that injured plaintiffs. Another senior Hamas leader who served as the Minister for Telecommunications for the Hamas-run

---

[1] See United States v. Holy Land Foundation, No. 04-cr-240, Dkt. No. 656 (N.D. Tex. May 29, 2007).

4

government in Gaza, Jamal N. al-Khoudary, also served as the Chairman of the Board of Trustees of IUG from 1993 until 2014. Khalil Isma'il Ibrahim al-Hayya, the deputy of Hamas' senior leader in Gaza, Yahya Sinwar, lectured in Islamic Law at IUG, delivered a speech at IUG in September 2014, accepted a diploma for his "martyred" son, and visited IUG publicly with Haniyeh in 2017.

Just as with IHH, the Turkish media had reported on IUG's ties to Hamas before the attacks that injured plaintiffs. In 2007, a major Turkish newspaper reported that a weapons cache was uncovered on IUG's campus. The Qassam Brigades had long used IUG's facilities for terrorist activities and training, such as storing weapons on its campus, using its laboratories to develop and manufacture weapons, and using its rooms to hold meetings for Hamas leadership and operatives. In 2008, a Turkish news website described the university as "a cultural symbol of Hamas." In September 2015, the country's media reported that Al-Agha Jr., the head of IUG's supervisory board, had been designated as a senior Hamas fundraiser by the U.S. Treasury Department.

The third customer of Kuveyt Turk included in plaintiffs' amended complaint, Jihad Yaghmour, was sentenced by an Israeli military court to thirty years in prison for his participation in the high-profile 1994 kidnapping and killing of an Israeli soldier. Yaghmour was freed as part of a prisoner exchange between Israel and Hamas. Turkey accepted Yaghmour as one of eleven Palestinian prisoners the country took in as part of the prisoner exchange. Once released, Yaghmour remained in Turkey and served as Hamas' liaison with Turkish authorities.

Yaghmour's connection to Hamas was published in the Turkish media. For example, in September 2015, Turkish media reported that Yaghmour participated in the Turkish president's

5

political party meeting with a delegation of Hamas members that included Khalid Mishal and Mousa Abu Marzook, both designated SDGTs by the U.S. Treasury Department.

Kuveyt Turk employs several mechanisms to ostensibly avoid doing business with terrorist organizations. Its Risk, Control and Compliance Department claims it engages in (a) suspicious activity reporting, (b) transaction monitoring, (c) adverse information screening, and (d) sanctions compliance. The Bank further claims that its Anti-Money Laundering and Combating Finance of Terrorism Policy prohibits it from maintaining a business relationship with "[t]hose who are in the lists of supporters of money laundering and/or financing terrorism prepared by local regulators or international bodies and institutions" and that it monitors "the client and his/her activities while the client-relationship continues."

Despite these prophylactic measures, from at least 2012 through 2016, Kuveyt Turk maintained several bank accounts for Yaghmour, IHH, and IUG. Some of these accounts were Eurodollar accounts, which were used to transfer substantial funds through correspondent bank accounts in the United States.[2] In the years immediately preceding the acts of terrorism at issue here, Kuveyt Turk transferred at least hundreds of thousands of Eurodollars in the name of IUG, at the direction of two individuals mentioned above: Jamal N. al-Khoudary, the high-ranking Hamas official who served as the Chairman of IUG's Board of Trustees; and Al-Agha Jr., the U.S. designated SDGT identified as a Hamas fundraiser, who served as the head of IUG's supervisory board.

Plaintiffs claim that Kuveyt Turk, by maintaining multiple bank accounts for a notorious Hamas operative, Hamas' most prominent fundraiser in Turkey, and a key Hamas institution in

---

[2] Eurodollars are U.S. dollars that have been deposited with a banking institution located outside the United States. Citibank, N.A. v. Wells Fargo Asian Ltd., 495 U.S. 660, 662-63 (1990). The vast majority of Eurodollar transfers between banks are cleared and settled in New York.

6

Gaza, understood that it was providing vital financial services to the terrorist organization responsible for the deaths and injuries of plaintiffs. Plaintiffs thus bring a sole cause of action under JASTA against the Bank for allegedly aiding and abetting Hamas by knowingly providing substantial assistance to Hamas while the Bank was generally aware of its role in a continuing criminal enterprise from which terrorist and violent activities were a foreseeable consequence.

