UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- X

ESTATE OF EITAM HENKIN, et al.,    :

                                          :    **<u>MEMORANDUM DECISION AND</u>**

                      Plaintiffs,     :    **<u>ORDER</u>**

                                            :

       - against -         :    19-cv-5394 (BMC)

                                          :

KUVEYT TÜRK KATILIM BANKASI A.Ş.,  :

                                          :

                      Defendant.     :

------------------------------------------------------- X

**COGAN**, District Judge.

      This case is before the Court on defendant Kuveyt Turk Katilim Bankasi A.S.'s ("Kuveyt Turk" or "the Bank") motion for reconsideration of this Court's January 16, 2025 Memorandum Decision and Order (the "January decision") which (1) vacated the Court's prior decision to dismiss for lack of personal jurisdiction and (2) denied Kuveyt Turk's motion to dismiss, except as to personal jurisdiction, the decision on which the Court deferred pending discovery. The facts of this case are set out in full in the Court's January decision, familiarity with which is assumed. <u>See</u> <u>Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S.</u>, No. 19-cv-5394, 2025 WL 218830 (E.D.N.Y. Jan. 16, 2025). In short, plaintiffs (survivors and estates and heirs of victims killed in Hamas terrorist attacks) allege that Kuveyt Turk aided and abetted Hamas in committing the terrorist attacks that injured them by knowingly providing substantial assistance to Hamas while being generally aware of its role in a continuing criminal enterprise from which terrorist and violent activities were a foreseeable consequence, in violation of the Justice Against State Sponsors of Terrorism Act ("JASTA").

      Kuveyt Turk requests that this Court reconsider its January decision, or in the alternative certify the decision for interlocutory appeal or stay the case pending the Second Circuit's

decision in <u>Wildman v. Deutsche Bank Aktiengesellschaft</u>, No. 23-132 (2d Cir. argued March 13, 2024).

## LEGAL STANDARD

As stated in the Court's January decision, to succeed on a motion for reconsideration, the moving party must "point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." <u>Shrader v. CSX Transp., Inc.</u>, 70 F.3d 255, 257 (2d Cir. 1995) (citations omitted). "A motion for reconsideration should be granted only when the [moving party] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." <u>Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.</u>, 729 F.3d 99, 104 (2d Cir. 2013) (internal quotation marks and quotation omitted). Motions for reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided." <u>Shrader</u>, 70 F.3d at 257.

"[A] movant bears a substantial burden when urging the district court to depart from binding Second Circuit precedent on the basis of an asserted intervening change in controlling law. For a district court to ignore binding Second Circuit precedent, it is not enough for a Supreme Court decision to be in tension with that precedent." <u>King v. Habib Bank Ltd.</u>, No. 20-cv-4322, 2023 WL 8355359, at *1 (S.D.N.Y. Dec. 1, 2023), <u>motion to certify appeal denied</u>, 2024 WL 3761821 (S.D.N.Y. Jan. 2, 2024) (citations omitted). "[T]he district court must follow Second Circuit precedent 'unless and until it is overruled in a precedential opinion by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit.'" <u>Id.</u> (quoting <u>United States v. Diaz</u>, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015) (citation omitted).

District courts have discretion to certify an issue for interlocutory appeal where the issue involves "a controlling question of law as to which there is substantial ground for difference of opinion and [where] an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).  Because "[i]t is a basic tenet of federal law to delay appellate review until a final judgment has been entered," Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 865 (2d Cir. 1996) (citation omitted), § 1292(b) "must be strictly construed" and "only exceptional circumstances" will justify a departure from the final judgment rule. Wausau Bus. Ins. Co. v. Turner Constr. Co., 151 F. Supp. 2d 488, 491 (S.D.N.Y. 2001) (internal quotations marks and citations omitted).  The Second Circuit has repeatedly emphasized that district courts must "exercise great care in making a § 1292(b) certification."  Id. at 491-92 (citing Westwood Pharm., Inc. v. Nat'l Fuel Gas Dist. Corp., 964 F.2d 85, 89 (2d Cir. 1992)). Accordingly, a district court may deny certification even where the statutory criteria are met. See Republic of Colombia v. Diageo N. Am. Inc., 619 F. Supp. 2d 7, 9 (E.D.N.Y. 2007) (citation omitted).