## PROCEDURAL HISTORY

Kuveyt Turk has moved to dismiss this action twice. On its first motion to dismiss, the Bank recognized that lack of personal jurisdiction as a basis for dismissal might best be decided after discovery on the issue. Kuveyt Turk explained that the parties had agreed that "this Court should first consider the Bank's arguments regarding failure to state a claim" and that "[i]f the Court holds that dismissal is unwarranted after considering the allegations in the Complaint," the Bank's "personal jurisdiction defense should be reconsidered by the Court with all other applicable arguments at the time a summary judgment motion is filed." The Court denied Kuveyt Turk's motion to dismiss, except as to personal jurisdiction, on which the Court deferred decision pending discovery in accordance with the parties' agreement.

Kuveyt Turk moved to file an interlocutory appeal with the Second Circuit, which this Court granted. The question presented to the Second Circuit was:

> Under the ATA/JASTA, what amount and type of media coverage, governmental pronouncements, and other publicly available information – if any – is sufficient circumstantial evidence for a plaintiff to plead a plausible claim that a financial institution was aware that, by providing financial services to a client, it was thereby playing a role in violent or life-endangering activities as an aider and abettor?

The Second Circuit granted Kuveyt Turk's motion to file an interlocutory appeal, but then dismissed it as improvidently granted and remanded the case in light of the Second Circuit's "subsequent decisions in Honickman v. BLOM Bank SAL, 6 F.4th 487 (2d Cir.

7

2021); Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842 (2d Cir. 2021); and Weiss v. Nat'l Westminster Bank, PLC., 993 F.3d 144 (2d Cir. 2021), cert. denied, 142 S. Ct. 2866 (2022)."

Plaintiffs filed an amended complaint and Kuveyt Turk filed its second motion to dismiss. Unlike the Bank's first motion to dismiss, this motion did not acknowledge the parties' agreement to delay a decision on personal jurisdiction until after discovery. Instead, Kuveyt Turk moved to dismiss plaintiffs' amended complaint based on lack of personal jurisdiction and failure to state a claim. Plaintiffs took issue with Kuveyt Turk's departure from the parties' prior agreement to defer the personal jurisdiction issue until after discovery, but nevertheless raised arguments in support of exercising personal jurisdiction over it. This Court granted the Bank's motion to dismiss for lack of personal jurisdiction.

In plaintiffs' motion for reconsideration now pending before the Court, plaintiffs assert that they have pled facts sufficient to establish personal jurisdiction. Plaintiffs also argue that this Court should "return to its original assessment in this case and resolve personal jurisdiction . . . after granting jurisdictional discovery."

Because this Court previously held that jurisdictional discovery was available to plaintiffs, and Kuveyt Turk consented to such an approach, plaintiffs' motion for reconsideration is granted.

## DISCUSSION

### I.     Motion for Reconsideration

To succeed on a motion for reconsideration, the moving party must "point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be

8

expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995) (citations omitted). "A motion for reconsideration should be granted only when the [moving party] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr., 729 F.3d 99, 104 (2d Cir. 2013) (internal quotation marks and quotation omitted). Motions for reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided." Shrader, 70 F.3d at 257.

In granting Kuveyt Turk's second motion to dismiss for lack of personal jurisdiction, the Court overlooked a crucial fact: the parties, as endorsed by this Court, had already agreed that plaintiffs would receive jurisdictional discovery before the Court would decide the question of personal jurisdiction. Kuveyt Turk did not waive its lack of personal jurisdiction defense, having raised the issue in both motions to dismiss. However, the Bank consented to this Court's exercise of jurisdiction over it for the purposes of, at least, jurisdictional discovery, by

> agree[ing] and respectfully submit[ting] that this Court should first consider the Bank's arguments regarding failure to state a claim, and agree[ing] that any discovery on personal jurisdiction should proceed simultaneously with any discovery on the merits in the event that this Court holds both that the case should not be dismissed for failure to state a claim and that it cannot rule on Defendant's Rule 12(b)(2) motion until discovery on that issue has taken place.

The Court did just that on Kuveyt Turk's first motion to dismiss: it denied the motion for failure to state a claim and deferred decision on the motion for lack of personal jurisdiction until after discovery. Thus, on Kuveyt Turk's second motion to dismiss the Court should have honored the parties' agreement and Kuveyt Turk's consent to a delay in determining the issue of personal jurisdiction by "first consider[ing] the Bank's arguments regarding failure to state a

9

claim" and then determining the personal jurisdiction question after plaintiffs received the benefit of discovery.