"It is within the sound discretion of a district court to enter a stay pending the outcome of independent proceedings that are likely to affect a case on its calendar."  Trikona Advisors Ltd. v. Kai-Lin Chuang, No. 12-cv-3886, 2013 WL 1182960, at *2 (E.D.N.Y. March 20, 2013) (citing Goldstein v. Time Warner N.Y. City Cable Grp., 3 F. Supp. 2d 423, 437-38 (S.D.N.Y. 1998)).  In considering a motion to stay, "it is the moving party's burden to establish 'a clear case of hardship or inequity in being required to go forward.'"  Id. (quoting Landis v. N. Am. Co., 299 U.S. 248, 255 (1936)).  Courts take into account "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests

3

of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest" in deciding whether to stay a case.  Id. at *2-3.

## DISCUSSION

For the reasons that follow, I deny Kuveyt Turk's request that this Court reconsider its January decision, certify the decision for interlocutory appeal, or stay the case pending the Second Circuit's decision in Wildman.

### I.    Motion for Reconsideration

Kuveyt Turk asserts that the Second Circuit precedents on which this Court relied in its January decision have been "directly overruled" by the Supreme Court's decision in Twitter, Inc. v. Taamneh, 598 U.S. 471 (2023), which, "[p]roperly applied, . . . compels dismissal."  In reality, Twitter largely aligns with Second Circuit precedent and does not dictate a different outcome of this Court's January decision.

In Twitter, the Supreme Court held that plaintiffs failed to state a claim against social media companies for aiding and abetting the Islamic State of Iraq and Syria ("ISIS") in carrying out a terrorist attack in Istanbul, Turkey, which killed thirty-nine people, including a U.S. national.  The basis for plaintiffs' claim was that the defendant social media companies "failed to detect and remove . . . ISIS-related" content on their sites, and in allowing ISIS videos to play with advertisements, "reviewed and approved at least some ISIS videos [to play with advertisements], thereby sharing some amount of revenue with ISIS."  Id. at 481-82.  The Supreme Court ordered the dismissal of the plaintiffs' complaint because they did not sufficiently plead that the "defendants gave such knowing and substantial assistance to ISIS that they culpably participated in the [terrorist] attack."  Id. at 497.  As to the first allegation – that defendants failed to detect and remove ISIS-related content – because plaintiffs only pled "mere

4

passive nonfeasance," they would have had to make "a strong showing of assistance and scienter" as to the relevant terrorist attack, which plaintiffs did not do.  Id. at 500.  As to the second allegation, asserted against Google as the owner of YouTube, that the site reviewed and approved ISIS-related videos "as part of its revenue-sharing system and thereby shared advertising revenue with ISIS," the plaintiffs failed to state a claim because their complaint was "devoid of any allegations about how much assistance Google provided and therefore did not plausibly allege that Google's assistance was substantial."  Id. at 505 (internal quotation marks and quotation omitted).

In reaching these holdings, the Supreme Court affirmed "Halberstam's common-law 'framework' as the primary guidepost for understanding the scope of § 2333(d)(2)," the statute that imposes liability for aiding and abetting under JASTA.  Twitter, 598 U.S. at 493; accord. Henkin, 2025 WL 218830, at *6.[1]  The Supreme Court also recognized that Halberstam's six factors for considering whether a defendant has provided "substantial assistance"[2] are properly viewed as aiding "courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor."  Twitter, 598 U.S. at 504; accord. Henkin, 2025 WL 218830, at *6, *9 ("These factors are 'variables,' and the absence of some need not be dispositive." (quoting Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 856 (2d Cir. 2021) (cleaned up))).  And just as this Court explained that liability for aiding and abetting under

---

[1] "First, 'the party whom the defendant aids must perform a wrongful act that causes an injury.' . . .  Second, 'the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance.' . . .  And, third, 'the defendant must knowingly and substantially assist the principal violation.'"  Twitter, 598 U.S. at 486 (quoting Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983)).