For the reasons stated in its prior order, the Court still has some skepticism that jurisdictional discovery will permit plaintiffs to establish personal jurisdiction over Kuveyt Turk. It is hard to see in the amended complaint "any relationship between the Bank's contacts with the United States and the terrorist attacks giving rise to their claim." Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S., No. 19-cv-5394, 2023 WL 4850999, at *3 (E.D.N.Y. July 28, 2023). It is unclear that any such connection exists. Nevertheless, the parties agreed to the resolution of this issue after plaintiffs receive jurisdictional discovery, which could uncover such a connection. The Court agreed to abide by this agreement, and should have continued to adhere to it in deciding defendant's second motion to dismiss by considering defendant's failure to state a claim arguments first, and deferring decision on the personal jurisdiction issue until after jurisdictional discovery.

In opposition to plaintiffs' motion for reconsideration, Kuveyt Turk states that the parties' agreement to reserve the personal jurisdiction issue until after discovery was only reached for purposes of the Bank's first motion to dismiss. Kuveyt Turk asserts that the parties did not enter into any such agreement in connection with its second motion to dismiss. That is not at all clear, and in any event, this Court adopted the parties' initial agreement as its own procedure for adjudicating this case in denying the Bank's first motion to dismiss. It would be unjust to deprive plaintiffs of the discovery opportunity this Court previously saw fit to grant, especially without first considering whether plaintiffs survive the Bank's alternative ground for dismissal, that is, failure to state a claim.

10

To prevent manifest injustice, the Court finds that reconsideration of its Memorandum Decision and Order is warranted. In compliance with the parties' agreement and the Court's previous approach, the Court first considers the Bank's arguments regarding plaintiffs' failure to state a claim. The Court does so, following the Second Circuit's instructions, "[i]n light of [the Second Circuit's] decisions in Honickman v. BLOM Bank SAL, 6 F.4th 487 (2d Cir. 2021); Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842 (2d Cir. 2021); and Weiss v. Nat'l Westminster Bank, PLC., 993 F.3d 144 (2d Cir. 2021), cert. denied, 142 S. Ct. 2866 (2022)." Finding Kuveyt Turk's failure to state a claim arguments unavailing, the Court will grant jurisdictional discovery, to proceed simultaneously with discovery on the merits, and decide the issue of personal jurisdiction at the summary judgment stage.

## II.   Motion to Dismiss for Failure to State a Claim

### A.   Legal Standard

Plaintiffs' amended complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," id. (citation omitted), in this case aiding and abetting a foreign terrorist organization in violation of 18 U.S.C. § 2333(d).

To be liable for aiding and abetting a foreign terrorist organization, "(1) the party whom the defendant aids must perform a wrongful act that causes an injury, (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, and (3) the defendant must knowingly and substantially assist the principal violation." Kaplan, 999 F.3d at 856 (quoting Halberstam v. Welch, 705 F.2d 472, 477

11

(D.C. Cir. 1983)) (internal quotation marks omitted).  There is no dispute here as to the first element of liability, that the party whom the Bank allegedly aided, Hamas, committed the attacks that injured and killed plaintiffs.

For the second prong, the general awareness requirement, plaintiffs must allege (1) that the "Bank was aware of [its customers'] connections with Hamas before the relevant attacks; and (2) the [customers] were so closely intertwined with Hamas's violent terrorist activities that one can reasonably infer [the Bank] was generally aware of its role in unlawful activities from which the attacks were foreseeable." Honickman, 6 F.4th at 501 (quoting Kaplan, 999 F.3d at 860) (cleaned up).  The Bank's customers "do not themselves need to be engaged in violent or terrorist acts." Id. at 499 n.15 (cleaned up).  Addressing the question presented to the Second Circuit on interlocutory appeal from this Court's Memorandum Decision and Order denying Kuveyt Turk's first motion to dismiss, "[a] complaint is allowed to contain general allegations as to a defendant's knowledge . . . because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind. . . .  However, plaintiffs are required to include allegations of the facts or events they claim give rise to an inference of knowledge." Kaplan, 999 F.3d at 864 (internal quotation marks, quotation, and citations omitted).