[2] These six factors are "(1) the nature of the act assisted, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the principal tort, (4) the defendant's relation to the tortious actor, (5) the defendant's state of mind, and (6) the duration of the assistance given."  Twitter, 598 U.S. at 486 (quoting Halberstam, 705 F.2d at 488) (internal quotation marks omitted).

JASTA requires a defendant to commit acts "not innocently or inadvertently," id. (quoting Honickman v. BLOM Bank SAL, 6 F.4th 487 (2d Cir. 2021)), the Supreme Court confirmed that "[t]he phrase 'aids and abets' in § 2333(d)(2), as elsewhere, refers to a conscious, voluntary, and culpable participation in another's wrongdoing." Twitter, 598 U.S. at 493. I thus reject Kuveyt Turk's assertion that "Twitter fundamentally changed the pleading standard for JASTA aiding-and-abetting claims." See King, 2023 WL 8355359 at *2-3 (finding that "the holdings in Twitter largely align with the [relevant] Second Circuit precedent").

Nor does the Supreme Court's decision in Twitter alter this Court's conclusions in its January decision, as is required to grant a motion for reconsideration. Shrader, 70 F.3d at 257. In affirming the applicability of the three elements of aiding and abetting liability established in Halberstam, the Supreme Court explained that "the knowledge and substantial assistance components should be considered relative to one another as part of a single inquiry designed to capture conscious and culpable conduct" and that "the 'knowing' part of that inquiry is therefore designed to capture the defendants' state of mind with respect to their actions and the tortious conduct (even if not always the particular terrorist act), not the same general awareness that defines Halberstam's second element." Twitter, 598 U.S. at 503-04 (internal quotation marks and quotation omitted). The "fundamental question of aiding-and-abetting liability" is thus "Did defendants consciously, voluntarily, and culpably participate in or support the relevant wrongdoing?" Id. at 505. Unlike the outcome in Twitter, as the Court explained in its January decision, the answer in this case is yes.

Although the Supreme Court clarified that "the 'knowing' sub-element" of the knowing and substantial assistance requirement is "not the same general awareness that defines Halberstam's second element," this Court's holding that plaintiffs plausibly alleged the knowing

6

sub-element as to Kuveyt Turk did not rely solely on its "general awareness" analysis.  The
January decision explicitly held that "in light of Kuveyt Turk's mechanisms in place to avoid
doing business with terrorist organizations, plaintiffs have plausibly alleged that the Bank
knowingly assisted Hamas." Henkin, 2025 WL 218830, at *9.  Recognizing that Kuveyt Turk
purports to "engage[ ] in (a) suspicious activity reporting, (b) transaction monitoring, (c) adverse
information screening, and (d) sanctions compliance," and monitors "the client and his/her
activities while the client-relationship continues" because it is prohibited "from maintaining a
business relationship with those who are in the lists of supporters of money laundering and/or
financing terrorism prepared by local regulators or international bodies and institutions," Henkin,
2025 WL 218830, at *3, this Court concluded, in accordance with the Supreme Court's decision
in Twitter, that plaintiffs plausibly alleged that it was the Bank's state of mind to aid and abet
Hamas.  "The analysis of 'knowing' assistance as assistance that is neither innocent nor
inadvertent goes beyond the 'general awareness' analysis, and is consistent with Twitter's
holding that the 'knowing' requirement is 'designed to capture the defendants' state of mind with
respect to their actions and the tortious conduct.'" King, 2023 WL 8355359, at *3 (quoting
Twitter, 598 U.S. at 504).