The third requirement for aiding and abetting liability, that the defendant knowingly and substantially assist the principal violation, requires that the principal violation "be foreseeable from the illegal activity that the defendant assisted; knowing and substantial assistance to the actual injury-causing act – here, Hamas's attacks – is unnecessary." Honickman, 6 F.4th at 499 (citing Halberstam, 705 F.2d at 477).  To qualify as "substantial" assistance, courts consider the following six factors: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to

12

the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." Kaplan, 999 F.3d at 856 (quotation omitted). "[T]hese factors are 'variables,' . . . and the absence of some need not be dispositive." Id. (quoting Halberstam, 705 F.2d at 483).

As the Second Circuit directed in remanding Kuveyt Turk's first motion to dismiss, this Court's analysis is guided by the Second Circuit's decisions in Weiss, 993 F.3d 144; Kaplan, 999 F.3d 842; and Honickman, 6 F.4th 487. In Weiss, the Second Circuit affirmed the district court's denial of the plaintiffs' motion to amend their complaint to assert, *inter alia*, a JASTA aiding and abetting claim. Because the parties had already engaged in "some 10 years of pretrial discovery," but "the record was [still] insufficient to show that the bank had been knowingly providing substantial assistance to . . . Hamas or that it was generally aware that it was playing a role in Hamas's acts of terrorism," plaintiffs' amendment of their complaint would have been futile. Kaplan, 999 F.3d at 861 (citing Weiss, 993 F.3d at 163-67). This insufficient record "included evidence that plaintiffs' expert said the charities to which [the bank] transferred funds as instructed by Interpal [(its customer)] performed charitable work and that, as plaintiffs admitted, Interpal did not indicate to [the bank] that the transfers were for any terroristic purpose; and plaintiffs proffered no evidence that the charities funded terrorist attacks or recruited persons to carry out such attacks." Weiss, 993 F.3d at 166.

In Kaplan, the Second Circuit reversed the district court's granting of the defendant's motion to dismiss because plaintiffs plausibly alleged the elements of a JASTA aiding and abetting claim. Specifically, in satisfying the general awareness element, plaintiffs included statements connecting the defendant bank's customers to Hezbollah that "were alleged to have been made in a particular time period (i.e., [leading up to the attack]), and were specific as to the status of the speaker . . . , the circumstances in which the statements were made . . . , and the

13

other specific media in which they were made." Kaplan, 999 F.3d at 864. Plaintiffs also alleged that one of the customer's "connection with Hizbollah was reported in several English-language publications" and that "Hizbollah has been a terrorist organization headquartered in Lebanon since 1982," the same country the bank was headquartered in. Id. at 864-65. The bank's "provision to Hizbollah affiliates, beginning no later than 2003, of banking services that permitted the laundering of money – nearly half a million dollars or dollar equivalents per day – in violation of regulatory restrictions meant to hinder the ability of FTOs to carry out terrorist attacks" satisfied the knowing and substantial assistance requirement.

Lastly, in Honickman, plaintiffs did not plead sufficient facts to survive a motion to dismiss for failure to state a claim. As to general awareness, plaintiffs pled that one of the defendant bank's customers was designated by the U.S. Treasury Department as an SDGT, but only after the attacks at issue in the case; another customer was designated as an SDGT, but only after the bank stopped providing banking services to that customer; and the last customer was designated by Israel as being "part of the Hamas organization or supporting it and strengthening its infrastructure" in 2002, but the complaint did not allege the timeframe in which the customer had an account with the defendant bank. Complaint, Honickman v. BLOM Bank SAL, 432 F. Supp. 3d 253 (E.D.N.Y. 2020), ECF No. 1. Plaintiffs' remaining allegations similarly failed to connect the bank's customers to Hamas before the attacks that injured the plaintiffs and while the bank was providing financial services to the customers. Because of "[t]he complaint's failure to support a reasonable inference that [the defendant bank] knew of the Three Customers' links to Hamas," the Second Circuit did not address whether the other elements of JASTA aiding and abetting liability were met. Honickman, 6 F.4th at 503.

### B. General Awareness

Applying these standards to the instant case, plaintiffs' amended complaint contains sufficient factual content, accepted as true, to allow the Court to conclude both that Kuveyt Turk was aware of its customers' connections to Hamas before the attacks that injured and killed plaintiffs and that the customers "were so closely intertwined with Hamas's violent terrorist activities that one can reasonably infer [the Bank] was generally aware of its role in unlawful activities from which the attacks were foreseeable." Id. at 501 (quoting Kaplan, 999 F.3d at 860) (cleaned up).