In addition, this Court analyzed the knowing and substantial assistance components
"relative to one another as part of a single inquiry . . . to capture conscious and culpable
conduct," Twitter, 498 U.S. at 503-04 (internal quotation marks and quotation omitted), finding
the knowing and substantial requirement met because:

> For many years before and even during the time of the terrorist attacks, Kuveyt
> Turk continued to provide banking services to three customers with many known
> connections to Hamas' violent terrorist activities, one of which was identified as a
> terrorist organization and a member of the Union of Good[3] by the Israeli

---

[3] The Union of Good was designated as a Specially Designated Global Terrorist ("SDGT") by the U.S. Treasury
Department in November 2008, well before the terrorist attacks at issue here.  Henkin, 2025 WL 218830, at *1.

government. Despite this designation, the Bank continued to do business with IHH, further demonstrating the bank's state of mind and close relationship with an entity known as a conduit for Hamas. And, on several occasions, the Bank transferred at least hundreds of thousands of Eurodollars in the name of IUG, a Hamas-controlled institution – at the direction of a Hamas Minister, who also served as the university's Chairman of the Board of Trustees and another individual designated as an SDGT by the U.S. government for being a Hamas fundraiser.

Henkin, 2025 WL 218830, at *9. Considering the Bank's state of mind, which (as plausibly alleged by plaintiffs) was to support Hamas' terrorist activities, and the substantial nature of the support provided, as well as the other elements of JASTA liability which are not at issue here, this Court found that plaintiffs plausibly alleged aiding and abetting liability as to Kuveyt Turk.

Twitter's requirement that a "defendant must have aided and abetted (by knowingly providing substantial assistance) another person in the commission of the actionable wrong – here, an act of international terrorism," 598 U.S. at 495 (citations omitted), is also met here, as the Court explained in its January decision. Although "it is not enough . . . that a defendant have given substantial assistance of a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it," "people who aid and abet a tort can be held liable for other torts that were 'a foreseeable risk' of the intended tort," and "even more remote support can still constitute aiding and abetting in the right case." Id. at 495-96 (quotation omitted). For example, a defendant may be liable for aiding and abetting a "group's actions or perhaps some definable subset of terrorist acts" by providing "routine services" "in an unusual way" such that provision of those routine services "constitute[s] aiding and abetting a foreseeable terror attack." Id. at 502 (citation omitted).

Such is the situation that plaintiffs alleged in their amended complaint, as this Court recognized in its January decision. Despite Kuveyt Turk's robust monitoring and compliance systems, which plausibly alerted the Bank to its customers' involvement in Hamas' terrorist

8

activities, Kuveyt Turk had a "close relationship" with entities known as conduits for Hamas. Henkin, 2025 WL 218830, at *9. Kuveyt Turk's argument that its "steps to ensure that terrorist groups do not use the Bank's services" are evidence of its lack of intent "to advance Hamas's terrorist ends" is not persuasive. The existence of Kuveyt Turk's policies and systems in place to prevent supporting terrorists with banking services solidifies the Bank's culpability (as alleged by plaintiffs). In active defiance of the regulations Kuveyt Turk claims to comply with, it still maintained accounts, and facilitated the transfer of at least hundreds of thousands of Eurodollars, for entities and people that the Bank knew were closely intertwined with Hamas' violent terrorist activities, including at the direction of an individual designated as an SDGT by the U.S. Treasury Department. This is not to say, of course, that every time a bank fails to prevent the use of its services for criminal activity, it may be liable for aiding and abetting those crimes. Here, Kuveyt Turk provided routine services in such an unusual and prolonged manner as to impose liability, as the Supreme Court recognized was possible in Twitter. 598 U.S. at 502 (citation omitted).