Plaintiffs plead, as to IHH, that it was the most prominent non-governmental fundraiser for Hamas in Turkey, that it was a member of the Union of Good, an organization designated by the U.S. Treasury Department as an SDGT in 2008 due to its financial support of Hamas; that IHH was designated as a Terrorist Organization by the Israeli government in 2012 for its support provided to Hamas; that IHH organized a public demonstration in Turkey's capital in support of Hamas in 2009; and that it participated and used violence in the internationally-covered Gaza Freedom Flotilla in 2010, supported by Hamas. Plaintiffs' amended complaint specifies the time period, sources, and circumstances of these facts, which more than plausibly allege that IHH's connection to Hamas and close integration with Hamas' violent terrorist activities were "openly, publicly, and repeatedly" acknowledged by Hamas, English-language publications, Turkish publications, as well as multiple governments. Kaplan, 999 F.3d at 864 (citation omitted). This information was public while Kuveyt Turk continued to provide banking services to IHH and before the attacks that killed and injured plaintiffs.

Given this widespread, public knowledge of IHH's connectedness with Hamas' violent terrorist activities and Kuveyt Turk's mechanisms in place to avoid doing business with terrorist

15

organizations, it "defies credulity that [the defendant] did not know that something illegal was afoot." Halberstam, 705 F.2d at 486. Just as in Halberstam, which Congress "specified as the proper legal framework for assessing" JASTA aiding and abetting claims, Kaplan, 999 F.3d at 845, the Bank "knew about and acted to support [a criminal's] illicit enterprise," which "establish[es] that [the Bank] had a general awareness of [its] role in a continuing criminal enterprise." Halberstam, 705 F.2d at 488.

Regarding IUG, plaintiffs plead that, as reported on Hamas' websites, IUG served as a principal source for recruitment into Hamas, including the Qassam Brigades, Hamas' terrorist apparatus; Arabic media described IUG as "the main stronghold of Hamas in Gaza;" the U.S. Department of Justice listed IUG as an unindicted co-conspirator in a federal criminal prosecution involving the alleged provision of millions of dollars to Hamas; Hamas leaders ran or had positions of power at IUG; and Turkish news described IUG as "a cultural symbol of Hamas" and reported on a weapons cache uncovered on IUG's campus. These are the types of allegations the Second Circuit has deemed sufficient to allege a bank's knowledge of its customer's connections with a terrorist organization and the bank's awareness that, through its provision of banking services to that customer, it was playing a role in the terrorist organization's terrorist activities. See Kaplan, 999 F.3d at 864-65.

IUG's storage of weapons for Hamas, recruitment of martyrs and other terrorists for Hamas, and its role as a co-conspirator in providing millions of dollars to Hamas were sufficiently common, public knowledge that plaintiffs plausibly allege that IUG was "so closely intertwined with Hamas's violent terrorist activities that one can reasonable infer [Kuveyt Turk] was generally aware of its role in unlawful activities from which the attacks were foreseeable." Honickman, 6 F.4th at 501 (quoting Kaplan, 999 F.3d at 860) (cleaned up). Unlike in Weiss,

16

993 F.3d at 166, in which the plaintiffs "proffered no evidence that the charities funded terrorist attacks or recruited persons to carry out such attacks," both allegations are plausibly made here.

Finally, plaintiffs plead that Jihad Yaghmour, formerly convicted by an Israeli military court for his participation in kidnapping and killing an Israeli soldier, served as Hamas' liaison with Turkish authorities. Plaintiffs also plead that this role was publicly known – for example, in September 2015, Turkish media reported on Yaghmour's participation in meetings with Hamas members including two designated SDGTs by the U.S. Treasury Department. As with IHH and IUG, plaintiffs specify the time period, source, and circumstances of statements and events tying Yaghmour to Hamas and its violent terrorist activities.