As opposed to the "mere passive nonfeasance" of the defendants in Twitter that did nothing more than fail to stop ISIS from using their platforms which were "generally available to the internet-using public," 598 U.S. at 499-500, plaintiffs here have plausibly alleged facts more analogous to those the Twitter plaintiffs raised against Google: as Google approved ISIS-related videos "and thereby shared advertising revenue with ISIS," id. at 505, Kuveyt Turk opened bank accounts for entities deeply intertwined with Hamas' terrorist activities and facilitated the transfer of hundreds of thousands of dollars for them, including at the direction of a designated SDGT. And plaintiffs here do not suffer from the defect in pleading that doomed the Twitter plaintiffs' claim against Google. Plaintiffs' amended complaint is not "devoid of any allegations about how much assistance [Kuveyt Turk] provided." Id. Plaintiffs allege that Kuveyt Turk

9

"transferred at least hundreds of thousands of Eurodollars in the name of IUG, a Hamas-controlled institution," and that the Bank provided banking services to "the most prominent non-governmental fundraiser for Hamas in Turkey." Henkin, 2025 WL 218830, at *7, *9. These allegations plausibly allege that Kuveyt Turk's assistance was substantial, enabling Hamas to access the funds it needed to carry out terrorist attacks.

Plaintiffs' allegations are not of "passive act[ions]" that the Supreme Court explained should not form the basis of liability "lest . . . banks become liable for all of their customers' crimes by virtue of carrying out routine transactions." Id. at 491. As the case the Supreme Court cites for this proposition explains, "inaction . . . may provide a predicate for liability where the plaintiff demonstrates that the aider-abettor [c]onsciously intended to assist in the perpetration of a wrongful act." Monsen v. Consolidated Dressed Beef Co., 579 F.2d 793, 800 (3d Cir. 1978) (citations omitted). Such is the case here, to the extent Kuveyt Turk's actions can be characterized as "inaction."

Kuveyt Turk did not passively carry out "routine transactions." For years, it knowingly and intentionally provided banking services and facilitated the transfer of hundreds of thousands of dollars for Hamas to assist Hamas' terrorist attacks, violating its own procedures to do so. Given the length and close nature of the relationship alleged between the Bank and the relevant customers, this is not a situation in which the Bank negligently or accidentally failed to comply with its policies, or had an "arm's-length relationship" with Hamas. Twitter, 598 U.S. at 504. Nor can Kuveyt Turk claim the "undisputed lack of intent to support [Hamas]" that defendants were able to assert as to ISIS in Twitter. Id. Rather, the Bank's actions enabling Hamas to access the funds necessary to commit terrorist attacks comprised "participation in another's

10

wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor."  Id.

Finally, Kuveyt Turk asserts that this Court should reconsider its decision to allow the parties to exchange discovery before deciding on Kuveyt Turk's personal jurisdiction defense. But the Bank does not provide any "intervening change of controlling law, . . . new evidence, . . . clear error or . . . manifest injustice" in this Court's discretionary decisions to defer the personal jurisdiction issue until after jurisdictional discovery and to grant simultaneous discovery on personal jurisdiction and the merits.  Kolel Beth Yechiel Mechil of Tartikov, Inc., 729 F.3d at 104 (internal quotation marks and quotation omitted).  Kuveyt Turk argues that because it "did not reach *any* agreement with Plaintiffs regarding its motion to dismiss the *amended* complaint," (emphasis in original), it would not be unjust to rule on the Bank's personal jurisdiction defense before allowing discovery.  The Court explicitly acknowledged this argument in its January decision ("Kuveyt Turk asserts that the parties did not enter into any such agreement in connection with its second motion to dismiss," Henkin, 2025 WL 218830, at 5), but concluded that because "this Court adopted the parties' initial agreement as its own procedure for adjudicating this case in denying the Bank's first motion to dismiss[, i]t would be unjust to deprive plaintiffs of the discovery opportunity this Court previously saw fit to grant."  Id.  As the Court has already noted in its February 3, 2025 order directing the parties to conduct jurisdictional discovery and discovery on the merits simultaneously, Kuveyt Turk has not raised any new or overlooked issues that would impact the outcome of that portion of the January decision either.