Given plaintiffs' thorough pleadings connecting Kuveyt Turk's customers to Hamas, and specifically Hamas' violent terrorist activities, this is not a situation in which the Bank's customers were "*believed by some* to have links" to Hamas, which would be insufficient to establish the Bank's general awareness of its customers' connections with Hamas. Siegel v. HSBC N. Am. Holdings, Inc., 933 F.3d 217, 224 (2d Cir. 2019) (emphasis added). National governments, English-language newspapers, Turkish media, and Hamas itself publicized these connections. The fact that IHH and IUG also had "legitimate roles" in addition to their close ties to Hamas' violent terrorist activities does not change this analysis, because it does not undermine the widespread, public information that these organizations were connected to Hamas' violent terrorist activities.

Nor does the fact that some of plaintiffs' sources connecting Jihad Yaghmour to Hamas postdate the alleged provision of financial services, the attacks, or both. In contrast with the complaint in Honickman, plaintiffs also include sufficient facts that *predate* the attacks and coincide with the Bank's provision of financial services to Yaghmour such that plaintiffs

17

plausibly allege an inference of the Bank's knowledge. Disregarding allegations that are irrelevant to the Bank's state of mind "at the time that it provided banking services," Honickman, 6 F.4th at 501, plaintiffs still plead sufficient facts to satisfy the general awareness requirement on a motion to dismiss for failure to state a claim.

Kuveyt Turk argues that, if plaintiffs' amended complaint is deemed sufficient to satisfy the general awareness requirement, this Court would be making an "unworkable" assumption that "Kuveyt Turk was aware of the allegedly public documents Plaintiffs cite" and that "the Bank was required to accept them as gospel." The Bank's argument that these assumptions are "unworkable" is foreclosed by the Second Circuit: "as we explained in Kaplan, Plaintiffs did not need to allege that [the] Bank knew or should have known of the public sources at the pleading stage. . . . Such a requirement at this juncture would be too exacting." Honickman, 6 F.4th at 501 (citing Kaplan, 999 F.3d at 865). What is required is what plaintiffs have pled here: "allegations of the facts or events [plaintiffs] claim give rise to an inference of knowledge." Kaplan, 999 F.3d at 864. Accordingly, plaintiffs have pled sufficient facts to satisfy the general awareness requirement for imposing JASTA aiding and abetting liability.

### C. Knowing and Substantial Assistance

Plaintiffs also plausibly plead that Kuveyt Turk knowingly and substantially assisted the principal violations at issue in this lawsuit. "The knowledge component is satisfied if the defendant knowingly – and not innocently or inadvertently – gave assistance." Honickman, 6 F.4th at 499-500 (quoting Kaplan, 999 F.3d at 864) (cleaned up). The court in Halberstam "did not require [the defendant] to 'know' anything more about [the criminal's] unlawful activities than what she knew for the general awareness element." Honickman, 6 F.4th at 500. As discussed above, plaintiffs have sufficiently alleged the general awareness element to survive a

motion to dismiss, and in light of Kuveyt Turk's mechanisms in place to avoid doing business with terrorist organizations, plaintiffs have plausibly alleged that the Bank knowingly assisted Hamas.

Considering the six factors relevant to the substantial assistance inquiry, "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance," Kaplan, 999 F.3d at 856 (quotation omitted), plaintiffs meet this requirement as well. For many years before and even during the time of the terrorist attacks, Kuveyt Turk continued to provide banking services to three customers with many known connections to Hamas' violent terrorist activities, one of which was identified as a terrorist organization and a member of the Union of Good by the Israeli government. Despite this designation, the Bank continued to do business with IHH, further demonstrating the bank's state of mind and close relationship with an entity known as a conduit for Hamas. And, on several occasions, the Bank transferred at least hundreds of thousands of Eurodollars in the name of IUG, a Hamas-controlled institution – at the direction of a Hamas Minister, who also served as the university's Chairman of the Board of Trustees and another individual designated as an SDGT by the U.S. government for being a Hamas fundraiser. These factual allegations are sufficient at this stage.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for reconsideration is granted. The Court's decision dismissing the case for lack of personal jurisdiction is VACATED. Defendant's motion to dismiss is denied, except as to the personal jurisdiction issue, the decision on which is deferred pending discovery. The Court further orders that jurisdictional discovery will proceed

19

simultaneously with discovery on the merits. Within fourteen days of entry of this Order, the parties shall submit a proposed discovery schedule.

**SO ORDERED.**

                                                   *Brian M. Cogan*
                                                                       U.S.D.J.

Dated: Brooklyn, New York
        January 15, 2025