Because Kuveyt Turk does not point to "controlling decisions or data that . . . might reasonably be expected to alter the conclusion reached by the court," Shrader, 70 F.3d at 257 (citations omitted), its motion for reconsideration is denied.

## II.    Motion for Leave to Bring Interlocutory Appeal

Kuveyt Turk's request that, in the alternative, this Court certify its January decision for interlocutory appeal is also denied.  The Bank identifies as a question for certification the extent to which this Court "must, or can, apply Twitter."  As discussed above, I find that this Court's January decision comports with the standard for JASTA aiding and abetting liability articulated in Twitter.  Thus, this case does not present a question as to the applicability of Twitter, much less "a controlling question of law as to which there is substantial ground for difference of opinion [or a question where] an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  In other words, because the January decision properly denied Kuveyt Turk's motion to dismiss under both the standards articulated by Second Circuit precedent and the Supreme Court in Twitter (to any extent that the two standards differ), an answer to the question of "the extent to which [this Court] must, or can, apply Twitter" will not control the outcome of this case or advance the termination of this litigation.

## III.    Motion to Stay Proceedings

In requesting that the Court stay this case pending the Second Circuit's decision in Wildman, Kuveyt Turk has not established "a clear case of hardship or inequity in being required to go forward.'"  Trikona, 2013 WL 1182960, at *2 (quoting Landis, 299 U.S. at 255).

Considering first "the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed," id. at *3, the interests of plaintiffs in proceeding with this litigation are quite high.  Given this Court's conclusion that its January decision comports with both Second Circuit precedent and the Supreme Court's opinion in Twitter, the Second Circuit's application of Twitter to a completely different case, concerning different litigants and different facts, is not likely to resolve or even apply to plaintiffs' claims here.  All a stay would accomplish is further delay.

For the same reason, Kuveyt Turk will not be prejudiced by the denial of a stay: this case will not be impacted by the Second Circuit's application, in an unrelated case, of Supreme Court precedent with which the January decision already comports.  To note just a few differences between the cases that make it even more likely the Second Circuit's decision in Wildman will impact this case: in Wildman, plaintiffs alleged a complex "Afghanistan-to-Russia Opium Pipeline" through which the Taliban, al-Qaeda, Iran, and the Russian mafia participated in a "Syndicate-Russian Mafia Opium Joint Venture."  Wildman v. Deutsche Bank Aktiengesellschaft, No. 21-cv-4400, 2022 WL 17993076, at *5 (E.D.N.Y. Dec. 29, 2022). According to plaintiffs, "Defendants worked with a number of . . . individuals and organizations who were, sometimes tangentially, involved with the 'international criminal network'" that then in turn supported the U.S.-designated Foreign Terrorist Organizations that committed the terrorist attacks that injured plaintiffs.  Id. at *3.  Thus, the banks' customers in Wildman are much further removed from the terrorist organizations that committed the relevant terrorist attacks.  The district court, in dismissing plaintiffs' complaint in the decision that is now pending on appeal, found that plaintiffs did not even satisfy the general awareness requirement that "any Defendant was ever aware of [the alleged] connections" between the defendants' customers and

terrorist organizations.  Id. at *5.  Given these factual and legal differences between the cases, it is highly unlikely that this case will be impacted by the Second Circuit's eventual ruling in Wildman.

Furthermore, because the Second Circuit's decision in Wildman is not likely to affect the decision in this case, the interests of the courts, "persons not parties to the civil litigation" and "the public interest" are also not served by a stay.  Trikona, 2013 WL 1182960, at *3.

## CONCLUSION

For the foregoing reasons, Kuveyt Turk's motion for reconsideration, or in the alternative for certification of an interlocutory appeal or a stay pending the Second Circuit's decision in Wildman, is denied.

**SO ORDERED.**

_Brian M. Cogan_
_____
U.S.D.J.

Dated:  Brooklyn, New York
        February 25, 2025

14